# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :
 :
V. :
 :
HERNAN GIRALDO-SERNA, :  Criminal No. 04-114-1 (RBW)
  a/k/a "El Viejo," :
  a/k/a "El Patron," :  **FILED UNDER SEAL**
  a/k/a "Don Hernán," :
 :
Defendant. :

## RESPONSE OF THE UNITED STATES
## TO ORDER TO SHOW CAUSE IN CONNECTION WITH MOTION
## TO ENFORCE RIGHTS UNDER THE CRIME VICTIMS' RIGHTS ACT

### PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in response to the Court's

Order to Show Cause why Zulma Natazha Chacin De Henriquez, Nadiezhda Natazha Henriquez

Chacin, and Bela Henriquez Chacin (hereinafter, collectively, "the movants"), as representatives

of their deceased husband and father, respectively, Julio Eustacio Henriquez Santamaria (Mr.

Henriquez), should not be granted rights under the Crime Victims' Rights Act ("CVRA"), 18

U.S.C. § 3771 (2006).  Although Mr. Henriquez was the victim of a crime in Colombia, pursuant

to the statutory definition set forth in the CVRA, he is not a "crime victim" of the federal offense

charged by the United States in this case.  The record in this case, including the undocketed

pleading that the movants submitted to the Court, does not support granting CVRA rights, and

this Court therefore should deny the movants' request.

## OVERVIEW OF THE LAW

Enacted as Title I of the Justice for All Act of 2004, Pub. L. No. 108-405, § 102(a), 118

Stat. 2260 (Oct. 30, 2004), the CVRA extends an array of substantive and procedural rights to

individuals who qualify as "crime victims" as defined in the statute.  Those rights include the

following:

> (1) The right to be reasonably protected from the accused; (2) The right to
> reasonable, accurate, and timely notice of any public court proceeding, or any
> parole proceeding, involving the crime or of any release or escape of the accused;
> (3) The right not to be excluded from any such public court proceeding, unless the
> court, after receiving clear and convincing evidence, determines that testimony by
> the victim would be materially altered if the victim heard other testimony at that
> proceeding; (4) The right to be reasonably heard at any public proceeding in the
> district court involving release, plea, sentencing, or any parole proceeding; (5) The
> reasonable right to confer with the attorney for the Government in the case; (6)
> The right to full and timely restitution as provided in law; (7) The right to
> proceedings free from unreasonable delay; (8) The right to be treated with fairness
> and with respect for the victim's dignity and privacy.

18 U.S.C. § 3771(a).  A "crime victim" is "a person directly and proximately harmed as a result

of the commission of a Federal offense," 18 U.S.C. § 3771(e), but if the victim is deceased,

incapacitated, incompetent, or under the age of 18, then the victim's "family members * * * may

assume the crime victim's rights." *Id.*

In defining "crime victims" eligible to demand rights, the CVRA, in pertinent part, limits

the rights to those "directly and proximately harmed as a result of the commission of a Federal

offense." 18 U.S.C. § 3771(e).  Pursuant to the statutory definition, a person must be directly

harmed as a result of the offense and the harm must be proximate to the crime.  *See In re*

*McNulty*, 597 F.3d 344, 350-51 (6th Cir. 2010); *In re Rendon Galvis*, 564 F.3d 170, 175-76 (2nd

Cir. 2009) (finding that admission by defendant, an extradited former paramilitary leader of the

Autodefenses Unidas de Colombia (AUC), of general responsibility for ordering a death not sufficiently direct and proximate to the charged conduct); *see also In re Antrobus*, 519 F.3d 1123, 1126 (10th Cir. 2008) (Tymkovich, J., concurring) (applying "traditional rules of 'but-for' and 'proximate' causation" in the CVRA context, and noting that "direct" harm "encompasses a 'but-for' causation notion" that is different from proximate harm).

The CVRA explicitly limits in-court participation of eligible crime victims to "public" proceedings. 18 U.S.C. § 3771(a). This limitation is necessary to ensure that promoting victims' rights to participate in criminal proceedings does not undermine prosecutorial discretion to, among other goals, maintain confidentiality regarding ongoing criminal investigations. Accordingly, Congress, at 18 U.S.C. § 3771(d)(6), expressly stated that "Nothing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction."

