RECEIVED
AUG 0 5 2010
Clerk, U.S. District and
Bankruptcy Courts

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.:  1:04-cr-00114-RBW-1 |
| v. | ) | |
| | ) | |
| GIRALDO-SERNA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MOVANTS ZULMA NATAZHA CHACÍN DE HENRÍQUEZ, NADIEZHDA NATAZHA HENRÍQUEZ CHACÍN AND BELA HENRÍQUEZ CHACÍN OPPOSITION MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE RIGHTS UNDER THE CRIME VICTIMS' RIGHTS ACT**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

ARGUMENT ....................................................................................................... 11

I.     HAVING CONCEDED THAT MOVANTS ARE VICTIMS OF THIS
DEFENDANT, THE GOVERNMENT IS WRONG IN CONTENDING THAT
THAT MOVANTS ARE NOT VICTIMS OF THIS CRIME .......................... 11

     A.     The Government Impermissibly Narrowed the Definition of What
Constitutes A Crime Victim For the Purposes of the CVRA .............................. 11

     B.     The Government Incorrectly Concludes that Movants, Whose Immediate
Family Member Was Killed by the Defendant in Furtherance of His Drug
Trafficking Conspiracy, Did Not Suffer Direct and Proximate Harm as a
Result of the Commission of the Offense ............................................................. 19

          1.     Mr. Henríquez's Killing Would Not Have Occurred But For the
Defendant's Charged Drug Conspiracy .................................................... 19

          2.     Mr. Henríquez's Killing Was A Forseeable Result and Committed
in Furtherance of the Defendant's Drug Conspiracy ............................... 23

CONCLUSION .................................................................................................... 27

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Associated General Contractors v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983)................................................................25

*Babbit v. Sweet Home Chapter of Cmtys. for a Great Oregon,* 515 U.S. 687
(1995) ................................................................................23

*Castillo v. United States,* 200 F.3d 735 (11th Cir. 2000)................24

*Donnelly v. F.A.A.,* 411 F.3d 267 (D.C. Cir. 2005) ........................7

*Hughey v. United States,* 495 U.S. 411 (1998) ...........................14

*In re Antrobus,* 519 F.3d 1123 (10th Cir. 2008) .........................23

*In re McNulty,* 597 F.3d 344 (6th Cir. 2010)...................13, 16, 18

*In re Rendon Galvis,* 564 F.3d 170 (2d Cir. 2009) ...................19, 20

*In re Stewart,* 552 F.3d 1285 (11th Cir. 2008)...................11, 12, 13

*Kenna v. United States District Court,* 435 F.3d 1011 (9th Cir. 2006) ........15

*United States v. Alvarez,* 755 F.2d 830 (11th Cir. 1985)................24

*United States v. Atlantic States Cast Iron Pipe, Co.,* 612 F. Supp. 2d 453
(D.N.J. 2009)......................................................................15

*United States v. Brock-Davis,* 504 F.3d 991 (9th Cir. 2007), *cert denied,*
129 S.Ct. 2415 (2009)............................................................16

*United States v. Cummings,* 937 F.2d 941 (4th Cir. 1991) .................24

*United States v. Donaby,* 349 F.3d 1046 (9th Cir. 2003).................18

*United States v. Golter,* 880 F.2d 91 (8th Cir. 1989)...................24

*United States v. Hunter,* No. 2:07CR307DAK, 2008 WL 53125
(D. Utah Jan. 3, 2008)......................................................15, 16

*United States v. Rubin,* 558 F. Supp. 2d 411 (E.D.N.Y. 2008)................18

*United States v. Rutgard,* 116 F.3d 1270 (9th Cir. 1997) ..............14

*United States v. Sharp,* 463 F. Supp. 2d 556 (E.D. Va. 2006)............16, 17, 18

*United States v. Turner,* 367 F. Supp. 2d 319 (E.D.N.Y. 2005)..............16, 17

## STATUTES

18 U.S.C. § 3579(a)(1)....................................................................................................15

18 U.S.C. § 3663(a)(2)....................................................................................................14

18 U.S.C. § 3663A(a)(2)..................................................................................................14

18 U.S.C. § 3771(e) ..................................................................................................14, 15

## MISCELLANEOUS

RESTATEMENT (SECOND) OF TORTS § 435A (1965)........................................................25

U.S. SENTENCING GUIDELINES § 1B1.3 ...........................................................................13

## **INTRODUCTION**

Movants Zulma Natazha Chacín de Henríquez ("Zulma"), Nadiezhda Natazha Henríquez Chacín ("Nadiezhda") and Bela Henríquez Chacín ("Bela") (collectively the "Movants") are crime victims under the Crime Victims' Rights Act, 18 U.S.C. § 3771 (the "Statute" or "CVRA"). They are the surviving relatives (wife and children) of Julio Eustacio Henríquez Santamaría ("Mr. Henríquez"). Mr. Henríquez was killed by Hernán Giraldo-Serna (the "Defendant") because Mr. Henríquez opposed the drug trafficking activities for which the Defendant is indicted and encouraged local farmers not to plant the Defendant's coca, despite the Defendant's threats of death.

It is indisputable that:

- The Defendant's drug trafficking conspiracy is alleged to have been perpetrated over at least an 11-year period, from 1994 to and including the time of the indictment in 2005.

- Movants' husband and father, Mr. Henríquez, was disappeared on February 4, 2004, during the time covered by the Defendant's conspiracy, and was never seen alive again.

- Mr. Henríquez refused to grow the Defendant's coca, uprooting and burning any coca or marijuana found on his farm located in Colombia's northern coast, the same location as the Defendant's alleged drug conspiracy.

- Mr. Henríquez founded an environmental non-profit organization, *Madre Tierra*, which publicly opposed coca cultivation on Colombia's northern coast and encouraged local farmers not to grow the Defendant's coca in the months immediately preceding his death.

- Mr. Henríquez was a former member of M-19, having long-since disarmed in 1984, and had lived in the area of Magdalena for almost five years, without any threat of violence or harm against him.

- Mr. Henríquez was abducted only after – and just after – forming *Madre Tierra*, and after being threatened for his anti-coca activities.

- Mr. Henríquez was abducted from an anti-coca meeting he was conducting.

Plainly, Mr. Henríquez is a victim of the crime before the Court. Yet the Government strains to deprive Mr. Henríquez's family members of their rights under the Statute.[1] The Government urges a cramped definition of who is a crime victim that is inconsistent with precedent, the intent of the Statute, and would produce the absurd result that there would never be a qualifying victim when the charged offense is a conspiracy. Movants respectfully request that the Court grant Movants all rights provided for under the CVRA.

### STATEMENT OF FACTS

As described in Movants' prior submission to this Court, the Defendant was a leader of the *Autodefensas Unidas de Colombia* ("AUC"), a narco-terrorist paramilitary organization based out of Colombia, and the leader of an AUC subdivision that controlled "virtually all aspects of drug trafficking on the North Coast of Colombia."[2] On March 2, 2005, the

---

[1] It is inconceivable that the Government would take the position, as it has here, that an 11-year cocaine conspiracy has no victims if comparable facts occurred in the United States. If, on the streets of an American city, a gang leader had a social worker killed because the social worker was opposing the gang's crack distribution, would the Government seriously contend that the murdered social worker is be a victim of the crack distribution conspiracy – even if the social worker had once nearly 20 years before, been in a rival gang? That the Movants are victims in Colombia should not, and cannot, diminish their status as victims. DOJ guidelines explicitly contemplate international victims. *See* U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL GUIDELINES FOR VICTIM AND WITNESS ASSISTANCE, at 20, 23 (2005) (Ex. 26) (describing procedures for contacting foreign victims) (all exhibits ("Ex.") unless otherwise noted are attached as Exhibit A to the Declaration of Joshua Holzer in Support of Movants Zulma Natazha Chacín De Henríquez, Nadiezhda Natazha Henríquez Chacín and Bela Henríquez Chacín Opposition Memorandum in Support of Motion To Enforce Rights Under The Crime Victims' Rights Act, filed concurrently herewith).

