IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  )
                           )
                           )
                  Plaintiff, )     CASE NO.:  1:04-cr-00114-RBW-1
        v.                 )
                           )
GIRALDO-SERNA, et al.,     )
                           )
                           )     **FILED**
                  Defendants. )
                           )     APR 2 6 2010
                           )
                               U.S. DISTRICT COURT

**MOTION TO ENFORCE RIGHTS UNDER THE CRIME VICTIMS' RIGHTS ACT
BY ZULMA NATAZHA CHACÍN DE HENRÍQUEZ, NADIEZHDA NATAZHA
HENRÍQUEZ CHACÍN AND BELA HENRÍQUEZ CHACÍN**

**TABLE OF CONTENTS**

Page

INTRODUCTION AND BACKGROUND ............................................................................... 1

ARGUMENT ................................................................................................................................. 8

I.     THE MOVANTS ARE "CRIME VICTIMS" UNDER THE CVRA ................................ 8

     A.     The Definition of "Crime Victim" Under the CVRA Is Intentionally Broad
and Unambiguous .................................................................................................... 8

     B      Mr. Henriquez Was Abducted and Killed as a Consequence, and in
Furtherance, of the Conspiracy .......................................................................... 10

CONCLUSION .......................................................................................................................... 12

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Blum v Stenson*, 465 U.S. 886 (1984) ...................................................................................9

*Donnelly v. F.A.A.*, 411 F.3d 267 (D.C. Cir. 2005) ...........................................................4

*In re Antrobus*, 519 F.3d 1123 (10th Cir. 2008) ...............................................................10

*In re Dean*, 527 F.3d 391 (5th Cir. 2008) (per curiam) ...............................................7, 12

*In re Mikhel*, 453 F.3d 1137 (9th Cir. 2006)....................................................................11

*In re Simons*, 567 F.3d 800 (6th Cir. 2009) .......................................................................8

*In re Stewart*, 552 F.3d 1285 (11th Cir. 2008).................................................................9

*Kenna v United States District Court*, 435 F.3d 1011 (9th Cir. 2006) ............................12

*United States v. Hunter*, No. 2:07CR307DAK, 2008 WL 53125 (D. Utah Jan. 3,
   2008) .................................................................................................................10

*United States v. L.M.*, 425 F Supp. 2d 948 (N.D. Iowa 2006).........................................11

*United States v. Lexington Mill & Elevator Co.*, 232 U.S. 399 (1914) .............................9

*United States v. Rubin*, 558 F. Supp. 2d 411 (E.D.N.Y. 2008)........................................10

*United States v. Saltsman*, No. 07-CR-641NGG, 2007 WL 4232985 (E.D.N.Y.
   Nov. 27, 2007) .................................................................................................8

*United States v. Turner*, 367 F. Supp. 2d 319 (E.D.N.Y. 2005)..................................8, 10

*United States v. West Indies Transp. Inc.*, 127 F.3d 299 (3d Cir. 1997) ..........................12

*United States v. Wood*, CR No. 05-00072DAE, slip op. (D. Haw. July 17, 2006)............10

### STATUTES

18 U.S.C. § 3663 .............................................................................................................8, 12

18 U.S.C. § 3771 ..........................................................................................................*passim*

### RULES

FED. R. CRIM. P. 32(1)(4)(B)................................................................................................1

FED. R. CRIM. P 60(a)(3) ....................................................................................................1

FED. R. CRIM. P. 60 .............................................................................................................8

## INTRODUCTION AND BACKGROUND

Movants Zulma Natazha Chacín de Henríquez ("Zulma"), Nadiezhda Natazha Henríquez Chacín ("Nadiezhda") and Bela Henríquez Chacín ("Bela") (collectively the "Movants") lost their husband and father, respectively, to the violence Hernán Giraldo-Serna (the "Defendant") perpetuated in executing the drug trafficking conspiracy for which he is indicted here. The Department of Justice ("DOJ") has inexplicably (and continually) refused to treat the Movants as victims of the Defendant's crime. DOJ is violating its statutory obligations, and the Court should now order that the Movants are entitled to all the rights and protections afforded by the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771. *See also* FED. R. CRIM. P. 32(i)(4)(B) & 60(a)(3).