## STATEMENT OF FACTS

### I.    The Charges, Extradition, and Court Proceedings

On March 2, 2005, a federal grand jury in the District of Columbia returned a second superseding indictment, under seal, charging the defendant, along with multiple co-conspirators, with one count (Count One) of conspiring, from in or about 1994 up to and including the date of the indictment, to manufacture and distribute five kilograms or more of cocaine intending that such substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959, 960, and 963, and aiding and abetting that offense, in violation of Title 18, United States Code, Section 2. The second superseding indictment also included a forfeiture allegation naming the defendant and his co-conspirators. The indictment did not allege

or reference the killing of Mr. Henriquez or any other acts of violence taken in furtherance of the charged narcotics-trafficking conspiracy. In fact, the charges included no allegations that the defendant or his co-conspirators engaged in any acts of violence or force either in Colombia or the United States.

On May 13, 2008, the defendant was extradited from Colombia to the United States, along with 14 other former AUC leaders, including Diego Fernando Murillo-Bejarano, a/k/a "Don Berna," who was prosecuted in the Southern District of New York.[1] The defendant appeared before Magistrate Judge Alan Kay on May 15, 2008, and entered a plea of not guilty.[2] On May 21, 2008, Magistrate Judge Kay ordered the defendant detained pending trial.

## II.    Prior Request Under the CVRA

Through letters dated July 17, 2008, sent to, among others, Kenneth Blanco, then-Chief of the Department of Justice's (DOJ) Narcotic and Dangerous Drug Section (NDDS), the DOJ component prosecuting the defendant in this case, one of the movants' attorneys and other representatives of Colombian victims demanded that DOJ ensure that the rights of Colombian victims of the extradited AUC defendants were fully protected under the CVRA. The letter pertaining to the movants sought to ascertain the specific steps that DOJ was taking to implement its CVRA obligations, and it alleged generally both the defendant's responsibility for Mr. Henriquez's death, as well as a purported causal link between the defendant's drug-trafficking

---

[1] The extradited AUC defendants have been, and are being, prosecuted in various federal district courts, including in the District of Columbia, the Middle District of Florida, the Southern District of Florida, the Southern District of Texas, and the Southern District of New York.

[2] On May 15, 2008, upon the defendant's extradition to the United States, the second superseding indictment was unsealed.

activities and that death.  Because the letter and other letters received by DOJ in connection with

the prosecution of extradited former AUC leaders affected criminal cases in multiple federal

districts, DOJ coordinated a single response.  That response letter, dated December 19, 2008, and

signed by now Deputy Assistant Attorney General (DAAG) Kenneth Blanco, was sent to the

movants' attorney, among others, and explicitly referenced the prosecution of the defendant in

this case.  In that letter ("DAAG letter"), DOJ stated that, after careful review, it did not consider

the individuals discussed in the letters to be crime victims as defined by the CVRA.  In pertinent

part, the DAAG letter explained:

> The CVRA defines a "victim" as "a person directly and proximately
> harmed as a result of the commission of a Federal offense or an
> offense in the District of Columbia." 18 U.S.C. § 3771(e).  That
> definition does not automatically confer victim status on anyone who
> may have been harmed by any and all criminal acts of a particular
> defendant.  Rather, the definition required the victim to be "directly
> and proximately harmed" as a result of a "Federal offense or an
> offense in the District of Columbia."  United States courts that have
> construed the definition of "victim" under the CVRA have looked to
> the offenses at issue in a particular prosecution . . . The AUC
> defendants have been charged with numerous offenses that relate
> primarily to narcotics trafficking.  The harm sustained by the
> individuals in Colombia, as described in your letter, does not directly
> and proximately result from the charged offenses in this case.

The DAAG letter also explained that DOJ had been "working closely with Colombian officials to

establish a procedure that will provide Colombian officials with access to any of the AUC

defendants who is participating in the Colombian Justice and Peace process."[3]  Consistent with

---

[3]  The Colombian Justice and Peace Law, enacted in 2005 as a paramilitary
"demobilization" act, was intended to encourage the leaders of the AUC and other paramilitary
organizations to cease all criminal activity, surrender contraband and weapons, confess all
crimes, including human rights violations, forfeit illegally-obtained assets, and make victim
reparations in exchange for limited amnesty, i.e., a maximum sentence of eights years in jail and
the forfeiture of property.  Despite the movants' assertions (Henriquez Mot. 1, 5), the extradition

the DAAG letter, the Government in this case has advised the defendant's counsel of the interest

of Colombian authorities in continuing the Justice and Peace Law proceedings involving the

defendant.

## III.   Communications with Movants

By letter dated June 22, 2009 (although DOJ had responded previously through the

December 19, 2008 DAAG letter to the earlier request to enforce the CVRA rights of Mr.

Henriquez and other similarly situated victims), the movants again sought to assert CVRA rights.

The June 22, 2009 letter to NDDS prosecutors alleged additional facts about the killing of Mr.