[2] *See* Motion to Enforce Rights Under the Crime Victims' Rights Act by Zulma Natazha Chacín de Henríquez, Nadiezhda Natazha Henríquez Chacín and Bela Henríquez Chacín, *United States v. Giraldo-Serna, et al.*, No. 1:04-cr-00114-RBW-1, Docket Entry No. 188-1 (D.D.C. April 26, 2010) ("CVRA Motion") at 1, 2; Government's Motion to Exclude Time Under the Speedy Trial Act and Declare the Case Complex, *United States v. Giraldo-Serna, et al.*, No. 1:04-cr-00114-RBW-1, Docket Entry No. 139 (D.D.C. June 11, 2008) ("Govt.'s Speedy Trial Memo") at 4.

Defendant was charged by a federal grand jury with conspiring to manufacture and distribute five kilograms or more of cocaine intending that such substance would be unlawfully imported into the United States and in aiding and abetting that offense, in violation of 21 U.S.C. §§ 959, 960, 963 and 18 U.S.C. § 2. The conspiracy was alleged to have been perpetrated over at least an 11-year period: from 1994 to, and including, the time of the indictment in 2005.[3] As part of the charged offense, the Government has alleged that the Defendant "oversaw the manufacture . . . [and] transportation of multi-ton quantities of cocaine" in and around the city of Santa Marta, located in the Magdalena region of northern Colombia. Govt.'s Speedy Trial Memo at 5. The Government has also alleged that the Defendant "require[d] local farmers growing coca in the [Santa Marta] area, the primary ingredient for cocaine, to sell their coca only to his organization under a penalty of death." Government's Motion for Pretrial Detention, *United States v. Giraldo-Serna, et al.*, No. 1:04-cr-00114-RBW-1, Docket Entry No. 124 (D.D.C. May 15, 2008) (the "Govt.'s Detention Memo") at 2; Govt.'s Speedy Trial Memo at 6.

One of those individuals killed by the Defendant was Movants' husband and father, Mr. Henríquez.[4] Prior to 1984, Mr. Henríquez had been member of M-19, a guerilla movement in

---

[3] *See* Second Superseding Indictment, *United States v. Giraldo-Serna*, No. 04-114-RBW (D.D.C. Mar. 2, 2005) (the "Second Superseding Indictment"), Count 1.

[4] *See* Conviction of Hernan Giraldo Serna at 17 (Jan. 21, 2009) (Ex. 7 to the Response of the United States to Order to Show Cause in Connection With Motion to Enforce Rights Under the Crime Victims' Rights Act, *United States v. Giraldo-Serna, et al.*, No. 1:04-cr-00114-RBW-1, Docket Entry No. 200 (D.D.C. June 18, 2010) ("Govt.'s Response")); BULLETIN, DECEMBER 2007, UNIT OF INCIDENCE, ANALYSIS AND DOCUMENTATION, CATLAN TABLE FOR PEACE AND HUMAN RIGHTS IN COLOMBIA at 1 (Dec. 2007), *available at* http://www.taulacolombia.org/butlletides07/butlleticas.html (Ex. 10); Juan Forero, Paramilitary Extraditions Spark Debate in Colombia, NATIONAL PUBLIC RADIO at 1 (Sept. 29, 2009) (Ex. 11).

Colombia which disbanded in 1989.[5]  Mr. Henríquez left the M-19 group in 1984, 17 years

before his abduction and murder.[6]  In 1987, three years after his demobilization, Mr. Henríquez

and his family moved to the Santa Marta area where Mr. Henríquez purchased a farm named El

Picacho.[7]  Mr. Henríquez lived in the Santa Marta area from 1987 to 1992 before moving

abroad.[8]  He moved back to Santa Marta in 1996, where he lived until his abduction on

February 4, 2001.[9]

During the second time Mr. Henríquez lived in Santa Marta, the Defendant was in *de

facto* control of the Magdalena region, including Santa Marta.[10]  During this time, and in open

defiance to the Defendant's order requiring local farmers to grow coca "under penalty of

death," Mr. Henríquez would immediately uproot and burn coca or marijuana found on his

farm.[11]  Declaration of Nadiezhda Natazha Henríquez Chacín ("Nadiezhda Decl.") at ¶ 5.

According to Mr. Henríquez's daughter, these actions made the Defendant "furious."[12]

---

[5] Statement of Charges for Expected Judgment for Hernan Giraldo-Serna at 13, 14 (March 20, 2007) (Govt.'s Response Ex. 6).

[6] *Id.* (Nadiezhda Natazha Henríquez Chacín stated that "in 1984 President Betancourt granted her father amnesty for having been a member of the M-19.").

[7] Report No. 0117 UDH-DIH at 5 (July 7, 2003) (Ex. 5); Govt.'s Response Ex. 6 at 14.

[8] Govt.'s Response Ex. 6 at 14.

[9] *Id.*

[10] *See* Superseding Indictment at 1, Govt.'s Speedy Trial Memo at 3-4.

[11] *See* Ex. 5 at 5 ("[O]ne day, [Mr. Henríquez] appeared with his family at the property in question and, taking a tour of the lands, was surprised to find marijuana growing inside his property and got so angry that he pulled it out with his own hands and burned the crop.").

[12] *See* Govt.'s Response Ex. 6 at 14 ("when [Mr. Henríquez] found those crops on his farm he pulled them out and burned them and that made HERNAN GIRALDO furious.").

4

In January of 2001, Mr. Henríquez formed *Madre Tierra*, an environmental non-profit organization that publicly opposed coca cultivation on Colombia's northern coast and encouraged local farmers not to grow the Defendant's coca.[13]  *See* Declaration of Zulma Natacha Chacín de Henríquez ("Zulma Decl.") at ¶ 8; Nadiezhda Decl. at ¶ 7; Declaration of Bela Henríquez Chacín ("Bela Decl.") at ¶ 5.  Mr. Henríquez offered training on, and access to government funding for, the purchase of substitute crops such as cacao and fruit trees.[14]  Zulma Decl. at ¶ 8; Nadiezhda Decl. at ¶ 7.  On January 30, 2001, Mr. Henríquez traveled to Calabazo, a village in the Middle Magdalena region, to give a lecture to farmers about the eradication of coca crops.[15]  According to Carmelo Sierra Urbina, a former AUC paramilitary under the Defendant's command, as a result of Mr. Henríquez's anti-coca activities, and three days prior to Mr. Henríquez's forced abduction, the Defendant had his son, "El Grillo," personally threaten Mr. Henríquez to either "leave the village . . . [or] suffer the consequences."[16]  As elaborated by Sierra Urbina, the Defendant threatened Mr. Henríquez "because [the Defendant] is a coca grower and because invading his lands was enough reason to kill someone . . ."[17]  Mr. Henríquez, nonetheless, remained in the area and continued his efforts in convincing local farmers to give up growing the Defendant's coca.[18]

---

[13] *See* Statement of Charges for Expected Judgment for Hernan Giraldo-Serna at 1-2 (March 20, 2007) (Ex. 6); Declaration of Carmelo Sierra Urbina at 1 (Sept. 25, 2003) (Ex. 8); Declaration of Julio Nelson de la Cruz Barros at 2 (July 4, 2003) (Ex. 9).

[14] *See* Ex. 6 at 1-2; Ex. 8 at 1; Ex. 9 at 2.

[15] Ex. 8 at 1.

[16] *Id.  See also* Ex. 6 at 9, 22.

[17] Ex. 8 at 6.

[18] Govt.'s Response Ex. 8 at 5.