The Defendant was a leader in a narco-terrorist paramilitary organization, named the *Autodefensas Unidas de Colombia* ("AUC").[1] Government's Motion for Pretrial Detention, *United States v. Giraldo-Serna, et al.*, No. 1:04-cr-00114-RBW-1, Docket Entry No. 124 (D.D.C. May 15, 2008) (the "Govt.'s Detention Memo") at 3; Government's Motion to Exclude Time Under the Speedy Trial Act and Declare the Case Complex, *United States v. Giraldo-Serna, et al.*, No. 1:04-cr-00114-RBW-1, Docket Entry No. 139 (D.D.C. June 11, 2008) (the "Govt.'s Speedy Trial Memo") at 5. The AUC was involved in "various aspects of drug trafficking activity," including "encouraging coca planting and discouraging alternative development" within Colombia.[2]

On May 13, 2008, the Defendant was extracted from Colombia's Justice and Peace Process and extradited to the United States to face charges for conspiracy to traffic drugs and for

---

[1] *See* 2001 REPORT ON FOREIGN TERRORIST ORGANIZATIONS, U.S. DEP'T OF STATE at 1 (Oct. 5, 2001) (Ex. 1). All exhibits to this motion are attached to the Declaration of Joshua A. Holzer, filed concurrently herewith.

[2] *See* Drugs, Money and Terror (congressional testimony of DEA official Asa Hutchinson, Admin'r, Drug Enforcement Admin.) at 2 (April 24, 2002) (Ex. 2).

MOTION TO ENFORCE RIGHTS UNDER THE CRIME
VICTIMS' RIGHTS ACT BY ZULMA NATAZHA
CHACÍN DE HENRÍQUEZ, NADIEZHDA NATAZHA
HENRÍQUEZ CHACÍN AND BELA HENRÍQUEZ CHACÍN

1

aiding and abetting.[3]  Second Superseding Indictment, *United States v. Giraldo-Serna*, No. 04-114-RBW (D.D.C. Mar. 2, 2005) (the "Second Superseding Indictment"), Count 1.  The United States alleged that the Defendant was a leader of a subdivision of the AUC that controlled "virtually all aspects of drug trafficking on the North Coast of Colombia." Govt.'s Speedy Trial Memo at 4.  Specifically, the Defendant "oversaw the manufacture . . . [and] transportation of multi-ton quantities of cocaine" by one particular cocaine organization, "Los Mellos," based in and around the city of Santa Marta which is located in Magdalena on Colombia's Northern Coast. Govt.'s Speedy Trial Memo at 5.  Movants' husband and father, Mr. Julio Eustacio Henriquez Santamaría ("Mr. Henríquez"), owned a farm named El Picacho close to the city of Santa Marta in Magdalena.[4]  Declaration of Zulma Natacha Chacín de Henríquez ("Zulma Decl.") at ¶ 5; Declaration of Nadiezhda Natazha Henríquez Chacín ("Nadiezhda Decl.") at ¶ 4; Declaration of Bela Henríquez Chacín ("Bela Decl.") at ¶ 4.  He was killed by the Defendant's men as they violently exerted control over that lucrative coca-growing area.[5]  The Defendant "require[d] local farmers growing coca in the [Santa Marta] area, the primary ingredient for cocaine, to sell their coca only to his organization *under a penalty of death*." Govt.'s Detention

---

[3] *See* Press Release, 14 Members of Colombian Paramilitary Group Extradited to the United States to Face U.S. Drug Charges, U.S. Attorney's Office (S.D. Fla.) at 1 (May 13, 2008) (Ex. 3).  On July 22, 2005, the Colombian government passed the Justice and Peace Law (Law 975), in an attempt to end the violence caused by paramilitary groups throughout Colombia.  The Defendant could have avoided his extradition to the United States had he actually cooperated and provided truth and reparation to his victims.  *See* Press Release, President Alvaro Uribe of Colombia speaks on the occasion of the delivery in extradition of persons subjected to the Law of Justice and Peace (English translation) (May 13, 2008) at 1 (Ex. 4) ("[P]eople were extradited, either because they had returned to crime after having submitted to the Law of Justice and Peace or because they had not cooperated with the justice system as they should; and all of them because they had failed to due [sic] their duty in making reparations to the victims, by concealing their assets or delaying their surrender.").