Henriquez and the defendant's purported role in the killing.  Since the receipt of that letter, which

the Government considered to be a request for reconsideration of the decision previously

communicated to the movants' representatives by the DAAG letter, the Government has received

---

of the defendant and other former AUC leaders has not prevented their participation in the
ongoing Colombian Justice and Peace Law process.  In fact, United States and Colombian
authorities have devoted, and continue to devote, significant Government resources to arrange
and conduct interviews, depositions, confessions, and related proceedings in connection with
numerous Colombian criminal cases against the extradited AUC leaders.  Consequently, the
United States Government has facilitated, rather than prevented, the participation of the
extradited AUC defendants in that process, and contrary to the claims of the movants (Henriquez
Mot. 5-6), the United States has not "foreclosed any hope for justice and restitution."  Moreover,
the defendant remains within the Justice and Peace process.  The movants remain eligible for
restitution under the Colombian Justice and Peace Law as well as through the ordinary criminal
restitution process in Colombia based on the defendant's criminal conviction for the forced
disappearance of Mr. Henriquez.  Due to confidentiality and security concerns, the Government
is not able to disclose any communications with the defendant in this case regarding his
participation in the Colombian Justice and Peace process, or the scheduling of any Justice and
Peace proceedings.  Contrary to the movants' assertions (Henriquez Mot. 5), the extradition of
the defendant has not prevented him from serving the 38-year sentence imposed in Colombia for
his conviction for the killing of Mr. Henriquez.  Rather, the commencement of that sentence has
been postponed to permit the United States to enforce its legitimate rights to prosecute the
defendant for unrelated narcotics trafficking charges.  Further, if the defendant successfully
completes his Justice and Peace Law obligations, he could receive a substantially lower sentence
in Colombia.

and diligently reviewed numerous documents and submissions provided by the movants and has continued to communicate with the movants' attorneys about the information provided and the timing of the Government's decision.  While there have not been any public proceedings in this case since the receipt of the June 22, 2009 letter, out of an abundance of caution, and in order to avoid prejudicing any potential CVRA rights of the movants, DOJ explicitly promised to notify the movants' representatives in advance of any public proceeding in the case, so that the movants would have sufficient time and opportunity to seek a judicial determination regarding their status under the CVRA should DOJ not reach a decision prior thereto.

Subsequently, although no public proceedings had been scheduled in the case, on April 19, 2010, the movants submitted to this Court a motion seeking enforcement of their CVRA rights.  Although the motion was intended to be filed in the criminal case of defendant Giraldo-Serna, the petitioners incorrectly submitted the motion under the criminal case number for a co-defendant of Giraldo-Serna.  On April 26, 2010, without accepting the motion for filing, this Court issued an Order to Show Cause to the Government as to why the Court should not recognize the CVRA rights of the petitioners.[4]  As a result of the incorrect criminal case number cited in the motion, the Order to Show Cause was incorrectly docketed publicly in the criminal case of Giraldo-Serna's co-defendant.  On May 5, 2010, upon viewing the more than 700 pages of Spanish-language documents attached as exhibits to the petitioners' CVRA motion, the Government learned that a majority of the attached exhibits were only provided in the original Spanish and without full English translations.  As a result of the need to translate, on an urgent

_____

[4] As noted in their motion, this Court had deferred acceptance of an earlier CVRA motion submitted by the movants, and had directed the movants to discuss the matter further with DOJ.

basis, a number of the Spanish-language Colombian documents extensively cited in the CVRA

motion, on May 20, 2010, the Government filed a motion requesting an extension of time within

which to respond to the District Court's Order to Show Cause.[5]  Subsequently, while the

Government's response to the Court's Show Cause Order was still pending, on June 8, 2010, the

movants filed a petition with the United States Court of Appeals for the District of Columbia

Circuit seeking a writ of mandamus directing this Court to "take up and decide . . . forthwith" the

movants' CVRA motion, and to afford them "the usual privileges of any movant in the District

Court." By decision dated June 11, 2010, the Court of Appeals denied the movants' petition.  In

its denial, the Court of Appeals directed this Court to promptly notify the movants of its

disposition of their motion.