5

On February 4, 2001, Mr. Henríquez hosted a *Madre Tierra* meeting to call on local farmers to stop growing coca.[19]  At approximately 9:45 am, several of the Defendant's subordinates suddenly appeared at the meeting and forced Mr. Henríquez into a white pickup truck.[20]  Mr. Henríquez was not seen alive again.  Zulma Decl. at ¶¶ 9-11; Nadiezhda Decl. at ¶¶ 8-9; Bela Decl. at ¶¶ 6-7.  After Mr. Henríquez's forced "disappearance," the Defendant and his co-conspirators took control of Mr. Henríquez's farm and grew coca on his land.[21]  Mr. Henríquez's body was not discovered until October 11, 2007, after the Defendant admitted to Mr. Henríquez's murder and provided the location of his remains.[22]

On March 20, 2007, the Colombian Office of the Prosecutor General instituted charges against the Defendant for conspiracy to commit a criminal act and for aggravated forced disappearance of Mr. Henríquez.[23]  The Prosecutor General concluded that the Defendant opposed Mr. Henríquez's creation of *Madre Tierra* and threatened him to leave the area.[24]  The Prosecutor General found when Mr. Henríquez continued his anti-coca activities, the Defendant ordered his subordinates to "disappear" Mr. Henríquez.[25]  On January 21, 2009, a Colombian

---

[19] Ex. 6 at 1-2.

[20] Conviction of Hernan Giraldo Serna at 4 (Jan. 21, 2009) (Gov't Response Ex. 7); Ex. 6 at 1-2.

[21] *See* Ex. 5 at 5.

[22] Ex. 11; Official Letter No. 5711, Report by the Judicial Police at 1, 5 (Oct. 23, 2007) (Ex. 12).

[23] Ex. 6 at 1.

[24] *Id.* at 2.

[25] *Id.*

Court located in Santa Marta reached the same conclusion and convicted and sentenced the

Defendant for Mr. Henríquez's forced disappearance.[26]

In its ruling,[27] the Colombian Court found that the testimony of two of Mr. Henríquez's

family members, Nadiezhda and Zulma, and that of two demobilized paramilitaries, Carmelo

Sierra Urbina and Alberto Segundo Manjarres Charris, to be most the most credible and

relevant evidence.[28] In specific statements provided to the Colombian Prosecutor General and

the Colombian Court, each of these individuals testified that the Defendant issued orders to kill

Mr. Henríquez *because he took a prominent role against coca growing in Santa Marta.*[29]

Specifically, Nadiezhda Natazha Henríquez Chacín testified that Mr. Henríquez's removal of

---

[26] Ex. 7 at 21. As noted by the District of Columbia, Circuit Court of Appeals, foreign criminal convictions constitute *prima facie* evidence of the facts underlying the judgment. *See Donnelly v. F.A.A.*, 411 F.3d 267, 270-71 (D.C. Cir. 2005).

[27] The Government has not provided any evidence that the Defendant has or will cooperate with the Colombian Justice and Peace Process. In fact, it appears from the website of the Justice and Peace process, that while the Defendant was scheduled to provide testimony on numerous occasions prior to his extradition, he has not been scheduled on even one occasion since it. Regardless, the Defendant was not convicted of Mr. Henriquez's murder by the Justice and Peace process, he was convicted by an ordinary criminal court in Colombia. That court also ordered restitution for Mr. Henriquez's victims which, to date, they have been unable to claim due to the extradition of the Defendant.

[28] Ex. 7 at 13 ("[C]redibility must be given to the story of the demobilized persons who categorically indicated the incursion of the [Defendant] within the [AUC] and who carried out the forced disappearance against the will of the person, as their testimonies are consistent, precise, and logical . . . ."); *id.* at 14 (the Colombian court noted that Mr. Henríquez's relatives had reached the same conclusion as these former paramilitaries, "namely that [the Defendant] triggered [Mr. Henríquez's] disappearance because he was working against the objectives of the AUC, namely to continue cultivating coca, which [Mr. Henríquez] wanted to eradicate in order to cultivate cocoa [sic], which was not allowed by [the Defendant] who, due to vengeance and hatred, decided . . . to make [Mr. Henríquez] disappear . . .").

[29] *See generally* Govt.'s Response Ex. 6 at 14, 16, 21, 22-23, 24, 37; Govt.'s Response Ex. 7 at 5, 6, 14; Govt.'s Response Ex. 8 at 1-2, 6; Declaration of Alberto Segundo Manjarres-Charris at 2, 4 (Aug. 22, 2003) (Ex. 14).

coca crops on his farm made the Defendant "furious."[30]  The Colombian Court also relied on a

statement by Zulma Natazha Chacín de Henríquez that Mr. Henríquez's anti-coca activities and

the creation of *Madre Tierra* were the reason behind his disappearance . . ."[31]

These statements were corroborated by ex-paramilitaries who had no interest in

testifying against the Defendant and could who possibly implicate themselves by doing so.  As

the Colombian Court noted, Manjarres Charris was told that the Defendant had Mr. Henríquez

killed *to prevent him from forming Madre Tierra*.[32]  Sierra Urbina also confirmed that Mr.

Henríquez was killed *because he interfered with the Defendant's coca-growing*.[33]

The Colombian Court determined that the testimonies of these four individual was

consistent and reached the same conclusion: "[I]n that [Mr. Henríquez] had to be disappeared at

all costs since *he was impeding the objectives of the AUC to continue planting coca, which*

*Henríquez wished to see eradicated in order to cultivate cacao*.  The Colombian Court also

reasoned, that Mr. Henríquez's conduct was particularly a "bad thing" because he was gaining

support and notoriety for his anti-coca activities.[34]  This was not permitted by Hernán Giraldo

who, in revenge and with malice decided, together with his right-hand man, Leónidas Acosta

Ángel, aka Troilo, to make Henríquez Santamaría disappear."[35]

---

[30] Govt.'s Response Ex. 6 at 14.

[31] Govt.'s Response Ex. 6 at 16.

[32] *Id.* at 21.

[33] *See* Ex. 6 at 23.

[34] Ex. 7 at 14 ("[t]his was the other motive for which he was executed, since the evidence shows that it was not well received for an ex-guerilla to gain momentum, especially in the zone of paramilitary influence.").

[35] *Id.* (emphasis added).

Prior to being sentenced and convicted by the Colombian Court, the Defendant was

extradited to the United States from Colombia on May 13, 2008 to face these proceedings.[36]

Since the Defendant's extradition, the Movants have exhausted all efforts to obtain the

Government's support.[37] This first attempt came on July 17, 2008, when representatives from

the Center for Justice and Accountability and the International Human Rights Law Clinic at

Berkeley Law School sent a general letter to the Government requesting that it take steps to

identify and contact Colombian victims who may be entitled to rights under the CVRA.[38] After

---

[36] Press Release, 14 Members of Colombian Paramilitary Group Extradited to the United States to Face U.S. Drug Charges, U.S. Attorney's Office (S.D. Fla.) at 1 (May 13, 2008) (Ex. 3). On July 22, 2005, the Colombian government passed the Justice and Peace Law (Law 975), in an attempt to end the violence caused by paramilitary groups throughout Colombia. The Defendant could have avoided his extradition to the United States had he actually cooperated and provided truth and reparation to his victims. *See* Press Release, President Alvaro Uribe of Colombia speaks on the occasion of the delivery in extradition of persons subjected to the Law of Justice and Peace (English translation) (May 13, 2008) at 1 (Ex. 4) ("[P]eople were extradited, either because they had returned to crime after having submitted to the Law of Justice and Peace or because they had not cooperated with the justice system as they should; and all of them because they had failed to due [sic] their duty in making reparations to the victims, by concealing their assets or delaying their surrender.").