[4] Report No. 0117 UDH-DIH at 5 (July 7, 2003) (Ex. 5).

[5] Statement of Charges for Expected Judgment for Hernán Giraldo-Serna at 1-2 (March 20, 2007) (Ex. 6); Conviction of Hernán Giraldo Serna at 14 (Jan. 21, 2009) (Ex. 7).

Memo at 2 (emphasis added). In open defiance of that order, Mr. Henríquez immediately uprooted and burned coca or marijuana found on his farm.[6] Nadiezhda Decl. at ¶ 5. Mr. Henríquez also founded an environmental organization known as *Madre Tierra* that publicly opposed coca cultivation on Colombia's northern coast and encouraged local farmers not to grow the Defendant's coca.[7] Zulma Decl. at ¶ 8; Nadiezhda Decl. at ¶ 7; Bela Decl. at ¶ 5. Mr. Henríquez offered training on, and access to government funding for, the purchase of substitute crops such as cacao and fruit trees.[8] Zulma Decl. at ¶ 8; Nadiezhda Decl. at ¶ 7.

In retaliation for Mr. Henríquez's efforts to organize local farmers and eradicate coca cultivations, the Defendant had his son, "El Grillo," personally threaten Mr. Henríquez to either "leave the village . . . [or] suffer the consequences."[9] During the time period covered by the indictment, the Defendant ordered his troops to kidnap and murder Mr. Henríquez when he continued his anti-cocaine efforts.[10] Mr. Henríquez was abducted and violently forced into a waiting car by the Defendant's men, on February 4, 2001, when conducting a meeting with local farmers to discuss coca eradication through reforestation.[11] Mr. Henríquez was not seen alive again. Zulma Decl. at ¶¶ 9-11; Nadiezhda Decl. at ¶¶ 8-9; Bela Decl. at ¶¶ 6-7. After his forced

---

[6] *See also* Ex. 5 at 5 ("[O]ne day, [Mr. Henríquez] appeared with his family at the property in question and, taking a tour of the lands, was surprised to find marijuana growing inside his property and got so angry that he pulled it out with his own hands and burned the crop.").

[7] *See also* Ex. 6 at 1-2; Declaration of Carmelo Sierra Urbina at 1 (Sept. 25, 2003) (Ex. 8); Declaration of Julio Nelson de la Cruz Barros at 2 (July 4, 2003) (Ex. 9).

[8] *See also* Ex. 6 at 1-2; Ex. 8 at 1; Ex. 9 at 2.

[9] Ex. 8 at 1. *See also* Ex. 6 at 9, 22.

[10] Ex. 6 at 23; Ex. 8 at 6; BULLETIN, DECEMBER 2007, UNIT OF INCIDENCE, ANALYSIS, AND DOCUMENTATION, CATALAN TABLE FOR PEACE AND HUMAN RIGHTS IN COLOMBIA at 1 (Dec. 2007), *available at* http://www.taulacolombia.org/butlletides07/butlleticas.html (Ex. 10); Juan Forero, Paramilitary Extraditions Spark Debate in Colombia, NATIONAL PUBLIC RADIO at 1 (Sept. 29, 2009) (Ex. 11).

[11] Ex. 6 at 1-2.

"disappearance," the Defendant and his co-conspirators took control of Mr. Henríquez's farm and grew coca on his land.[12]

In June 2007, *the Defendant admitted to the murder of Mr. Henríquez* and provided the location of his remains.[13] Mr. Henríquez's body was finally discovered on October 11, 2007, when the Defendant's lawyer provided a list signed by the Defendant detailing the location of various unmarked graves.[14] Zulma Decl. at ¶ 11; Nadiezhda Decl. at ¶ 9; Bela Decl. at ¶ 7. Mr. Henríquez had been tortured before being killed.[15] He also had suffered two gunshot wounds to his head.[16] On March 20, 2007, the Defendant was charged in Colombia for conspiracy to commit a criminal act and for aggravated forced disappearance of Mr. Henríquez.[17] The Defendant was convicted and sentenced for Mr. Henríquez's forced disappearance on January 21, 2009.[18] As noted by both the Attorney General's office in its statement of charges and the Colombian court in its conviction, a former subordinate of the Defendant had specifically testified that the reason for Mr. Henríquez's murder was his interference in the Defendant's drug trafficking.[19] This has been reaffirmed by another former AUC member who said that the Defendant ordered "the guy from Calabazo from the NGO" to be killed when he was not

---

[12] *See* Ex. 5 at 5.