## ARGUMENT

### I.  The Movants Are Not "Crime Victims" of the Charged Federal Offense as Required Under the CVRA

To determine whether an individual qualifies as a crime victim pursuant to the statutory

definition set forth in the CVRA, a court must conduct a two-step inquiry.  The first step of that

inquiry requires that courts, as a matter of law, determine the scope of the specific conduct or

behavior constituting the "Federal offense." *See United States v. Stewart*, 552 F.3d 1285, 1288

(11th Cir. 2008); *Rendon Galvis*, 564 F.3d at 175; *United States v. Sharp*, 463 F. Supp. 2d 556,

563 (E.D. Va. 2006).  As described below, based on important legal and policy reasons, courts

---

[5]    Included as exhibits in an addendum to the Government's Response are the full
English language translations of the Spanish language Colombian court documents attached to
the movants' CVRA motion as Exhibits 5 through 9 and Exhibit 14.  The Movants had only
attached English translations for a total of 15 of the 233 pages in those documents. *See
Addendum*.

have generally used the elements of the offense charged in order to delineate the scope of that

conduct. The second step requires that courts, as a matter of fact, determine whether the requisite

causation exists, i.e., whether there is a sufficient nexus between the alleged harm and the

defendant's criminal conduct at issue. *Stewart*, 552 F.3d at 1288; *In re McNulty*, 597 F.3d at

350; *In re Rendon Galvis*, 564 F.3d at 175.

### A. The Movants Were Not Victimized by Conduct Underlying an Element of the Defendant's Charged Narcotics-Trafficking Crime

### 1. Murder Is Not Conduct Prohibited by the Offense of Conspiring to Manufacture and Distribute Five Kilograms or More of Cocaine Destined for Importation into the United States

Despite their loss, the movants are not "crime victims" of the defendant's "Federal

offense" as defined in the CVRA. Here, the defendant was charged with one count of conspiring

to manufacture and distribute five kilograms or more of cocaine intending and knowing that the

cocaine would be unlawfully imported into the United States, in violation of Title 21, U.S.C. §§

959(a), 960, and 963, and aiding and abetting that offense. That offense, an international

narcotics importation conspiracy, has the following elements: (1) an agreement between two or

more persons, the object of which is to manufacture and distribute five kilograms or more of

cocaine while knowing or intending that the cocaine would be imported into the United States,

and (2) the defendant either intentionally or knowingly joining the conspiracy. The conduct

underlying these elements does not include any acts of violence or force. Nor has the defendant

been charged with, or admitted to in a United States court, any acts of violence or force, such as

the killing of Mr. Henriquez or the killing of any other individual in Colombia or the United

States.

2.     **The CVRA Uses a Narrower Definition of "Crime Victim" Than That Used by Other Victims' Rights Statutes**

The CVRA does not provide rights to victims of all actions committed by a defendant, rather, in determining the scope of the conduct from which the harm to the victim must arise, courts have generally limited their inquiry to "conduct underlying an element of the offense." *Sharp*, 463 F. Supp. 2d at 563; *see also Stewart*, 552 F.3d at 1288-89.  This interpretation is consistent with the language of the CVRA itself, because the statute speaks of the commission of "a Federal offense."  Comparison of the CVRA's language with the clearly broader definition of a crime victim in the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, and the Victim Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, is also instructive.  Under the VWPA and the MVRA, a "victim" is defined as:

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered *including*, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, *any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.*  (emphasis added).

18 U.S.C. § 3663(a)(2) (VWPA); § 3663A(a)(2) (MVRA).  Thus, as the VWPA and the MVRA expressly include as victims those harmed "in the course of a scheme, conspiracy, or pattern of criminal activity," and the subsequently-enacted CVRA does not contain that expansive phrase, it is clear that the definition of "victim" under the CVRA is substantially narrower than the definition in the MVRA and the VWPA.  *See Sharp*, 463 F. Supp. 2d at 563.

Furthermore, Congress enacted the CVRA knowing that the Supreme Court had interpreted similar language in an earlier version of the VWPA as not referring to related, uncharged conduct. *Sharp*, 463 F. Supp. 2d at 561 & n.11; *United States v. Turner*, 367 F. Supp.

2d 319, 326-27 (E.D.N.Y. 2005). Specifically, in *Hughey v. United States*, 495 U.S. 411, 413 (1990), the Supreme Court held that an earlier version of the VWPA authorized restitution to a victim only for loss caused by the specific conduct which formed the basis for the defendant's offense of conviction. In that case, the Court interpreted language defining a crime victim under the earlier version of the VWPA; the VWPA language at issue was substantially similar to the CVRA's definition of crime victim. *Id.* at 415-18. The Court held that "[h]ad Congress intended to permit a victim to recover for losses stemming from all conduct attributable to the defendant, including conduct related to the offense of conviction, Congress would likely have chosen language other than 'the offense,' which refers without question to the offense of conviction." *Id.* at 418.