[37] The Government should not have been required by the Court to show cause because the Government has the affirmative duty to identify crime victims and ensure they are afforded the rights to which they are entitled. *See* Ex. 26 at 22 ("At the earliest opportunity after the detection of a crime at which it may be done without interfering with an investigation, the responsible official of the investigative agency shall identify the victims of the crime."). Congress specifically provided funds for this purpose. *See* 108 CONG. REC. S4260, S4242 (daily ed. Apr. 22, 2004) (statement of Sen. Feinstein) (Ex. 27) ("The [CVRA] also has two separate resource provisions, which together will authorize the appropriation of $75 million over the next five years to ensure that the federal government assist crime victims in asserting these rights.").

[38] *See* Letter from Roxanna Altholz, International Human Rights Law Clinic at the University of California Berkeley School of Law, and Almudena Bernabeu, Center for Justice and Accountability, to Kenneth A. Blanco, U.S. Dep't of Justice, at 1 (July 17, 2008) (Aug. 5, 2010 Holzer Ex. C); Letter from Roxanna Altholz, International Human Rights Law Clinic at the University of California Berkeley School of Law, and Almudena Bernabeu, Center for Justice and Accountability, to Michael J. Garcia, U.S. Dep't of Justice, at 1 (July 17, 2008) (Aug. 5, 2010 Holzer Ex. D); Letter from Roxanna Altholz, International Human Rights Law Clinic at the University of California Berkeley School of Law, and Almudena Bernabeu, Center for Justice

(continued...)

the Government rejected this general request, Movants contacted them again, on June 22, 2009, requesting that it afford the rights to Movants specifically.[39] The Government agreed to take Movants' specific request under consideration and said it would promptly respond.[40] The Movants continued to correspond with the Government in good faith, including after this Court requested that the parties continue to correspond and that DOJ reach a final determination.[41] It was only after waiting for an additional five months that, on April 19, 2010, Movants sought leave to file their motion with the Court, seeking enforcement of their rights as crime victims.[42] The Court issued an order that the Government show cause, within a month, why the "Court should not recognize the movants' status as victims under the Crime Victims' Rights Act and order the government to comply with the provisions of that Act."[43] After obtaining an extension, on June 18, 2010 the Government filed its response. On June 21, 2010 the Court

---

(...continued from previous page)

and Accountability, to Robert E. O'Neill, U.S. Dep't of Justice, at 1 (July 17, 2008) (Aug. 5, 2010 Holzer Ex. E).

[39] *See* Letter from Leo Cunningham, Wilson Sonsini Goodrich & Rosati, and Roxanna Altholz, International Human Rights Law Clinic at the University of California Berkeley School of Law, to Glenn C. Alexander, U.S. Dep't of Justice, at 1 (June 22, 2009) (Ex. 17).

[40] *See* email from Mr. Paul Joseph, U.S. Dep't of Justice, to Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati (Nov. 12, 2009) (Ex. 20).

[41] *See* Letter from Leo Cunningham, Wilson Sonsini Goodrich & Rosati and Roxanna Altholz, Berkeley Law International Human Rights Law Clinic, to Mr. Paul Joseph, U.S. Dep't of Justice (Mar. 11, 2010) (Ex. 23); Email from Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati to Mr. Paul Joseph, U.S. Dep't of Justice (Apr. 1, 2010) (Ex. 24); Email from Mr. Paul Joseph, U.S. Dep't of Justice to Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati (Apr. 5, 2010) (Ex. 25).

[42] Email from Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati, to Tiffany Stedman (Apr. 19, 2010) (Aug. 5, 2010 Holzer Decl. Ex. F).

[43] Order, *United States v. Giraldo-Serna, et al.*, No. 1:04-cr-00114-RBW-1, Docket Entry No. 188 (D.D.C. April 26, 2010).

unsealed the Government's response and deemed Zulma, Nadiezha, and Bela "Movants" for

the purpose of responding to the Government's response.[44]  In an Order on July 22, 2010, the

Court extended the time to which Movants had to respond to August 5, 2010.[45]

**ARGUMENT**

I.  **HAVING CONCEDED THAT MOVANTS ARE VICTIMS OF THIS DEFENDANT, THE GOVERNMENT IS WRONG IN CONTENDING THAT THAT MOVANTS ARE NOT VICTIMS OF THIS CRIME**

   A.  **The Government Impermissibly Narrowed the Definition of What Constitutes A Crime Victim For the Purposes of the CVRA**

   While the Government begins its analysis defining the right approach for determining

who is a crime victim, it then fails to follow it.  As described in Movants' original motion filed

with the Court, the correct approach is outlined by the Eleventh Circuit Court of Appeals in *In

re Stewart,* 552 F.3d 1285 (11th Cir. 2008) which explained:

> [F]irst, we identify the behavior constituting "commission of a federal offense."
> Second, we identify the direct and proximate effects of that behavior.

*Id.* at 1288.  In responding to the Court's Order to Show Cause the Government misapplies the

test expressed in *Stewart* by: (1) impermissibly narrowing the definition of what constitutes a

federal offense; and (2) wrongly claiming that Movants, whose immediate family member was

killed by the Defendant in furtherance of his drug trafficking conspiracy, did not suffer direct

and proximate harm as a result of its commission.  *See* Govt.'s Response at 9.

   In an attempt to claim that an individual murdered by the Defendant as a result of his

opposition to the Defendant's coca trafficking activities could not be a crime victim, the

---

[44] Order, *United States v. Giraldo-Serna, et al.,* No. 1:04-cr-00114-RBW-1, Docket Entry No. 202 (D.D.C. June 21, 2010).

[45] Order, *United States v. Giraldo-Serna, et al.,* No. 1:04-cr-00114-RBW-1 (D.D.C. July 22, 2010).

Government tortures the definition of what constitutes a federal offense for the purposes of the CVRA. *See* Govt.'s Response at 9-13. In doing so, the Government comes to an absurd result that essentially means there will never be a crime victim in a conspiracy case, regardless of what violent means (such as those used here), were used to conduct it.

The Government argues that, because murder is not conduct prohibited by an international narcotics importation conspiracy, Mr. Henríquez cannot be a victim of the conspiracy. Govt.'s Response at 9. But the question is not whether Mr. Henríquez's murder was conduct prohibited by the offense of conspiring to distribute cocaine because, as the Court in *Stewart* rightly noted, "[u]nder the plain language of the [CVRA], a party may qualify as a victim, even though it may not have been the target of the crime, *as long as it suffers harm as a result of the crime's commission.*" 552 F.3d at 1289 (emphasis added). The Court in *Stewart*, in fact, found that homeowners who were not the target of a dishonest services charge or mentioned in the indictment, were nonetheless directly and proximately harmed by the defendant's conduct and, therefore, qualified as a "crime victim." *Id.*

And while the Government admits the correct approach in determining whether Mr. Henríquez is a crime victim is to look to the conduct underlying the elements of the Defendant's drug trafficking conspiracy, it instead lists the elements of the conspiracy: "(1) an agreement between two or more persons, the object of which is to manufacture and distribute five kilograms or more of cocaine while knowing or intending that the cocaine would be imported into the United States, and (2) the defendant either intentionally or knowingly joining the conspiracy." Govt.'s Response at 9. The Government ignores the conduct underlying these elements in stating that Mr. Henríquez's murder was not "required, let alone integral" to "establishing [the] conspiracy to manufacture and distribute cocaine intending and knowing the

cocaine would be unlawfully imported into the United States. Govt.'s Response at 20. When determining who constitutes a crime victim under the CVRA, courts do not look solely to the elements of a crime (here an agreement with intent) in isolation. *Stewart* recognized that "[t]he CVRA . . . does not limit the class of crime victims to those whose identity constitutes an element of the offense or who happen to be identified in the charging document. The Statute, rather, instructs the district court to look at the offense itself *only* to determine the harmful effects the offense has on parties." 552 F.3d at 1289 (emphasis added); *see also In re McNulty*, 597 F.3d 344, 351 (6th Cir. 2010) (same). Courts look to the actual conduct underlying the elements of the offense; they look to the criminal behavior that actually occurred as the crime was committed and, if that criminal behavior causes a party direct and proximate harmful effects, the party is a "crime victim." *Stewart*, 552 F.3d at 1288 (describing the "relevant criminal behavior" by looking at the how the offense is factually alleged).