[13] Ex. 10 at 1; Ex. 11; Official Letter No. 5711, Report by the Judicial Police at 5 (Oct. 23, 2007) (Ex. 12).

[14] Ex. 12 at 1, 5.

[15] Expert Autopsy Report No. 2007010111001004743 at 2-3 (Feb. 4, 2008) (Ex. 13).

[16] *Id* at 2.

[17] *See* Ex. 6 at 1.

[18] Ex. 7 at 21. As noted by the District of Columbia, Circuit Court of Appeals, foreign criminal convictions constitute *prima facie* evidence of the facts underlying the judgment. *See Donnelly v. F.A.A.*, 411 F.3d 267, 270-71 (D.C. Cir. 2005).

[19] *See* Ex. 6 at 23 ("The deponent also indicates that they made JULIO E. HENRIQUEZ SANTAMARIA disappear because he wanted to eradicate the coca crops and argued with

(continued...)

heeding the Defendant's threats.[20] The Colombian court relied upon the testimony of both individuals when determining the Defendant's conviction of Mr. Henríquez's forced disappearance and his sentence.[21] It noted that Mr. Henríquez's relatives had reached the same conclusion as these former paramilitaries, "namely that [the Defendant] triggered [Mr. Henríquez's] disappearance because he was working against the objectives of the AUC, namely to continue cultivating coca, which [Mr. Henríquez] wanted to eradicate in order to cultivate cocoa [sic], which was not allowed by [the Defendant] who, due to vengeance and hatred, decided . . . to make [Mr. Henríquez] disappear . . . ."[22]

The United States has prevented the Defendant from serving any part of his sentence for Mr Henríquez's death by extraditing him to face these charges. Colombia's Supreme Court has since refused to extradite any similarly-situated paramilitary drug traffickers due to the devastating effect such extraditions were having on Colombian victims.[23] Although the Bush administration's decision to extradite these narco-terrorists to the United States has foreclosed any hope for justice and restitution for these crimes in Colombia, the Obama Justice Department

---

(...continued from previous page)

HERNAN GIRALDO, since the latter is a coca grower and invading his lands constituted sufficient reason to kill someone since the Mafia does not forgive."); Ex. 7 at 14; Ex. 8 at 6.

[20] Declaration of Alberto Segundo Manjarres-Charris at 2 (Aug. 22, 2003) (Ex. 14).

[21] Ex. 7 at 13 ("[C]redibility must be given to the story of the demobilized persons who categorically indicated the incursion of the [Defendant] within the [AUC] and who carried out the forced disappearance against the will of the person, as their testimonies are consistent, precise, and logical . . . .").

[22] Id at 14.

[23] Approved Minutes No. 260, Juris. C.S.J. at 44-45 (Aug. 19, 2009) (extradition would violate "the international obligations of the Colombian State concerning the struggle against impunity in cases of crimes against humanity" and "grave harm would be done to the rights of the victims and Colombian society, as they would be unable to know the truth and receive reparation for the crimes committed by the paramilitary groups.") (Ex. 15); see Adriaan Alsema, Court disallows extradition of demobilized paramilitaries, COLOMBIA REPORTS (Aug. 20, 2009) (Ex. 16).

must not be allowed to compound the victimization of the Movants by denying them the rights all victims must be afforded in this country.