In response to the Supreme Court's decision in *Hughey*, Congress acted quickly to add to the definition of "victim" in the VWPA the expansive clause including those harmed in the course of a "scheme, conspiracy, or pattern of criminal activity." *See generally United States v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000); *United States v. Kones*, 77 F.3d 66, 70 (3d Cir. 1996). However, when subsequently enacting the CVRA, Congress excluded this broad language, and–as with the pre-*Hughey* version of the VWPA–limited the definition of a crime victim to only those harmed by the commission of a federal "offense." Consequently, it is clear that the CVRA uses a more restrictive definition of "crime victim" than the definition used in the current versions of the MVRA and the VWPA, and that the use of that more narrow standard in the CVRA was deliberate. *See, e.g., Sharp*, 463 F. Supp. 2d at 561 & n.11 (finding that Congress passed the CVRA knowing that the Supreme Court has interpreted similar language in prior victims' rights acts not to refer to uncharged conduct); *Turner*, 367 F. Supp. 2d at 326-27 (same).

11

Additionally, limiting crime victims under the CVRA to those harmed by conduct underlying the elements of a particular offense reflects important practical considerations.  If all victims of a defendant's related criminal conduct qualify as "crime victims," then both the Government, possibly very early in the criminal process, and Courts would be forced to determine the full scope of a defendant's related, but uncharged, criminal conduct in order to meet its obligations under the CVRA.  The Government and the Court may be required to engage in lengthy, costly, and far-flung ancillary investigation and litigation solely to determine the class of eligible crime victims.  And when the Government's case against a defendant is part of a broader, ongoing criminal investigation, such an inquiry may also jeopardize that ongoing criminal investigation.  This undertaking would be further complicated if the victims of a defendant's related, but uncharged, conduct numbered in the thousands, and all of the evidence surrounding the loss suffered by those victims and the defendant's criminal conduct were located in a foreign country.  If Congress had intended to expand the traditional criminal proceedings in such a manner, it surely would have said so clearly.

In support of the contention that the definition of "crime victim" under the CVRA should be interpreted expansively, the movants cite to the decision of the magistrate judge in *Turner* for the proposition that crime victims could even include "any person who self-identifies" as a victim of the defendant.  367 F. Supp. 2d at 327.  However, in *Turner*, the magistrate judge did not conclude that the statutory definition of crime victim under the CVRA included individuals who merely claimed victim status.  Rather the magistrate judge, in dictum, stated that, despite the lack of an express mandate in the statute, courts were not prohibited from extending some

12

participatory rights to such claimed victims. *Id.* at 326-27. The magistrate judge actually found that the express language of the CVRA precluded, rather than included, victims of uncharged conduct. *Id.* The magistrate judge added further that "absent an affirmative reason to think otherwise," although not required to do so by law, he would presume that individuals who self-identify as victims as well as those identified as victims by the Government would enjoy CVRA rights. *Id.* To the extent that the magistrate judge was suggesting that courts are authorized to exercise discretion to accord full crime victim status under the CVRA to individuals who do not meet the statutory criteria, he was wrong. There is no legal basis for that conclusion. Additionally, even under that expansive standard, in this case, as noted above, affirmative legal and policy reasons exist for this Court to decline to grant participatory rights to the victims of uncharged actions of the defendant.

**B.     An Insufficient Factual Nexus Exists Between Mr. Henriquez's Death and Giraldo-Serna's Participation in the Charged Narcotics Importation Conspiracy**

**1.     The Harm Must Arise Both from the Offense and be a Reasonably Foreseeable Result of the Offense**

Once the parameters of the defendant's conduct for purposes of determining crime victim status under the CVRA have been identified, in the second step of the test set forth in *Stewart*, a court identifies "the direct and proximate effects of that behavior on parties other than the United States." 552 F.3d at 1288. Courts have adopted a two-prong test for determining direct and proximate cause under the CVRA: 1) traditional but-for causation, i.e., the loss would not have occurred but for the defendant's crime; and 2) proximate cause, i.e., the loss must be a reasonably foreseeable result of the conduct underlying the charged offense. *In re McNulty*, 597 F.3d at 350-

51 (6th Cir. 2010); *In re Rendon Galvis*, 564 F.3d at 175. The Sixth Circuit in *McNulty* framed the analysis for conspiracy cases as whether the defendant's actions resulting in the alleged harm were merely ancillary to the conspiracy or not. 597 F.3d at 351-52. The necessary inquiry is a "fact-specific one." *In re Rendon Galvis*, 564 F.3d at 175.