The Government's cramped approach would prevent the Court from looking at the reality of the offense, force the Court to ignore all the conduct that the conspirators perpetrated in furtherance of their conspiracy, and would be inconsistent with the directive of the Sentencing Commission that, at sentencing – where victims have a right to be heard – the sentence reflect all relevant conduct– not merely some antiseptic characterization of the offense that results from consideration of only the elements in the abstract and divorced from the reality of the crime that was actually committed. *See generally* U.S. SENTENCING GUIDELINES § 1B1.3.

To bolster its erroneous "elements-only" approach, the Government suggests that Congress provided the CVRA with a narrower definition of "crime victim" than that included in the current versions of the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §

3663A and Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663 and that the

CVRA is substantially similar to a pre-amended version of the VWPA (previously codified in

18 U.S.C. § 3579 (1984)) which the United States Supreme Court determined did not provide

restitution to persons who were not victims of a defendant's offense of conviction. *See Hughey*

*v. United States*, 495 U.S. 411, 418 (1998) (holding that petitioner only pled guilty to one of the

six charges in the indictment and that the government could not seek restitution for the five

dropped charges). Congress amended the VWPA, post-*Hughey*, to include language that

broadened the VWPA so that restitution could be ordered to persons who were not the victim of

the offense of conviction. *See United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997)

("After the amendment [to the VWPA in 1990], restitution may be ordered for losses to persons

harmed in the course of the defendant's scheme even beyond the counts of conviction.").

The CVRA includes as victims all those persons "directly and proximately harmed as a

result of the commission of a Federal offense." 18 U.S.C. § 3771(e). The current VWPA and

MVRA similarly define victim as:

> [A] person directly and proximately harmed as a result of the commission of an
> offense for which restitution may be ordered *including, in the case of an offense
> that involves as an element a scheme, conspiracy, or pattern of criminal activity,
> any person directly harmed by the defendant's criminal conduct in the course of
> the scheme, conspiracy, or pattern.*

18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2) (emphasis added). The Government claims

that the CVRA is narrower than the MVRA and VWPA because it does not include the

expanding (italicized) language. Govt.'s Response at 10. The Government claims that the

definition of crime victim under the CVRA is more similar to the pre-amended VWPA, which

states:

> The court, when sentencing a defendant convicted of an offense under this
> title . . . may order, in addition to or in lieu of any other penalty authorized by
> law, that the defendant make restitution to any victim of the offense.

18 U.S.C. § 3579(a)(1)(1982); *see* Govt.'s Response at 11. What the Government ignores is that the definition of "crime victim" under the CVRA is intentionally broad and unambiguous, and completely different. By its plain language, the CVRA requires only that the harm caused to a victim be direct and proximate. The CVRA states:

> For the purposes of this chapter, the term "crime victim" means a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia . . . .

18 U.S.C. § 3771(e). It, therefore, does not tie victim status to the elements of a crime, or even to an actual offense of conviction. It is a broad definition limited by its direct and proximate language.

The Statute uses unrestricted language because it was intended to be a broad definition. The CVRA was designed to "build[] on [prior victim's rights law such as the VWPA] . . . fixing the problems with these earlier laws," to enable "meaningful progress" for the rights of victims. Ex. 27 at S4262 (statement of Sen. Feinstein); *see also Kenna v. United States District Court*, 435 F.3d 1011, 1015 (9th Cir. 2006) (giving considerable weight to the floor statements of Senator Kyl regarding the definition of a "crime victim" under the CVRA). Its purpose was "to **strengthen rather than weaken** victims' rights in federal criminal prosecutions," and to expand the rights enjoyed by victims of criminal acts beyond existing legislation. *United States v. Atlantic States Cast Iron Pipe, Co.*, 612 F. Supp. 2d 453, 462 (D.N.J. 2009) (emphasis added).

Other courts in administering the CVRA have adhered to this articulated intent of Congress. These courts have acknowledged the need for an expansive interpretation of the CVRA and an "inclusive approach" when determining "crime victims." *See United States v. Hunter*, No. 2:07CR307DAK, 2008 WL 53125, at *2 (D. Utah Jan. 3, 2008) (noting that the sponsors of the CVRA expected an expansive definition of the term). No court to date, in fact,

has agreed with the Government's excessively narrow interpretation.  It is a routine practice of the Courts, in all districts, to rely upon the amended VWPA and MVRA language (which the Government thinks is different) as persuasive both for how the CVRA is to be interpreted procedurally and for when an individual qualifies as a victim.  *See McNulty*, 597 F.3d at 350 n.6 ("[W]e find our case law construing the VWPA and the MVRA persuasive, both for how the CVRA is to be interpreted procedurally and for when an individual qualifies as a victim of a conspiracy."); *United States v. Brock-Davis*, 504 F.3d 991, 999 n.4 (9th Cir. 2007) ("Because the MVRA and VWPA utilize the same definition of victim, our interpretation of the definition is the same for both the VWPA and the MVRA."), *cert denied,* 129 S.Ct. 2415 (2009); *Hunter*, 2008 WL 53125, at *3 (referring to the CVRA, MVRA and VWPA, the court reasons that "[t]he definitions in these statutes are nearly identical."); *United States v. Sharp*, 463 F. Supp. 2d 556, 561-64 (E.D. Va. 2006) (applying interpretations of the MVRA and VWPA when determining the scope of "crime victim" under the CVRA).

While the Government cites to *United States v. Sharp* and *United States v. Turner,* 367 F. Supp. 2d 319 (E.D.N.Y. 2005) as support for its theory, neither *Sharp* nor *Turner* actually held that the definition of crime victim under the CVRA is narrower than that under the current VWPA and MVRA.  *See Sharp*, 463 F. Supp at 561 n.11 (noting that the statute in *Hughey* and the CVRA use similar definitions of "victim" and that it only *"appears"* that the reasoning in *Hughey* could apply) (emphasis added); *Turner*, 367 F. Supp. 2d at 327 (Noting that given the conflict between the "the explicit view of the law's sponsors against the inference to be drawn

from pre-existing case law" courts should "avoid the pitfall of seeking to determine who is

'actually' a victim.").[46]

In reality, here the Government's pre-occupation with *Hughey* is a sideshow. Unlike in

*Hughey*, Movants are not claiming they have been harmed by a completely separate offense for

which the Defendant has not been charged or convicted. *See Hughey*, 495 U.S. at 418

(rejecting the Government's contention that the pre-amended VWPA "authorizes courts to

include in their restitution calculus losses resulting from offense other than the offense of

conviction."). *Sharp* and *Turner* do not hold on the issue, both merely suggest that the usual

methods of determining whether Congress intended the CVRA to apply to persons who are

victims of <u>uncharged conduct</u> (*i.e.*, conduct that is a completely separate offense and is not

direct and proximate to the offense before the Court) produces inconsistent results. *See Sharp*,

463 F. Supp at 561 (after discussing how the sponsors of the CVRA intended that the definition

be interpreted "broadly" to include "all victims . . . whether or not they are the victim of the

count charged," the court includes a footnote suggesting that an opposite inference could,

however, be drawn if a court were to apply case law concerning the pre-amended VWPA);

*Turner*, 367 F. Supp. 2d at 327 (same). Unlike what the Government would have the Court

believe, however, whether or not the CVRA was intended to include persons who have been

---

[46] *Sharp* identified the elements of the defendant's crime (in that case conspiracy to possess with intent to distribute marijuana) solely to determine the conduct underlying those elements. 463 F. Supp. 2d at 563 (noting that "[t]he assault and battery (or other variation of the purported abuse) allegedly inflicted on Nowicki neither assisted the Defendant in the commission of his federal offense, nor was it an essential element necessary for the accomplishment of his criminal acts."). The District Court in *Turner* took an even more inclusive position presuming that "any person whom the government asserts was harmed by conduct attributed to a defendant, as well as any person who self-identifies as such, enjoys all of the procedural and substantive rights set

(continued...)

harmed by uncharged or unconvicted criminal conduct by a Defendant is not at issue before this Court. Movants were directly and proximately harmed by the conduct perpetrated as part of the drug trafficking offense for which the Defendant is charged and is before this Court. *See, e.g., United States v. Donaby*, 349 F.3d 1046, 1053 (9th Cir. 2003) ("The district court could properly conclude that robbing the bank directly and proximately led to the high-speed chase and the property damage that ensued. *Hughey* does not prevent a factual determination of causation.").