DOJ has denied Movants their rights for nearly two years and has refused to make even a determination as to their crime victim status. This was true on June 22, 2009, after Movants received no victim notification for over a year, when undersigned counsel contacted DOJ and requested that it recognize and afford the rights entitled to Movants under the CVRA.[24] It was true on November 6, 2009, when undersigned counsel attempted to electronically file a motion to have Movants recognized as crime victims with the Court and the Court informed counsel that they would not be allowed to file Movants' motion based in part on the fact that DOJ asserted that it had not taken a final position regarding Movants' status as crime victims.[25] It continued to be true when, in accordance with the Court's decision, the undersigned counsel again requested that DOJ recognize Movants as "crime victims" or at least come to a determination.[26] It remains true now, nearly five months after the undersigned counsel was assured by DOJ that it was "preparing a formal response" which it expected to forward "shortly."[27] Despite multiple attempts requesting DOJ provide Movants' with a position, including recent efforts in March and April, DOJ has not articulated any final determination [28] While purporting to make no decision,

---

[24] *See* Letter from Leo Cunningham, Wilson Sonsini Goodrich & Rosati, and Roxanna Altholz, International Human Rights Law Clinic at the University of California Berkeley School of Law, to Glenn C. Alexander, U.S. Dep't of Justice, at 1 (June 22, 2009) (Ex. 17).

[25] Prior to attempting to file the motion with the court, we provided the DOJ with a copy of Clients' Motion to Enforce Their Rights Under the CVRA on November 4, 2009 – two days in advance of our planned filing date. The Government said it would "review the draft motion immediately. *See* email from Mr. Paul Joseph, U.S. Dep't of Justice, to Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati (Nov. 4, 2009) (Ex. 18).

[26] *See* email from Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati, to Mr. Paul Joseph, U.S. Dep't of Justice (Nov. 9, 2009) (Ex. 19).

[27] *See* email from Mr. Paul Joseph, U.S. Dep't of Justice, to Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati (Nov. 12, 2009) (Ex. 20).

[28] On November 13, 2009, we sent DOJ an email requesting a date when we should expect to be informed of the Government's final position. *See* email from Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati, to Mr. Paul Joseph, U.S. Dep't of Justice (Nov. 13, 2009) (Ex. 21).
(continued...)

DOJ has nevertheless extended no rights to Movants to which they are entitled to as "crime victims."

The Government has not articulated its decision as to whether or not Movants are victims, but, whether intentionally or not, the Government's actions -- and inactions -- constitute their decision: the Government has not extended Movants rights they are entitled to as "crime victims." As a result, the Movants have been denied their rights to timely notice of public court proceedings involving the Defendant's crimes and to confer with the Government. 18 U.S.C. §§ 3771(a)(3), (5). The Movants have also been denied the right to provide input during ongoing plea negotiations.[29] The Movants have further been deprived of the right to have information on the proceedings. 18 U.S.C. §§ 3771(a)(1), (3).

The U.S. Department of Justice (and the Courts) are obligated to protect the rights of these victims even if it may be inconvenient for the Justice Department. 18 U.S.C. §§ 3771(b),

---

(...continued from previous page)

On November 16, 2009, DOJ informed us that it expected to "know today" when we would receive the Government's determination. *See* email from Mr. Paul Joseph, U.S. Dep't of Justice, to Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati (Nov. 16, 2009) (Ex. 22). Four months later, on March 11, 2010, we demanded the DOJ either make a decision or inform us that it could not make a decision so we could again as leave from the Court to file the motion *See* letter from Leo Cunningham, Wilson Sonsini Goodrich & Rosati and Roxanna Altholz, Berkeley Law International Human Rights Law Clinic, to Mr. Paul Joseph, U.S. Dep't of Justice (Mar. 11, 2010) (Ex. 23). Two weeks later we were told the DOJ had met and discussed the matter but it was still "under consideration." *See* email from Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati to Mr. Paul Joseph, U.S. Dep't of Justice (Apr. 1, 2010) (Ex. 24). When we asked to speak further to the Assistant United States Attorney involved in the matter (to provide any further information they may need) he suggested that he should "check whether [he was] cleared to discuss the matter with [us] further." *See* email from Mr Paul Joseph, U.S. Dep't of Justice to Lee-Anne Mulholland, Wilson Sonsini Goodrich & Rosati (Apr. 5, 2010) (Ex. 25). This is the last we heard from DOJ.

[29] *In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008) (per curiam) ("In passing the Act, Congress made the policy decision – which we are bound to enforce – that the victims have a right to inform the plea negotiation process by conferring with prosecutors before a plea agreement is reached."); U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL GUIDELINES FOR VICTIM AND WITNESS ASSISTANCE, at 29 (2005) (Ex. 26) ("[P]rosecutors should be available to consult with victims about major case decisions, such as dismissals . . . plea negotiations, and pretrial diversion.").