Courts have consistently held that where there is an insufficient nexus between the offense and the harm alleged, a person is not a crime victim under the CVRA and is not entitled to the rights afforded to crime victims. *See In re Rendon Galvis*, 564 F.3d at 175-76 (finding that mother was not a crime victim under the CVRA because the killing of her son was not a direct and proximate result of conspiring to import cocaine into the United States); *Sharp*, 463 F.Supp. 2d at 566 (concluding that marijuana customer's abuse of girlfriend was neither a direct result of the defendant's sale of marijuana to the customer, as the girlfriend failed to establish but-for causation, nor was the abuse a proximate result of the crime, as it was not a foreseeable result); *In re Antrobus*, 519 F.3d at 1125 (finding that the defendant's crime of selling a gun to a juvenile was not the proximate cause of the buyer's use of the gun to shoot a third person as the harm was not a reasonably foreseeable result of the crime). In *Rendon Galvis*, the mother of an individual murdered in Colombia by paramilitaries affiliated with a former AUC leader sought to enforce CVRA rights in the prosecution of the defendant in the United States for conspiring to import cocaine into the United States. 564 F.3d 173. As in this case, the defendant in *Rendon Galvis* confessed to, and pleaded guilty in Colombia to, the killing in a Colombian court proceeding. *Id.* In affirming the district court's finding that the mother failed to establish direct and proximate harm resulting from the defendant's participation in the drug conspiracy charged, the Second Circuit concluded that there were multiple possible motivations for the killing unrelated to the

14

defendant's drug-trafficking activity. *Id.* at 175. Additionally, the Court of Appeals found that there was "chaotic" violence in the area in Colombia where the killing took place inflicted by both drug gangs and paramilitaries. *Id.* As a result, the Court held that the requisite causal connection between the harm and the defendant's charge had not been demonstrated. *Id.*

### 2. Movants Have Not Established That the Killing of Mr. Henriquez Was a Result of, or Reasonably Foreseeable, in Connection with the Defendant's Importation Conspiracy

In this case, the movants' allegations, as a matter of fact, do not establish that the defendant's participation in the charged drug conspiracy was the direct cause of the killing of Mr. Henriquez, as it was, at most, ancillary to the charged conspiracy, and, at least, wholly unrelated to the commission of the offense charged in the United States. Although the movants assert that the killing of Mr. Henriquez was in response to his anti-coca cultivation activities, even the evidence adduced by the movants in support of their assertion is ambiguous on that issue, or even contradictory to that conclusion.[6] For example, the movants claim that "the [Colombian] sentencing court noted the direct and proximate connection between Mr. Henriquez's murder and

---

[6] The majority of the pages of documents submitted as attachments to the movants' CVRA motion were only provided to the Government and this Court in the original Spanish language without English translations. Although the Government had received a draft of an earlier version of the CVRA motion months earlier, the attached exhibits had not been provided to the Government, in English or Spanish, at the time of the receipt of the earlier draft. Critically, for 7 attached documents obtained by the movants from Colombian authorities and cited extensively by the movants in their motion, only 16 non-consecutive pages of the 252 total pages were translated into English for the District Court and the Government. Notwithstanding the movants' claims that all relevant portions of the documents were translated into English, in fact, upon translating the documents on an expedited basis, the Government learned that the untranslated pages contained facts highly relevant to this Court's assessment of the rights of the movants pursuant to the CVRA. In particular, as noted herein, those untranslated pages included discussions of the possible motivations, beyond the single possible drug-trafficking related motivation isolated by the movants, for the defendant's apparent ordering of the killing of Mr. Henriquez in Colombia.

the defendant's drug trafficking" at page 14 of Exhibit 7, the Colombian court's conviction of the

defendant.  (Henriquez Mot. 11.)  However, as the court's discussion on the very same page of

that document makes clear, there were multiple reasons for the killing of Mr. Henriquez.

(Henriquez Mot. Ex. 7 at 14.)  One important motivation for the killing described by the court,

but not referenced by the movants in their motion, was the fact that Mr. Henriquez was an "ex-

guerilla" member of "M-19," a leftist guerilla organization.  *Id.*  The Colombian court stated in

its decision that this was "the other motive" for the killing, because the presence of an ex-M-19

guerilla member in an AUC "zone of paramilitary influence" was "not well-received."  *Id. See*

*also* Government's Exhibit (Gov. Ex.) 6, English Translation of Henriquez Mot. Ex. 6,

Colombian Statement of Charges, at 24 - 25 (citing to the witness statement of Ms. Magali

Patricia Ortiz Rios, who said that she was told that Mr. Henriquez was a "guerrilla (sic) fighter"

and "for that reason" he was ordered killed).