Where, as here, the Defendant is charged with a conspiracy, Court's take the logical approach of determining the direct and proximate effects of the criminal conduct in the course of the conspiracy. As described by the Sixth Circuit Court of Appeals in a case referred to by the Government, *McNulty*, given the definition of conspiracy "'[a]n agreement by two or more persons to commit an unlawful act, coupled with an intent to achieve the agreement's objective, and (in most states) action or conduct that furthers the agreement; a combination for an unlawful purpose'. . . it appears logical that those directly and proximately harmed by criminal conduct in the course of the conspiracy beyond the overt act required to prove the conspiracy would be victims under CVRA, just as they would under the VWPA and the MVRA." 597 F.3d at 350 n.6 (citation omitted). The court in *Sharp* also followed this approaching stating: "since the Defendant's offense includes as an element a conspiracy, Nowicki could argue that she is a victim because she was harmed by an act taken in furtherance of the conspiracy." 463 F. Supp. 2d at 564 n.16. Movants qualify as victims because the offense charged here is a conspiracy and Movants were directly and proximately harmed as a result of it.

---

(...continued from previous page)

forth in § 3771." 367 F. Supp. 2d. at 327; *see also United States v. Rubin*, 558 F. Supp. 2d 411, 419 (E.D.N.Y. 2008) (same).

**B.      The Government Incorrectly Concludes that Movants, Whose Immediate
Family Member Was Killed by the Defendant in Furtherance of His Drug
Trafficking Conspiracy, Did Not Suffer Direct and Proximate Harm as a
Result of the Commission of the Offense**

**1.      Mr. Henríquez's Killing Would Not Have Occurred But For the
Defendant's Charged Drug Conspiracy**

The determination as to whether the harm suffered by Mr. Henríquez was a "result" of

the Defendant's commission of the drug trafficking conspiracy is fact-specific and, here, the

facts are inescapable. *See In re Rendon Galvis*, 564 F.3d 170, 175 (2d Cir. 2009) (holding that

the "necessary inquiry" for the direct and proximate cause analysis "is a fact-specific one").

There may be others in Colombia who were not harmed as a direct and proximate result of the

Defendant's drug-trafficking crime, but Mr. Henríquez was not one of them.  Mr. Henríquez's

murder would not have happened "but for" the Defendant's conspiracy.  After over 5 years of

living in the area controlled by the Defendant in the north coast of Colombia, unthreatened, Mr.

Henríquez was warned to leave the area, then was forcibly disappeared when, during the

Defendant's conspiracy in 2001, he founded a non-profit environmental organization that

publicly opposed the Defendant's coca cultivation in Colombia's northern coast and

encouraged local farmers not to grow the Defendant's coca.[47]  *See* Zulma Decl. at ¶ 8;

Nadiezhda Decl. at ¶ 7; Bela Decl. at ¶ 5.  In fact, the Defendant ordered his men to abduct Mr.

Henríquez from one of the trainings he was providing to local farmers.[48]

As the Government describes in its own words the Defendant "require[d] local farmers

growing coca in the area, the primary ingredient for cocaine, to sell their coca only to his

organization under a penalty of death."  Govt.'s Pretrial Detention Memo at 2.  But for his

---

[47] *See* Ex. 6 at 1-2; Ex. 8 at 1; Ex. 9 at 2.

[48] *See* Ex. 6 at 1-2.

public opposition to the Defendant's forcible growth of Coca for trafficking, part of the

Defendant's crime, Mr. Henríquez simply would not have been killed.[49]

The Government's desperate search for other motives for Mr. Henríquez's murder,

where none exist, again is an example of its desire to avoid treating Mr. Henríquez's wife and

children as crime victims.  Cherry-picking from witness statements for any suggestion that

there "could" be other reasons for Mr. Henríquez's death, the Government (which made a point

of its translation of the entirety of the exhibits) provides snippets, without any context.  Quoting

from the Colombian Court's holding out of context, the Government refers to Mr. Henríquez's

long-before M-19 membership as a "bad thing," then insinuates this could be one motive as to

why he was killed.  *See* Govt.'s Response at 16.  In fact, the Colombian Court ruling to which

the Government refers notes Mr. Henríquez's past membership was a "bad thing" only because

Mr. Henríquez was gaining "influence" in the area.[50]  The Colombian Court actually that Mr.

Henríquez was influential because he "plann[ed] to eradicate drugs in order to plant cacao,

thereby becoming a well-known figure with followers among all the residents of that sector of

our national territory."[51]  Mr. Henríquez, in fact, demobilized and received amnesty for his

membership from M-19 in 1984, approximately 17 years prior to being forcibly abducted and

murdered by the Defendant and his AUC subordinates.[52]  Mr. Henríquez had lived in

Magdalena for over 5 years, during which time the Defendant commanded the area from at

---

[49] *See generally* Govt.'s Response Ex. 6 at 14, 16, 21, 22-23, 24, 37; Govt.'s Response Ex. 7 at 5, 6, 14; Govt.'s Response Ex. 8 at 1-2, 6; Aug. 5, 2010 Holzer Decl. Ex. B at 2, 4.

[50] Ex. 7 at 14.

[51] *Id.*

[52] Govt.'s Response Ex. 6 at 13, 14.

least 1995 onwards.[53]  Notably, the Defendant's men (and the Defendant himself) consistently referred to Mr. Henríquez as the "gentleman of the NGO;" _not_ the former M-19 member.[54]  Mr. Henríquez was gaining "influence" from his anti-coca growing activities; he influencing local farmers not to grow the Defendant's coca.[55]  It was this "influence" that caused Mr. Henríquez to be killed, not his membership in an organization some 17 years earlier.

And the Government's attempt to suggest that "another motive" for Mr. Henríquez's murder was his refusal to obey an order by the Defendant to leave the area completely ignores the context of the origins of that threat.  Govt.'s Response at 17.  Manjarres Charris does suggest that "[the Defendant] would ask [Mr. Henríquez] to leave, the guy did not obey and he was told again to leave, when the [Defendant] again saw that he was not obeying him he sent some of his men to have him killed."[56]  But later in his testimony, Manjarres Charris points out the underlying reason for that threat was: "the BOSS had said that it was a co-op that was going to be set up but I do not know for what purpose, but he did not want to allow it to be set up."[57]

This underlying reason for the threats issued by the Defendant against Mr. Henríquez is supported by another witness who recalled that, due to his anti-coca activities, Mr. Henríquez was threatened to leave the area and was forcibly abducted when he ignored the Defendant's threats:

---

[53] _Id._ at 14; _see also_ Superseding Indictment at 1.

[54] Govt.'s Response Ex. 8 at 1-2; Aug. 5, 2010 Holzer Decl. Ex. B at 2.

[55] _See_ Govt.'s Response Ex. 7 at 20 (". . . planning to eradicate drugs in order to plant cacao, thereby becoming a well-known figure with followers among all the residents of that sector of our national territory . . . ").

[56] Aug. 5, 2010 Holzer Decl. Ex. B at 2.

[57] _Id._ at 4; _see also_ Govt.'s Response Ex. 6 at 21.