(c).[30]  The CVRA directs the Court to "take up and decide any motion asserting a victim's right

forthwith." 18 U.S.C. § 3771(b).[31]  Federal Rule of Criminal Procedure 60 also states that the

Court "must promptly decide any motion asserting a victim's rights . . . ."

The CVRA establishes rights for victims and DOJ Guidelines contemplate enforcing

those rights for foreign victims.[32]  18 U.S.C. § 3771(a).  DOJ has thus far failed to do so.  The

CVRA specifically authorizes a review of the Government's actions under 18 U.S.C. §

3771(d)(3).  Accordingly, the Movants now bring this motion under the CVRA.

## ARGUMENT

I.   **THE MOVANTS ARE "CRIME VICTIMS" UNDER THE CVRA**[33]

### A.   The Definition of "Crime Victim" Under the CVRA Is Intentionally Broad and Unambiguous

The CVRA was instituted in 2004 as part of the Justice For All Act, Pub. L. No. 08-405,

8. Stat. 2260 (effective Oct. 30, 2004), to "build[] on [prior victim's rights law such as the

Victim and Witness Protection Act, 18 U.S.C. § 3663] . . . fixing the problems with these

earlier laws," to enable "meaningful progress" for the rights of victims.  108 CONG. REC.

S4260, S4262 (daily ed. Apr. 22, 2004) (statement of Sen. Feinstein) (Ex. 27).  The definition

of "crime victim" under the CVRA is intentionally broad and unambiguous.  The CVRA states:

---

[30] *See also* Ex. 26 at 23-26.

[31] *In re Simons*, 567 F.3d 800, 801 (6th Cir. 2009) (holding that a district court's three-month delay in ruling on a movant's motion constituted a violation of the CVRA even where the Government had not recognized the movants as "crime victims.").

[32] Ex. 26 at 23 n.2 (describing how to facilitate contact with foreign victims residing in other countries).

[33] Because victims' rights under the CVRA begin prior to a defendant's conviction, the determination of who qualifies as a "crime victim" may be based on allegations rather than proof.  *See United States v. Saltsman*, No. 07-CR-641NGG, 2007 WL 4232985, at *1 (E.D.N.Y. Nov. 27, 2007); *United States v. Turner*, 367 F. Supp. 2d 319, 326 (E.D.N.Y. 2005).

> For the purposes of this chapter, the term *"crime victim"* means a person *directly and proximately* harmed as a result of the commission of *a* Federal offense or an offense in the District of Columbia . . . .

18 U.S.C. § 3771(e) (emphasis added). The definition of "crime victim" under the CVRA, by

its plain language, only requires that the harm caused to a victim be direct and proximate.

In *In re Stewart*, 552 F.3d 1285 (11th Cir. 2008), the Eleventh Circuit explained the

correct approach for determining who is a "crime victim":

> [F]irst, we identify the behavior constituting "commission of a Federal offense." Second, we identify the direct and proximate effects of that behavior . . . .

*Id.* at 1288. The *Stewart* Court then went on to find that homeowners who were not the target

of a dishonest services charge or mentioned in the indictment, were nonetheless directly and

proximately harmed by the defendant's conduct and, were therefore, "crime victims." *Id.* at

1289. As the Court in *Stewart* rightly noted, "[u]nder the plain language of the statute, a party

may qualify as a victim, even though it may not have been the target of the crime, *as long as it*

*suffers harm as a result of the crime's commission.*" *Id.* (emphasis added). *Stewart* also

recognized that "[t]he CVRA . . . does not limit the class of crime victims to those whose

identity constitutes an element of the offense or who happen to be identified in the charging

document  The statute, rather, instructs the district court to look at the offense itself *only* to

determine the harmful effects the offense has on parties." *Id.* (emphasis added).