Additionally, the movants claim that, according to sworn statements of two witnesses in

the Colombian criminal case, Carmelo Daniel Sierra Urbina and Alberto Segundo Manjarres

Charris, both apparently former members of the defendant's organization, "the Defendant

ordered his troops to kidnap and murder Mr. Henriquez in retaliation for his efforts to eradicate

coca cultivations when Mr. Henriquez continued to ignore his threats."  (Henriquez Mot. 11

(referencing Henriquez Exhibits 8 and 14)).  However, the movants overstate the motivations

ascribed to the defendant in those witness statements.  In support of their claims, the movants cite

to page 2 of Exhibit 14, the sworn statement of Manjarres Charris, and page 6 of Exhibit 8, the

sworn statement of Sierra Urbina.  However, at page 2 of the statement of Manjarres Charris,

when asked, "Do you know the reason Hernan Giraldo had to send people to kill [Mr.

Henriquez]?  Do you know it?" Manjarres Charris replied, "I do not know the reasons."

Manjarres Charris added further that he did not know the name of the victim either.  Earlier, on

the same page of that same statement, Manjarres Charris said that the defendant had stated that

he (the defendant) had ordered his men to "take care of" Mr. Henriquez, merely because he (Mr.

Henriquez) persistently refused to obey orders to leave the area.  (Henriquez Mot. Ex. 14 at 2.)

The movants failed to reference this motivation for the killing of Mr. Henriquez.  Manjarres

Charris, in the statement provided by the movants, did not further speculate as to the defendant's

motivation for ordering the killing.  *Id.*

Similarly, the sworn statement of witness Sierra Urbina proffered by the movants is also

equally ambiguous to the claimed assertion.  The following portion of the transcript of Mr. Sierra

Urbina's witness statement is instructive:

> "QUESTION: Tell the office whether, in order to carry out any activity in the Village El
> Calabazo, jurisdiction of Santa Marta, it is necessary to first obtain the permission or
> authorization or approval of Hernan Giraldo Serna . . . and what happens if the order is
> not obeyed? ANSWER: Mr. Giraldo is very clear about the urban structure.  Any seller
> who enters Guachaca, Calabazo, any seller of brooms or whatever, has to carry an
> identification card that identifies him as such, . . . but the person who does not wear the
> card and does not say the reasons . . . the order is to kill him."

(Henriquez Mot. Ex. 8 at 6.)  Earlier in that same statement, when specifically asked if Mr.

Henriquez had complied when the defendant had called him to a meeting, witness Sierra Urbina

said that Mr. Henriquez "did not go."  *Id.*  Importantly, the witness continued, " . . . in part, the

reasons to order him killed was that."  *Id.*  As a consequence, even looking only to the facts

provided by the movants, it is clear that one of the several motivations, if not the primary

motivation, for the killing of Mr. Henriquez was the mere fact that he had refused to meet, as

directed, with the defendant or his men, as was required by all in that area.  Thus, although the

17

defendant's actions may be directly related to his efforts, as an AUC leader, to exert control over all in his geographic area, and to ensure civilian loyalty and support for the AUC in its war with the FARC and other leftist guerilla organizations, there is insufficient evidence to support the conclusion that, *but for* the defendant's participation in the charged conspiracy to traffic in drugs destined for importation into the United States, Mr. Henriquez would not have been killed. As the court noted in *Rendon Galvis*, "there are too many questions left unanswered concerning the link between the Defendant's federal offense and [the movants' harm]." 564 F.3d at 175 (quoting *Sharp*, 463 F. Supp. 2d at 566).

Further, although the movants cite to the Government's Detention Memorandum (Henriquez Mot. 2, 11) for the statement that the defendant threatened local farmers growing coca in the area to sell coca only to his organization under penalty of death, the movants do not allege that Mr. Henriquez was one of those threatened coca farmers. Rather, the evidence provided by the movants simply suggests that one of the several possible motivations for the killing of Mr. Henriquez was that he was speaking with local coca farmers about growing alternative crops. While the movants might argue that the defendant created a culture of fear and intimidation in the region which permitted him to, among other things, conduct his narcotics-trafficking activities, the Colombian criminal record cited by the movants is clear that, as a leader of an AUC paramilitary bloc, the defendant was conducting a civil war with FARC rebels. A large number of killings occurred for many reasons unrelated to drug-trafficking, including obtaining strategically important land, or to simply exert control over the civilian population.[7]

---

[7] *See* Gov. Ex. 6 at 8 (citing to a Colombian National Police intelligence report stating that Hernan Giraldo Serna was in charge of a self-defense group which had "a wide network of informants and hit men in charge of conducting 'social cleansings'"); Gov. Ex. 7 at 12 (in the