> [V]ictim had gone to give a lecture about the eradication of coca, and received a message from Hernán Giraldo, [the Defendant's son]," in which he was told to leave the village or else suffer the consequences. Since he paid no heed, Hernán, on orders from Pacho Musso, gave the order to have him disappeared . . . [58]

The Government would like the Court to believe the Defendant's threat for Mr. Henríquez to leave was an intervening factor or unique event that can be looked in isolation of the Defendant's drug trafficking activity. *See* Govt.'s Response at 17. Logically, the Court must look to the underlying reason why Mr. Henríquez was threatened, then killed, which would not have happened but for the Defendant's conspiracy.

In the Government's continuing attempts to use statements out of context, it completely omits a statement from its quoted language of the sworn witness statement of Sierra Urbina, then claims it is ambiguous. *See* Govt.'s Response at 17. Again, in a failed attempt to show other "possible" motive, the Government suggests that Sierra Urbina states: "[a]ny seller who enters Guachaca, Calabazo, any seller of brooms or whatever, has to carry an identification card that identifies him as such, . . . but the person who does not wear that card and does not say the reasons . . . the order is to kill him." Govt.'s Response at 17. What the Government omits from its quotation from Sierra Urbina is what makes it completely unambiguous. Sierra Urbina actually states that "the person who does not wear the card and does not say the reasons, . . . and he has suspicious behavior as if he were an informant or something, the order is to kill

---

[58] Govt.'s Response Ex. 6 at 3-4; *see also* Govt.'s Response Ex. 7 at 1-2 ("In 2001 he arrived at the district to give a lecture to the farmers for the eradication of coca crops. He gave his normal lecture. He had been at that district for 3 days and he got a message from Commander HERNAN GIRALDO SERNA, telling him he had to leave the town otherwise he would have to face the consequences, that he already knew what was going to happen to him. The message was delivered to him directly by HERNAN's son, also known as GRILLO. Three days went by and he then went to Las Tinajas. The gentleman kept on giving his lectures, so Mr. HERNAN pulled

(continued...)

him."[59]  Contrary to what the Government suggests, Sierra Urbina does not say that <u>all</u>

individuals entering Calabazo needed an identification card, but that the Defendant would kill

individuals who he believed were informants.[60]  And Sierra Urbina <u>never</u> even suggests this as

a possible motive for Mr. Henríquez's murder.  Notably, on the actual reason for Mr.

Henríquez's murder, Sierra Urbina is absolutely unambiguous, suggesting the reason was

"obvious."  He said:

> **ANSWER:**  Obviously, Mr. HERNAN did not agree with it, what that
> gentleman was telling the peasants, because he grows coca, and if they
> invaded his lands, that is sufficient reason to kill somebody. . .[61]

Sierra Urbina understood that, but for Mr. Henríquez's opposition to the Defendant's drug

conspiracy, he would not have been threatened and killed.

### 2.  Mr. Henríquez's Killing Was A Forseeable Result and Committed in Furtherance of the Defendant's Drug Conspiracy

Courts have long interpreted proximate harm to mean that the harm to a "crime victim"

should be a reasonably foreseeable result of a defendant's actions.  *See In re Antrobus*, 519

F.3d 1123, 1126-27 (10th Cir. 2008) (Tymkovich, J., concurring) ("evidence could be

developed to show that [the] crime was . . . reasonably foreseeable."); *see also Babbit v. Sweet*

*Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 713 (1995) (O'Connor, J.,

concurring) ("proximate cause principles inject a foreseeability element into the statute").  As

---

(...continued from previous page)

out a commander in charge, commander WALTER who was up in the mountains and the orders
he gave him were to gather their people and make the gentleman of the NGO disappear.").

[59] Ex. 8 at 6 (phrases omitted by the Government emphasized).

[60] *Id.*

[61] *Id.*

the Government here itself has alleged, the Defendant's offense before this Court is an eleven-year drug trafficking conspiracy, by self-admitted members of a terrorist organization, who controlled every aspect of drug trafficking on the northern coast of Colombia in the Departments of Magdalena and Guajira. *See* Govt.'s Detention Memo at 2; Govt.'s Speedy Trial Memo at 3, 5-6. The AUC established that control over drug trafficking by requiring local farmers growing coca in the area, the primary ingredient for cocaine, to sell their coca only to the Defendant's organization under a penalty of death. *See* Govt.'s Detention Memo at 2; Govt.'s Speedy Trial Memo at 6. The potential for violent conduct in drug conspiracies is well recognized. *See Castillo v. United States*, 200 F.3d 735, 737 n.2 (11th Cir. 2000) (carrying a weapon as part of a drug crime was reasonably foreseeable); *United States v. Cummings*, 937 F.2d 941, 945 (4th Cir. 1991) ("the illegal drug industry is, to put it mildly, a dangerous, violent business" and finding that possession of a firearm was a reasonably foreseeable part of a drug conspiracy); *United States v. Golter*, 880 F.2d 91, 94 (8th Cir. 1989) (finding that the Defendant's possession of a firearm was a reasonably foreseeable consequence of a drug conspiracy); *United States v. Alvarez*, 755 F.2d 830, 848 (11th Cir. 1985) (upholding the jury's conclusion that "murder was a reasonably foreseeable consequence of the drug conspiracy alleged in the indictment"). When the drug offense in question, however, specifically involves a terrorist organization and avails of "threats of death," the foreseeability of actual harm, of course, must be heightened. The Government contends, albeit not in the indictment, that the conspiracy included killings – at least the killing of a judge. *See* Govt.'s Pretrial Detention Memo at 4 (noting that a co-conspirator "ordered the murder of a Colombian

24

judge because the judge was interfering with the organization's cocaine manufacturing operations.").[62]   The Government cannot now turn its back on its words; part of the drug trafficking conspiracy was a threat to local farmers to grow coca under penalty of death. *See* Govt.'s Detention Memo at 2.  Mr. Henríquez was a local famer who refused to grow coca for the Defendant and encouraged others to do the same.  Mr. Henríquez's murder was, therefore, a foreseeable consequence of the Defendant's drug-trafficking conspiracy. *See Associated General Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 548 (1983) ("it has always been assumed that the victim of an intentional tort can recover from the tortfeasor if he proves that the tortuous conduct was a cause-in-fact of his injuries."); RESTATEMENT (SECOND) OF TORTS § 435A (1965) ("A person who commits a tort against another for the purpose of causing a particular harm to the other is liable for such harm if it results, whether or not it is expectable, except where the harm results from an outside force the risk of which is not increased by the defendant's act.").

But Mr. Henríquez's murder was not merely a foreseeable result of the Defendant's drug trafficking conspiracy – it was committed in furtherance of it.  The Defendant controlled the area by threatening "local farmers growing coca in the area . . . to sell their coca only to his organization under a penalty of death."  Govt.'s Detention Memo at 2.  The Defendant killed Mr. Henríquez because Mr. Henríquez himself gained "influence" on those farmers and jeopardized the Defendant's control over the coca-growing in the area.

The Government is wrong to suggest that this case involves the same type of "symbiotic relationship" between the AUC's drug-trafficking and its terrorist operations as in *In re Rendon*

---

[62] The Government's position as to the Movants would mean the Government would take the
(continued...)

*Galvis*. In *Rendon*, the Second Circuit Court of Appeals held that district court did not abuse

its discretion when finding that Ms. Rendon Galvis's son, Juan Fernando Vargas Rendon, was

not directly harmed by the federal crime committed by the defendant in that case because

Rendon only "alleged that there was a symbiotic relationship between the AUC's drug-

trafficking and its terrorist operations and that Vargas's abduction and murder took place in a

geographic area that was significant for the AUC's drug-trafficking operation." 564 F.3d at

175.