When a statute's plain wording is clear and obvious, there is no need for a court to

resort to interpretative methodologies. *See generally United States v. Lexington Mill &*

*Elevator Co* , 232 U.S. 399, 409 (1914) (If a legislative purpose is expressed in "plain and

unambiguous language, . . . the . . . duty of the courts is to give it effect according to its

terms.")  However, if looking beyond a statute's plain terms is necessary, a court should look

first to the statute's legislative history. *See Blum v. Stenson*, 465 U.S. 886, 896 (1984) (in

resolving question of Congress' intent, "we look first to the statutory language and then to the

legislative history if the statutory language is unclear."). Congress itself suggested it used an

"intentionally broad" definition to "correct, not continue, the legacy of the poor treatment of crime victims in the criminal process." 108 CONG. REC. S4260, S4269, S4270 (daily ed. Apr. 22, 2004) (statement of Sens. Feinstein and Kyl) (Ex. 27).

Other courts in administering the CVRA have adhered to Congress' legislative intent and the CVRA's plain and ordinary language. These courts demonstrated an expansive interpretation of the CVRA and an "inclusive approach" when determining who are "crime victims." *See United States v. Hunter*, No. 2:07CR307DAK, 2008 WL 53125, at *2 (D. Utah Jan. 3, 2008) (noting that the sponsors of the CVRA expected an expansive definition of the term); *United States v. Wood*, CR No. 05-00072DAE, slip op. at 3 (D. Haw. July 17, 2006) (holding that although the defendant directly harmed the corporation, the President and Senior Director of Operations of the corporation were proximately harmed because they continue to suffer the effects of the fraud in their personal and business relationships).

Other courts have taken an even more inclusive position presuming that "any person whom the government asserts was harmed by conduct attributed to a defendant, as well as *any person who self-identifies as such*, enjoys all of the procedural and substantive rights set forth in § 3771." *Turner*, 367 F. Supp. 2d. at 327 (emphasis added); *see also United States v. Rubin*, 558 F. Supp. 2d 411, 419 (E.D.N.Y. 2008) (same) (citations omitted). Here such an inclusive approach taken by other courts is not needed: these Movants were directly and proximately harmed by the indicted offense – they are "crime victims," consistent with legislative intent, who fit squarely within the CVRA's plain and ordinary language.

**B.     Mr. Henríquez Was Abducted and Killed as a Consequence, and in Furtherance, of the Conspiracy**

The Defendant is responsible for directly and proximately causing Mr. Henríquez's abduction and murder as part of the charged drug conspiracy.

The requirement that the victim be "directly and proximately harmed" encompasses the traditional "but for" and foreseeability analyses. *See In re Antrobus*, 519 F.3d 1123, 1126-27 (10th Cir. 2008) (Tymkovich, J., concurring) ("First of all, the victim must be 'directly' harmed

by the crime. This encompasses a 'but-for' causation notion that is met here."). As the
Government acknowledges, as part of this drug trafficking conspiracy and during the indicted
period, the Defendant threatened "local farmers growing coca in the area . . . to sell their coca
only to his organization under a penalty of death." Govt.'s Detention Memo at 2. The
Defendant had his son personally threaten Mr. Henríquez to either "leave the village or . . .
suffer the consequences" when Mr. Henríquez defied him by continuing his efforts to persuade
local farmers from growing coca.[34] According to two former members of the Defendant's
organization, the Defendant ordered his troops to kidnap and murder Mr. Henríquez in
retaliation for his efforts to eradicate coca cultivations when Mr. Henríquez continued to ignore
his threats.[35] Acting upon these orders, the Defendant's men abducted Mr. Henríquez, brutally
killed him, and used his farm for growing coca.[36] The Defendant has admitted his role in the
murder of Mr. Henríquez.[37] He has been convicted of it and was sentenced.[38] The sentencing
court noted the direct and proximate connection between Mr. Henríquez's murder and the
Defendant's drug trafficking in the Defendant's conviction.[39]

　　　The Movants, Mr. Henríquez's closest relatives, are entitled to victim status because the
murder of Mr. Henríquez was a direct and forseeable consequence – it was, in fact, an integral
and necessary part of the Defendant's crime.[40] These Movants are precisely the type of victims

---

[34] Ex. 8 at 1. *See also* Ex. 6 at 9, 23.

[35] Ex. 8 at 6, Ex. 14 at 2; Ex. 6 at 22-23.

[36] Ex. 6 at 1-2, 23; Ex. 5 at 5.