In this case, there is no evidence in the record cited to by the movants that the defendant manufactured cocaine using coca grown on Mr. Henriquez's land or distributed cocaine which was manufactured using coca grown there. Even if the movants can establish that there was some general relationship between the killing of Mr. Henriquez and the Colombian drug trafficking activities of the defendant's organization, the movants have not established, nor have they alleged, that the killing of Mr. Henriquez was in furtherance of the defendant's trafficking in narcotics specifically destined for unlawful importation into the United States, as proscribed by 21 U.S.C. 959(a), the offense at issue here.[8]   There is no evidence in the record to support the claim that coca from Mr. Henriquez's property, or from the properties of other farmers who Mr. Henriquez purportedly attempted to organize, was used to manufacture cocaine destined for importation into the United States by the defendant. The killing was a domestic Colombian crime; the record does not reflect that it assisted the defendant or his cohorts in conspiring to traffic in narcotics destined for the United States. Under the movants' extraordinarily broad view of the requisite nexus, any individual in Colombia who claimed that he or she was injured during the entire 11-year time period of the charged conspiracy by any drug trafficking activities of the

---

Colombian Criminal Conviction of the defendant, the court stated with respect to the criminal organizations under the command of the defendant, "the horrendous manner in which these illegal organizations have operated over the past several years is a well-known fact. They put the community in a state of nervousness and anxiety due to the military, economic, and even political power they have come to achieve").

[8] Not only did the United States not charge the defendant with the killing of Mr. Henriquez, it is not clear that the Government could have independently charged the defendant with the killing at the time of the second superseding indictment, as both the defendant and the victim are foreign nationals, the crime occurred in a foreign country, it did not have nor was intended to have any detrimental effects in the United States, and the defendant was not located in the United States at the time he was charged.

defendant or his associates in Colombia could claim CVRA rights in a United States prosecution for trafficking in drugs destined for the United States, even if that conduct bore no direct connection to the conspiracy charged in the United States. As described above, such an interpretation is inconsistent with the statutory language of the CVRA and the courts' generally narrow interpretation of the statute.

In claiming that the killing of Mr. Henriquez meets the foreseeability requirement necessary to establish "proximate harm," the movants claim only that the killing was "an integral and necessary part of the Defendant's crime," and, thus, was a "foreseeable consequence." (Henriquez Mot. at 11.) As noted, *supra*, Part I.A.1., however, any acts of violence or force, such as the killing of Mr. Henriquez, were not required, let alone integral, to establishing a conspiracy to manufacture and distribute cocaine intending and knowing that the cocaine would be unlawfully imported into the United States.[9] Additionally, the killing of an individual who purportedly attempted to organize local coca farmers was not an otherwise foreseeable result of that crime. As noted above, as there were multiple possible motivations wholly unrelated to drug trafficking for the killing of Mr. Henriquez, it can not be said that the killing was a reasonably foreseeable consequence of the charged conduct. As the court stated in *United States v. Atlantic States Cast Iron*, the purposes of the CVRA are defeated "if causation allegations are so attenuated in relation to the offense of conviction that the alleged victims are effectively turned into litigants, defending against contentions that intervening forces or their own actions

---

[9] Nor is violence or force an intrinsic part of a drug conspiracy. See *United States v. Diaz*, 778 F.2d 86, 88 (2d Cir. 1985) ("While the traffic in drugs is often accompanied by violence, it does not by its nature involve substantial risk that physical violence will be used. . . . Such transactions are often wholly consensual, and do not necessarily present threats of physical harm to any person or property.").

contributed to their harm." 612 F. Supp. 2d 453, 545 (D.N.J. 2009). Here, the causation

allegations of the movants are too attenuated, factually, to satisfy the proximate harm prong of

the causation analysis.

## CONCLUSION

For the foregoing reasons, the United States has shown good cause in response to the

Court's Order, and therefore the Court should not recognize the movants' status as victims under

the Crime Victims' Rights Act.


Dated:        June 18, 2010


                                   Respectfully submitted,

                                   WAYNE C. RAABE
                                   Acting Chief, Narcotic and Dangerous Drug Section



                                   Paul Joseph
                                   Robert J. Raymond
                                   Glenn C. Alexander
                                   Trial Attorneys
                                   Narcotic and Dangerous Drugs Section
                                   1400 New York Avenue, NW, 11th Floor
                                   Washington, D.C. 20005
                                   202/514-9644

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been sent by mail to Elita C. Amato, counsel of record for defendant Hernan Giraldo-Serna.

PAUL JOSEPH
Trial Attorney
202-514-9644