Mr. Henríquez's murder did occur at precisely the same place, the North Coast of

Colombia, where the Government has alleged the Defendant's conspiracy took place here.  And

it did occur during the same time period, between 1994 and 2005, that the Government has

alleged the conspiracy occurred.  Govt.'s Speedy Trial Memo at 3; Govt.'s Pretrial Detention

Memo at 2.  Here, however, there is not merely a "symbiotic relationship" between the

Defendant's drug-trafficking operation and the harm suffered by the Movants.  *See supra*

Section I.B.2.  The evidence here establishes specific motives and violent acts against Mr.

Henríquez taken to further the Defendant's drug trafficking conspiracy.  The evidence here

includes specific statements by the Colombian Court and various witnesses that Mr. Henríquez

was killed because of his anti-coca activities.  There can be no doubt: Mr. Henríquez's death

was committed in furtherance of the Defendant's drug trafficking conspiracy.[63]

_____

(...continued from previous page)

preposterous position that the murdered Colombian judge is also not a victim.

[63] Excerpts from sworn factual statements attributing Mr. Henríquez's murder to his
opposition to the Defendant's drug trafficking activities are attached hereto as Appendix A.

## CONCLUSION

For the foregoing reasons, the Movants respectfully request that the Court order that they be recognized as victims in this proceeding and be granted their rights as "crime victims" under the CVRA.  Pursuant to Local Criminal Rule 47(f), the Movants respectfully request that oral argument be heard to facilitate the Court's understanding of the unique issues presented by Movants.

Dated:  August 5, 2010

JOSHUA A. HOLZER
D.C. Bar No. 490438
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
1700 K Street, NW
Fifth Floor
Washington, DC 20006-3817
Telephone:  (202) 973-8800
Facsimile:  (202) 973-8899
Jholzer@wsgr.com

Leo P. Cunningham
Lee-Anne Mulholland
Nema Milaninia
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:  (650) 565-5100

Roxanna Altholz
INTERNATIONAL HUMAN RIGHTS LAW CLINIC
UNIVERSITY OF CALIFORNIA,
BERKELEY SCHOOL OF LAW – BOALT HALL
787 Simon Hall
Berkeley, CA 94720-7200
Telephone:  (510) 643-8781
Facsimile:  (510) 643-4625

*Counsel for Movants Zulma Natazha Chacín
de Henríquez, Nadiezhda Natazha Henríquez
Chacín and Bela Henríquez Chacín*

## APPENDIX A
### Factual Statements asserting Mr. Henríquez was Killed Due to His Opposition to the Defendant's Drug Trafficking Activities

The investigation reveals that the victim . . . was called to a meeting by HERNAN GIRALDO SERNA because HERNAN disagreed with the setting up of the Cooperative . . . so HERNAN ordered alias "WALTER" to gather some people, alias "TROILO" was among them, in order to "run the errand."

*Grounds for Decision, Office of the Prosecutor General, National Unit for Human Rights and International humanitarian Law, Barranquilla (Mar. 20, 2007) at p. 2.*

He reports that the victim apparently wanted to set up a Cooperative and "EL PATRON" did not want to let him set it up and that all this was said by HERNAN GIRALDO SERNA himself as an example because they had an associate who was very stubborn and that was the way the boss reprimanded him, giving him as an example what had happened in El Calabazo because of the stubbornness of the man from the NGO.

*Grounds for Decision, Office of the Prosecutor General, National Unit for Human Rights and International humanitarian Law, Barranquilla (Mar. 20, 2007) at p. 21 (summarizing statement of Alberto Segundo Manjarrez Charris).*

Mr. JULIO E. HENRIQUEZ SANTAMARIA, who had been in the area for three days, had come there to give a talk to the farmers about eradicating the coca crops and received a message from HERNAN GIRALDO SERNA, through alias "EL GRILLO," the latter's son, telling him to leave the town or he would have to bear the consequences, so he knew what could happen to him, and since JULIO ignored it, HERNAN, by order of PACHO MUSSO, took out a commander named "WALTER" and gave him the order to gather personnel and make the man from the NGO disappear, for which purpose they gathered seven men of whom two are dead, namely Commander WALTER and MONO LECHE, the other five are GUAJIRA, PATILISO, PAPEL, GARFIO and CAMARON.

*Grounds for Decision, Office of the Prosecutor General, National Unit for Human Rights and International humanitarian Law, Barranquilla (Mar. 20, 2007) at p. 22-23 (summarizing statement of Carmello Daniel Sierra Urbina).*

The deponent also indicates that they made JULIO E. HENRIQUEZ SANTAMARIA disappear because he wanted to eradicate the coca crops and was messing with HERNAN GIRALDO, since the latter is a coca grower and invading his lands constituted sufficient reason to kill someone . . .

*Grounds for Decision, Office of the Prosecutor General, National Unit for Human Rights and International humanitarian Law, Barranquilla (Mar. 20, 2007) at p. 23 (summarizing statement of Carmello Daniel Sierra Urbina).*

[V]ictim had gone to give a lecture about the eradication of coca, and received a message from Hernán Giraldo, via "Grillo," in which he was told to leave the village or else suffer the consequences. Since he paid no heed, Hernán, on orders from Pacho Musso, gave the order to have him disappeared . . .

*Summary of Proceedings, Republic of Colombia, Judicial Branch, Criminal Court of the Specialized Circuit (January 21, 2009) at p. 3-4.*

[O]n the morning of February 4, 2001, Mr. Julio Eustacio Henríquez Santamaría, in the Calabazo district, rural area of Santa Marta, was in a meeting with the association he had founded, "*Madre Tierra*," when suddenly several individuals appeared who, following a brief conversation with

Henríquez Santamaría, proceeded to take him away, against his will, in an unknown direction, in a white slat-sided pickup truck with license plate number [cut off] . . .

*Summary of Proceedings, Republic of Colombia, Judicial Branch, Criminal Court of the Specialized Circuit (January 21, 2009) at p. 4 (summary of the Prosecutor's arguments).*

[H]e was taken in an unknown direction while holding a meeting with residents of that area regarding a project he had set up with the environmental NGO "Madre Tierra," whose purpose was the eradication of coca in order to subsequently plant cacao, and thereby organize the plots of land to that end.

*Summary of Proceedings, Republic of Colombia, Judicial Branch, Criminal Court of the Specialized Circuit (January 21, 2009) at p. 11-12.*

The testimony by the relatives of Henríquez Santamaría is consistent with the above, as they reach the same conclusion as the demobilized individuals, in that the former had to be disappeared at all costs since he was impeding the objectives of the AUC to continue planting coca, which Henríquez wished to see eradicated in order to cultivate cacao. This was not permitted by Hernán Giraldo who, in revenge and with malice decided, together with his right-hand man, Leónidas Acosta Ángel, aka Troilo, to make Henríquez Santamaría disappear.

*Summary of Proceedings, Republic of Colombia, Judicial Branch, Criminal Court of the Specialized Circuit (January 21, 2009) at p. 14.*

## CERTIFICATE OF SERVICE BY HAND DELIVERY

On this date, I caused to be personally served Movants Zulma Natazha Chacín De Henríquez, Nadiezhda Natazha Henríquez Chacín and Bela Henríquez Chacín Opposition Memorandum In Support of Motion to Enforce Rights under the Crime Victims' Rights Act on the person(s) listed below by placing the document(s) described above in an envelope addressed as indicated below, which I sealed. I consigned the envelope(s) to a messenger for hand delivery by placing it/them for collection and processing on this day, following ordinary business practices at Wilson Sonsini Goodrich & Rosati.

> Elita C. Amato
> 2009 North 14th Street, Suite 708
> Arlington, VA 22201
>
> Paul Joseph
> U.S. Department of Justice
> Narcotic and Dangerous Drug Section
> 1400 New York Avenue, N.W.
> Bond Building, 8th Floor
> Washington, D.C. 20005

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Washington, D.C. on August 5, 2010.

Joshua A. Holzer