[37] Ex. 10 at 1; Ex. 11.

[38] Ex. 7 at 21.

[39] *Id.* at 14.

[40] It is well-established that immediate family members of a murder victim also constitute
"crime victims" under the CVRA. *See In re Mikhel*, 453 F.3d 1137, 1139 n.2 (9th Cir. 2006)
("Thus, the family members of the murder victims in this case are themselves victims for
purposes of § 3771."); *United States v. L.M.*, 425 F. Supp. 2d 948, 951 (N.D. Iowa 2006)
(continued...)

the CVRA was intended to protect. Accordingly, the Movants are entitled to the rights
guaranteed by the CVRA, including but not limited to, the right to be notified of public
proceedings involving the Defendant; to be heard at proceedings involving the release, plea or
sentencing of the Defendant; and to full and timely restitution as afforded to them under the
Victim and Witness Protection Act, 18 U.S.C. § 3663.[41]

A denial of these rights would prevent the type of "meaningful progress" in the
treatment of victims that was envisioned by Congress.[42]

## CONCLUSION

For the foregoing reasons, the Movants respectfully request that the Court order that
they be recognized as victims in this proceeding and be granted their rights as "crime victims"
under the CVRA. Pursuant to Local Criminal Rule 47(f), the Movants respectfully request that
oral argument be heard to facilitate the Court's understanding of the unique issues presented by
their motion

Dated. April 16, 2010                          /s Joshua A. Holzer

---

(...continued from previous page)

("[T]he parties agree that [the deceased's] family members qualify as 'crime victims' under the
CVRA. A 'crime victim' includes a family member of a person killed as a direct and
proximate result of the commission of a federal crime.") (citing 18 U.S.C. § 3771(e)).

[41] *See* 18 U.S.C. §§ 3771(a)(4)-(6); *Kenna v. United States District Court*, 435 F.3d 1011,
1016 (9th Cir. 2006) ("Victims now have an indefeasible right to speak, similar to that of the
defendant . . . ."); *In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008) ("victims have a right to
inform the plea negotiation process by conferring with prosecutors before a plea agreement is
reached"); *United States v. West Indies Transp. Inc.*, 127 F.3d 299, 315 (3d Cir. 1997)
("Restitution is authorized for violation of 18 U.S.C. § 2."). The Movants are also entitled to
all other rights enumerated at 18 U.S.C. § 3771(a): the right to be reasonably protected from the
defendant; to confer with Federal Prosecutors; not to be excluded from any public proceedings
involving the accused; to proceedings without unreasonable delay; and to be treated with
fairness, dignity, and respect for privacy.

[42] 108 CONG. REC. S10910, S10910 (daily ed. Oct. 9, 2004) (statement of Sen. Kyl) (Ex. 28)
("I would like to make it clear that it is not the intent of this bill to limit any laws in favor of
crime victims that may currently exist, whether these laws are statutory, regulatory, or found in
case law.").

MOTION TO ENFORCE RIGHTS UNDER THE CRIME          12
VICTIMS' RIGHTS ACT BY ZULMA NATAZHA
CHACÍN DE HENRÍQUEZ, NADIEZHDA NATAZHA
HENRÍQUEZ CHACÍN AND BELA HENRÍQUEZ CHACÍN

JOSHUA A. HOLZER
D.C. Bar No. 490438
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
1700 K Street, NW
Fifth Floor
Washington, DC 20006-3817
Telephone:  (202) 973-8800
Facsimile:  (202) 973-8899
Jholzer@wsgr.com

Leo P. Cunningham*
Lee-Anne Mulholland*
Nema Milaninia*
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:  (650) 565-5100
Roxanna Altholz*
INTERNATIONAL HUMAN RIGHTS LAW CLINIC
UNIVERSITY OF CALIFORNIA,
BERKELEY SCHOOL OF LAW – BOALT HALL
787 Simon Hall
Berkeley, CA 94720-7200
Telephone:  (510) 643-8781
Facsimile:  (510) 643-4625

*Pro Hac Vice (Pending)

Counsel for Movants Zulma Natazha Chacín
de Henríquez, Nadiezhda Natazha Henríquez
Chacín and Bela Henríquez Chacín