**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>Plaintiff, )<br>v. )<br><br>GIRALDO-SERNA )<br><br>Defendant, )<br><br>Zulma Natazha Chacín de Henríquez, Nadiezhda )<br>Natazha Henríquez Chacín, and Bela Henríquez )<br>Chacín )<br><br>Movants. ) | CASE NO.: 1:04-cr-00114-1 RBW<br><br>UNDER SEAL[1] |

**MOVANTS' FURTHER CVRA SUBMISSION IN RESPONSE TO DEFENDANT'S
OPPOSITION TO MOTION TO INTERVENE UNDER CRIME VICTIMS' RIGHTS
ACT**

---

[1] Movants object to filing this brief under seal and request that it be unsealed forthwith because there is no interest to protect in sealing it, and to the extent there were, any such interest could most likely be protected by a limited redaction.  *See* Movants' CVRA Submission in Connection With Status Conference Scheduled For February 18, 2015 at 6-9.  Maintaining an entire docket under seal is unconstitutional.  *See, e.g.*, *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1022-23 (11th Cir. 2005). "Complete closure of the judicial record is proper only in the absence of alternatives that would provide adequate protection."  *Dhiab v. Obama*, No. CV 05-1457 (GK), 2014 WL 4954458, at *4 (D.D.C. Oct. 3, 2014).

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................. 3

I.      THE DEFENDANT FAILS TO RECOGNIZE THAT THE CVRA
        FUNDAMENTALLY CHANGED THE VICTIM'S ROLE IN THE
        PROSECUTION OF A FEDERAL CRIMINAL CASE ...................................... 3

II.     THE COURT MUST CONSIDER HOW THE CONSPIRACY WAS
        ACTUALLY COMMITTED IN DETERMINING THE MOVANTS' STATUS
        AS CRIME VICTIMS ....................................................................................... 5

        A.      Neither the Prosecution nor the Defense Can "Plead Around" the Victims
                to Deprive Them of the Rights Conferred by the CVRA (or to Deprive the
                Court of Information Needed for a Just Result)....................................... 5

        B.      Determining Victim Status Involves Considerations Beyond the Elements
                of the Offense of Conviction................................................................... 7

        C.      No Court Has Adopted the Elements-Only Approach Urged by Defendant
                and the Authorities on which He Relies Establish That Movants are
                Victims in this Case .............................................................................. 10

        D.      The Definition of Crime Victim in the CVRA Is Not Narrower than the
                Definition in the Restitution Statutes.................................................... 14

III.    MR. HENRÍQUEZ WAS ABDUCTED AND MURDERED AS THE DIRECT
        RESULT OF THE DEFENDANT'S DRUG CONSPIRACY ......................... 15

CONCLUSION............................................................................................................ 20

## TABLE OF AUTHORITIES

**Page**

### CASES

*Dhiab v. Obama,*
    No. CV 05-1457 (GK), 2014 WL 4954458 (D.D.C. Oct. 3, 2014) ................ Caption Page

*In re Dean,*
    527 F.3d 391 (5th Cir. 2008) ..................................................................................................4

*In re McNulty,*
    597 F.3d 344 (6th Cir. 2010) ........................................................................................ *passim*

*In re Rendon-Galvis,*
    564 F.3d 170 (2d Cir. 2009).................................................................................7, 10, 18

*In re Simons,*
    567 F.3d 800 (6th Cir. 2009) ..................................................................................................4

*In re Stewart,*
    552 F.3d 1285 (11th Cir. 2008) ..................................................................................7, 9

*Kenna v. United States District Court,*
    435 F.3d 1011 (9th Cir. 2006) ..................................................................................3, 4

*Paroline v. United States,*
    134 S.Ct. 1710 (2014).................................................................................................18, 20

*Taylor v. United States,*
    495 U.S. 575 (1990).......................................................................................................8

*United States v. Atlantic States Cast Iron Pipe Co.,*
    612 F. Supp. 2d 453 (D.N.J. 2009) ..................................................................12, 13, 15

*United States v. Crandon,*
    173 F.3d 122 (3d Cir. 1999)........................................................................................18

*United States v. Ochoa-Vasquez,*
    428 F.3d 1015 (11th Cir. 2005) ............................................................... Caption Page

*United States v. Sellers,*
    512 F. App'x 319 (4th Cir. 2013) ........................................................................13, 14

*United States v. Sharp,*
    463 F. Supp. 2d 563 (E.D. Va. 2006) ............................................................11, 12, 18

*United States v. Turner,*
    367 F. Supp. 2d 319 (E.D.N.Y. 2005) ..................................................................4, 15

*United States v. Washington,*
    434 F.3d 1265 (11th Cir. 2006) ..................................................................................9

**STATUTES**

18 U.S.C. § 3661 ..............................................................................................................5

18 U.S.C. § 3771 ...................................................................................................... *passim*

21 U.S.C. § 850 ................................................................................................................5

**RULES**

Eleventh Circuit Pattery Jury Instructions (Crminnal Cases) (2010) ............................8

Fed. R. Crim. P. 1 ...........................................................................................................7

**MISCELLANEOUS**

1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm, § 27 ......................19

1 Wayne R. LaFave, Substantive Criminal Law § 6.4(b) (2d ed. 2003) (updated
Sept. 2014) ...............................................................................................................19

108 Cong. Rec. S10910 (daily ed. Oct. 9, 2004) ..........................................................19

108 Cong. Rec. S4260 (daily ed. Apr. 22, 2004) .....................................................4, 18

MODEL PENAL CODE § 2.03 cmt. 2 p. 259 (1985) ...................................................19

United States Sentencing Guidelines § 2D1.1 .........................................................9

U.S. Department of Justice, Attorney General Guidelines for Victim and
Witness Assistance (2012) ........................................................................................19

# INTRODUCTION

Movants, surviving relatives (wife and children) of Julio Eustacio Henríquez Santamaría ("Mr. Henríquez"), respectfully submit this further memorandum in response to the Defendant's Opposition to Motion to Intervene Under Crime Victims' Rights Act (the "Opposition" or "Opp."). Movants filed their most recent submission on these issues on February 13, 2015 (the "Feb. 13 Brief").

The Opposition is most notable for what it does not dispute: that *Defendant ordered the murder of Mr. Henríquez because of Mr. Henríquez's opposition to Defendant's drug trafficking conspiracy for which Defendant is before this Court*. Consequently, Mr. Henríquez, and therefore Movants, are victims of the conspiracy because the test is whether the harm to the victim was the direct and proximate result of the offense. It was; so Movants are victims.

Instead of challenging the facts, the Opposition argues that Movants are not victims because Mr. Henríquez's murder was not an element of the conspiracy. As Movants have explained in prior briefs, that is not the test. Neither the CVRA itself nor any case interpreting it – including those cited by Defendant – articulates the test urged by the Defendant. The question is one of causation, and the evidence establishes that the killing was caused by the conspiracy.

Accordingly, Movants respectfully reiterate their requests that the motion they filed in 2010 be granted so they are recognized as victims under the CVRA. Movants respectfully reserve their right to seek remediation, including, possibly, the setting aside of the plea agreement, if their rights were violated. Movants also request that all future proceedings in this matter be public, or at least open to the Movants; that the record of prior proceedings (including, especially, but not exclusively, any plea agreement or Rule 11 colloquy) be made available to the public, or at least the Movants; and that there be no further proceedings relating

to the determination of the Defendant's guilt, sentence, or detention without notice to the Movants and a prior determination of their right to be heard at such proceedings.[2]

## BACKGROUND

Mr. Henríquez's widow, Zulma, describes her husband as "the kindest and most humble and loving man on earth" and as a "leader who gave up his life to defend his community and the cause that he believed in."  *See* Declaration of Zulma Natazha Chacín de Henríquez ("Zulma Decl."), attached as Exhibit ("Ex.") A to the Declaration of Joshua A. Holzer in Support of Motion to Enforce Rights Under the Crime Victims' Rights Act ("First Holzer Decl.").  The Defendant's crime robbed her of her husband's emotional and financial support and robbed their three children of their father.  *Id.*  The Defendant has refused to reveal details about Mr. Henríquez's abduction and murder or to compensate the family for their loss.  *See* Zulma Decl., and the Declarations of Nadiezhda Natazha Chacín de Henríquez and Bela Henríquez (First Holzer Decl. Exs. B & C).  Zulma and her daughters have also been unable to recover the victim's farm, el Picacho, which they were forced to leave after Mr. Henríquez was abducted.[3]  Today, the land is illegally occupied by farmers.  Zulma and her daughters seek recognition as crime victims despite significant safety concerns.[4]

---

[2] The Movants rely on, and incorporate herein by this reference, the argument on this point made in the Feb. 13 Brief and are not further briefing these issues below.

[3] Report No. 0117 UDH-DIH at 5 (July 7, 2003), attached as Ex. 5 to the Declaration of Joshua A. Holzer in Support of Opposition Memorandum in Support of Motion to Enforce Rights Under the Crime Victims' Rights Act with evidence ("Holzer Opp. Decl.").

[4] The Defendant's family members remain active in the drug trade on Colombia's Northern Coast and are responsible for widespread killings.  In 2013, two of the Defendant's nephews, Ruben Giraldo and Aldemar Giraldo, were arrested in connection with their roles as leader of the drug gang "Los Giraldo."  A bloody dispute for control of the region's lucrative drug trade between "Los Giraldo" and another gang has claimed 150 lives.  *See* Elyssa Pachico, Arrest of Paramilitary Warlord Opens Way for Urabeños, IN SIGHT CRIME (May 2, 2013), attached as Ex. 5 to the Supplemental Declaration of Roxanna M. Altholz, filed concurrently herewith ("Altholz Supp. Decl.").  Since 2001, at least seven close relatives of the Defendant, including a brother (Jesus Antonio Giraldo Serna, alias "El Mono"), two sons (Hernán Giraldo Ochoa, alias "Rambo" and Daniel Giraldo Contreras, alias "el Grillo"), and four nephews (Dodier Giraldo Giraldo, Nodier Giraldo Giraldo, Ruben Giraldo and Aldemar Giraldo) have faced prosecution in Colombia and/or the United States for crimes related to narco-trafficking.

Contrary to the Opposition's assertion, the Movants have not found redress in Colombia. Opp. at 2. In 2009, the Defendant was convicted of forcibly disappearing Mr. Henríquez by an ordinary criminal court in Colombia and not the specialized courts created by the Justice and Peace law. The Movants are not participating in the Justice and Peace process[5] although the Justice and Peace prosecutor has accused the Defendant of 405 crimes, including killings, forced disappearances, torture, and sexual violence, against 2,500 victims.[6] The Movants refuse to participate because they believe the Justice and Peace process offers the Defendant legal benefits without guaranteeing their rights as victims.[7] The Movants are concerned that the Defendant will use the Justice and Peace Process to avoid the 38-year prison sentence and monetary compensation ordered by the 2009 conviction for the abduction and killing of Mr. Henríquez.

## ARGUMENT

### I.   THE DEFENDANT FAILS TO RECOGNIZE THAT THE CVRA FUNDAMENTALLY CHANGED THE VICTIM'S ROLE IN THE PROSECUTION OF A FEDERAL CRIMINAL CASE

The CVRA fundamentally changed the role of crime victims in the prosecution of those crimes. "The statute was enacted to make crime victims full participants in the criminal justice system." *Kenna v. United States District Court*, 435 F.3d 1011, 1016 (9th Cir. 2006) (recognizing the rights of victims includes the right to allocute at sentencing). "The criminal justice system has long functioned on the assumption that crime victims should behave like

---

[5] The Movants are not participating in the Justice and Peace Process as relatives of a victim of forced disappearance. They have sought restitution of Mr. Henríquez's land through the Justice and Peace process without success.

[6] Fiscalía radicó en Barranquilla 1010 hechos contra Diego Vecino y Hernán Giraldo, EL HERALDO (July 31, 2013) (Altholz Supp. Decl. Ex. 6).

[7] Colombia's Justice and Peace process offers legal leniency to paramilitary members in exchange for a commitment to disarm, forfeit assets, and tell the truth about human rights abuses they committed. The Defendant has not revealed details about the victim's abduction and murder. First Holzer Decl. Ex. B at 2.

good Victorian children – seen but not heard.  The [CVRA] sought to change this by making victims independent participants in the criminal justice process." *Id*. at 1013.

The CVRA made the change by articulating eight categories of rights all crime victims have.  18 U.S.C. § 3771(a)(1)-(8).  The CVRA requires prosecutors to make their best efforts to notify crime victims of and accord them rights.  18 U.S.C. § 3771(c)(1).  Congress recognized that the interests of the victims and those of the Government may not always coincide.[8]  The legislation gave teeth to CVRA rights by making the district court their guardian: "the court shall ensure that the crime victim is afforded the rights described in subsection (a)" of § 3771.  18 U.S.C. § 3771(b)(1).  *See United States v. Turner*, 367 F. Supp. 2d 319, 323 (E.D.N.Y. 2005) (recognizing the a court should "make every effort" to ensure a victim is not denied the right to attend court proceedings); *In re Dean*, 527 F.3d 391, 394-96 (5th Cir. 2008) (finding that "it was contrary to the provisions of the CVRA for the court to permit and employ the *ex parte* proceedings" and affirming that ordering the government to confer in some reasonable way with the victims would not have interfered with prosecutorial discretion); *In re Simons*, 567 F.3d 800, 801 (6th Cir. 2009) (affirming a crime victim's "clear and indisputable right to a prompt ruling on his motion to unseal" by the district court).  The CVRA expressly allows a putative victim to seek enforcement of these rights in the district court by motion, requiring the district court to decide such motions "forthwith," and allowing for expedited review in the Court of Appeals.  18 U.S.C. § 3771(d)(3).  The CVRA also allows for motions "to re-open a plea or sentence" where the victim's "right to be heard before or during the proceeding at issue . . . was denied."  18 U.S.C. § 3771(d)(5).

---

[8] 150 CONG. REC. S4260, S4269 (daily ed. April 22, 2004) (remarks of Sen. Kyl) (Holzer Opp. Decl. Ex. 27) ("where there is a material conflict between the government's attorney and the crime victim, [the enforcement] provision protects the crime victims' rights.  This means that if the government lawyers interpret a right differently from a victim, urge a very narrow interpretation of a right, or do not believe a right should be asserted, they are in conflict with the victim and this provision requires that they inform the victim of this and direct the victim to independent counsel, such as the legal clinics for crime victims contemplated under this law.  This is an important protection for crime victims because it ensures the independent and individual nature of their rights.").

By its very title, the Opposition fails to recognize the changes the CVRA has wrought. Victims are not outsiders required to "intervene" to be heard; they are participants in the prosecution entitled to move for relief when denied any of their specified rights.

## II. THE COURT MUST CONSIDER HOW THE CONSPIRACY WAS ACTUALLY COMMITTED IN DETERMINING THE MOVANTS' STATUS AS CRIME VICTIMS

### A. Neither the Prosecution nor the Defense Can "Plead Around" the Victims to Deprive Them of the Rights Conferred by the CVRA (or to Deprive the Court of Information Needed for a Just Result)

The Defendant would like to have the Court consider a misleadingly sanitized view of the Defendant and his conduct in producing and importing cocaine. The reason for that is obvious: the manner in which the Defendant committed this conspiracy is as despicable as the manner in which he has lived the rest of his life.[9] During his decades of controlling the lucrative drug trade of Northern Colombia the Defendant repeatedly used "threats, intimidation, murder, and corruption."[10] He victimized countless Colombians during his reign.[11] His abuse of power even included wanton indulgence in pedophilia – and to such an extent that he was

---

[9] Less obvious is why the Government would countenance such a denatured approach and thereby deprive the Court of information the Court should have had in considering a plea agreement and should have in considering a sentence. *See* 21 U.S.C. § 850 ("no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of any offense . . . for the purposes of imposing an appropriate sentence . . . ."); 18 U.S.C. § 3661 (same). One potential explanation is that the Government's forfeiture allegations have put the Government in conflict with Movants, and in league with the Defendant, with respect to the disposition of Defendant's assets. Second Superseding Indictment at 5-6, *United States v. Giraldo-Serna*, No. 04-114-RBW (D.D.C. Mar. 2, 2005) (the "Second Superseding Indictment").

[10] Declaration of Roxanna M. Altholz in Support of Movants' CVRA Submission ("Altholz Opening Decl.") Ex. 2. In this case, the Government acknowledged that the Defendant threatened violence against local farmers to further his drug conspiracy. Government's Motion for Pretrial Detention, *United States v. Giraldo-Serna*, No. 1:04-cr-00114-1 RBW, ECF No. 124 (D.D.C. May 15, 2008) (the "Govt.'s Detention Memo") at 2.

[11] Colombia's Checkbook Impunity – a briefing paper, Human Rights Watch (Sept. 22, 2003) (describing some of the atrocities committed by the Defendant including massacres, killings, and kidnapping), *available at* http://www.hrw.org/legacy/backgrounder/americas/checkbook-impunity.pdf (Altholz Supp. Decl. Ex. 7).

dubbed "el Taladro" or "the Drill" for the number of rapes of young girls he personally committed.[12]

In his effort to sanitize himself and his crime, the Defendant implies that the Court is limited to considering only the Superseding Indictment and Plea Agreement in ascertaining whether the Movants are victims here. Opp. at 2-3. The Defendant is wrong. In determining whether the Movants are crime victims under the CVRA, the Court is obligated to develop the facts. Nowhere does the CVRA say the Court is constrained by what the Government chose to include in (or exclude from) the indictment or what the Government and Defendant agreed to in a plea agreement – especially a plea agreement fashioned in derogation of Movants' rights because they were not allowed to confer with the government and had no opportunity to be heard by the Court before the plea was taken. *See* 18 U.S.C. § 3771(a)(4)(5) & (8).[13] To the contrary, the CVRA expressly recognizes that there can be victims who can assert rights under the CVRA even when there are *no* pleadings. In addressing venue, the CVRA states: "The rights . . . shall be asserted in the district in which a defendant is being prosecuted for the crime *or, if no prosecution is underway, in the district in which the crime occurred*." 18 U.S.C. § 3771(d)(3) (emphasis added). The CVRA thereby recognizes that there is a reality to a crime that is not limited by the pleadings, and in determining victim status, the Court needs to ascertain, not ignore, that reality.

The Defendant's suggestion that victim status be determined only from the pleadings was also rejected by the drafters of the Federal Criminal Rules of Procedure. When those

---

[12] *See, e.g.*, *id.* at 11 (noting "Taladro" as an alias for Defendant). *See also* Juan Forero, Rape in Colombia's war unearthed, THE WASHINGTON POST (June 9, 2013) (Altholz Supp. Decl. Ex. 8).

[13] Mr. Henríquez's abduction and murder occurred during the Defendant's conspiracy which, regardless of what the Parties may have described in fashioning a plea agreement, is said to have involved the manufacture and importation of over fifty tons of cocaine to the United States. Altholz Opening Decl. Ex. 2 ("[D]irect evidence indicate[s] that [the Defendant and his associates] coordinated over 30 cocaine smuggling trips from the North Coast of Colombian (sic) between 1999 and 2002. It is estimated that over 50 tons of cocaine were moved during these smuggling trips"). *See also* War Without End, NEWSWEEK (May 21, 2001) (describing the Defendant as the head of a drug syndicate that "accounts for $1.2 billion in annual shipments to the United States and Europe" and one of Colombia's "top five cocaine traffickers.") (Altholz Supp. Decl. Ex. 9).

Rules implemented the CVRA in 2008, the drafters expressly addressed the issue.  The 2008 amendments included a definition of "victim" in Rule 1.  FED. R. CRIM. P. 1(b)(12).  In the notes to that Rule, the Advisory Committee recognized the Court's authority to make necessary findings:  "Upon occasion, disputes may arise over the question whether a particular person is a victim.  Although the rule makes no special provision for such cases, *the courts have the authority to do any necessary fact finding and make any necessary legal rulings*."  FED. R. CRIM. P. 1 (Committee Notes on Rules – 2008 Amendment) (emphasis added).  That this Court can and should develop the facts in connection with determining victim status is also reflected in the deferential standard of appellate review for such factual findings, which is clear error.  *In re Rendon-Galvis*, 564 F.3d 170, 174 (2d Cir. 2009).

The strait-jacket approach to determining victim status urged by the Defendant is also inconsistent with the recognition that the CVRA "does not limit the class of crime victims to those whose identity constitutes an element of the offense or who happen to be identified in the charging document."  *In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008).  The Court is not limited to consideration of only the Superseding Indictment and Plea Agreement in determining whether the conspiracy at issue directly and proximately resulted in the death of Mr. Henríquez.

As Movants have already established, they are crime victims entitled to all their rights in this case because the murder of Mr. Henríquez as ordered by Defendant was a direct and proximate result of the charged conspiracy.  *See* page 11, below; *see also* Feb. 13 Brief at 3-4 (citing Movants' Opposition Memorandum in Support of Motion to Enforce Rights Under the Crime Victims' Rights Act ("Movants' Opp.") at 1, 3-8, 19-23 (marshalling evidence establishing Mr. Henríquez was killed because of his efforts to stop the production of coca)).

**B.     Determining Victim Status Involves Considerations Beyond the Elements of the Offense of Conviction**

Defendant's second front in his effort to sanitize his crime is to try to limit the Court's consideration to "an examination of the elements of the offense of conviction."  Opp. at 4.  Taken literally, that would allow consideration of no actual facts at all and Defendant has

adduced no support for that outlandish notion.  Assuming Defendant is suggesting the Court is limited to considering only those essential facts that establish an element of the offense, he is also wrong.

Even under Defendant's mistaken theory, however, Movants' would be victims of this conspiracy.  One of the elements of the conspiracy here requires proof beyond a reasonable doubt of the object of the conspiracy,[14] which the Government acknowledges "is to manufacture and distribute . . . cocaine . . . ."  *See* Response of the United States to Order to Show Cause in Connection with Motion to Enforce Rights Under the Crime Victims' Rights Act, *United States v. Giraldo-Serna*, No. 1:04-cr-00114-1 RBW, ECF No. 200 (D.D.C. June 18, 2010) ("Govt.'s Response") at 9.  Facts establishing that object would include the conspirators' behavior in causing the growing of coca, processing coca into cocaine, and overcoming obstacles that prevented any of that.  Mr. Henríquez was such an obstacle.  The Defendant's behavior in causing Mr. Henríquez's death was in furtherance of the conspiracy. Evidence of his killing establishes an essential element of the conspiracy, its object.  Thus, even if Defendant were correct that the Court is limited to looking only at facts underlying an element of the crime, the killing of Mr.Henríquez is such a fact.  But Defendant is not correct.

Movants have previously explained why the elements-only approach urged by the Government, and now the Defendant, is wrong.  Among those reasons are the following:

* The elements-only approach is belied by the plain language of the CVRA which confers victims' rights on anyone who is directly and proximately harmed as a result of "*the commission of* an offense," 18 U.S.C. § 3771(e) (emphasis added), and thereby requires an examination of how the offense was committed, not just how the elements were established.  *See* Feb. 13 Brief at 4 (citing, *inter alia, Taylor v. United States*, 495 U.S. 575, 600-02 (1990)).

---

[14] *See e.g.*, Eleventh Circuit Pattern Jury Instructions (Criminal Cases) at 147-48 (2010).

- The approach to determining who is a crime victim is to first "identify the *behavior* constituting '*commission* of a Federal offense'" and then "identify the direct and proximate effects of *that behavior* . . . ."  A victim of a crime need not have been targeted by the crime or identified in the indictment, and the victim's identity need not be an element of the offense.  *See* Movants' Motion to Enforce Rights Under the Crime Victims' Rights Act ("Movants' Mem.") at 9 (citing, *inter alia, Stewart*, 552 F.3d at 1288 (emphasis added)); Movants' Opp. at 11.

- The pertinent issue is not whether murder is prohibited by the conspiracy statute, the issue is whether the murder is a direct and proximate result of the conspiracy.  *See* Movants' Opp. at 12 (citing, *inter alia, Stewart*, 552 F.3d at 1289).

- Congress intended the definition of "crime victim" in the CVRA to be broad.  *See* Movants' Mem. at 9-10 (citing, *inter alia*, the statements of the CVRA's sponsors, Senators Kyl and Feinstein).

- Courts interpreting the restitution statutes with similar definitions of victims have repeatedly recognized as victims persons harmed by an aspect of a crime that is not an element of the offense.  *See* Feb. 13 Brief at 3 (citing, *inter alia, United States v. Washington*, 434 F.3d 1265, 1268 (11th Cir. 2006)).

- It is inconceivable that in an analogous situation in this country (*e.g.*, a social worker murdered at the direction of a gang leader because the social worker took steps to oppose the gang's crack distribution) anyone could seriously contend the decedent was not a victim of the drug conspiracy; and the law can be no different just because the victims are Colombian.  *See* Movants' Opp. at 2 n.1.

- The Sentencing Guideline for cocaine conspiracies like this one requires consideration of how the conspiracy was actually committed, including consideration of threats and killings, so it is nonsensical to deny victim status to persons harmed by what the Guidelines require be considered in sentencing.  *See* Feb. 13 Brief at 5 (citing, *inter alia*, U.S.S.G. §§ 2D1.1(d)(1) & 2D1.1(b)(2)).

**C.    No Court Has Adopted the Elements-Only Approach Urged by Defendant and the Authorities on which He Relies Establish That Movants are Victims in this Case**

To the foregoing reasons should be added another:  the only court that expressly considered Defendant's argument (made by the Government in that instance) stopped short of accepting it.  In *Rendon-Galvis*, the Second Circuit wrote:  "The district court did not explicitly impose any *per se* rule defining a victim according to the elements of the crime or offense of conviction.  To the extent that the district court adopted the Government's argument in that regard, however, we need not decide here whether such a rule is appropriate . . . ."  564 F.3d at 175.

Despite superficial similarities, *Rendon-Galvis* is a very different case from this one because the putative victim there lacked critical evidence tying the drug conspiracy to the killing.  The Movants here have such evidence.  In contrast to this case, the putative victim in *Rendon-Galvis* was unable to establish a motive for the killing.  *Id.*  Instead, she had to resort to arguing "only that there was a symbiotic relationship between the AUC's drug trafficking and its terrorist operations and that [the] abduction and murder took place in a geographic area that was significant for the AUC's drug-trafficking operations."  *Id.*  That was insufficient in light of the fact that there were active military operations in the region at the time of the killing, and the record showed that the organization obtained financing by means other than drug trafficking.  *Id.*

As a result, the *Rendon-Galvis* court found an insufficient nexus between the killing and that defendant's drug trafficking conspiracy.  *Id.*  *Rendon-Galvis* recognized, however, that the necessary causation inquiry for determining whether someone is a victim of an offense "is a fact-specific one."  *Id.*  In marked contrast to the facts of *Rendon-Galvis*, the facts in this case establish the causal connection.  Mr. Henríquez was actively opposing the object of the conspiracy and that is why he was killed.  In fact, he was forcibly abducted from a meeting where he was teaching coca eradication.  Govt.'s Response Ex. 7 at 11-12.  Critically lacking from *Rendon-Galvis* was any contention, much less proof or a judicial finding, that the

10

decedent was opposing coca production or otherwise thwarting an object of the conspiracy.

Also absent in *Rendon-Galvis* was evidence of the motive for the killing, but here the motive

has been established and it ties the killing directly to the conspiracy.   Former AUC members

testified to the role of his anti-coca efforts in Mr. Henriquez's killing:

> I think the reason why I am here is due to the disappearance of a delegate of an
> NGO in Calabazo.   In 2001 he arrived at the district to give a lecture to the
> farmers for the eradication of coca crops.   He gave his normal lecture.   He had
> been in that district for 3 days and he got a message from Commander HERNAN
> GIRALDO SERNA, telling him he had to leave the town otherwise he would
> have to face the consequences, that he already knew what was going to happen to
> him.   The message was delivered to him directly by HERNAN's son, also known
> as GRILLO.   Three days went by and he then went to Las Tinajas.   The
> gentleman kept on giving his lectures, so Mr. HERNAN pulled out a commander
> in charge, commander WALTER who was up in the mountains and orders he
> gave him were to gather their people and make the gentleman of the NGO
> disappear.

Govt.'s Response Ex. 8 (Sworn Statement of Carmelo Daniel Sierra Urbina of September 25,

2003) at 1-2.

> I do not know [the objective of Mr. Henríquez's organization] but the BOSS had
> said that it was a co-op that was going to be set up but I do not know for what
> purpose, but he did not want to allow it to be set up.

Holzer Opp. Decl. Ex. B (Affidavit of Alberto Segundo Manjarres Charris of August 22, 2003)

at 4.   And the Colombian court recognized the connection:

> The testimony by the relatives of Henríquez Santamaría is consistent with the
> above, as they reach the same conclusion as the demobilized individuals, in that
> the former had to be disappeared at all costs since he was impeding the objectives
> of the AUC to continue planting coca, which Henríquez wished to see eradicated
> in order to cultivate cacao.   This was not permitted by Hernán Giraldo who, in
> revenge and with malice decided, together with his right-hand man, Leónidas
> Acosta Ángel, aka Troilo, to make Henríquez Santamaría disappear.

Govt.'s Response Ex. 7 at 14 (conviction).   Under the analytical framework used in *Rendon-*

*Galvis*, the Movants here are victims of the Defendant's conspiracy.

*United States v. Sharp*, 463 F. Supp. 2d 563 (E.D. Va. 2006) is also no support for

denying Movants their rights as victims.   The district court in *Sharp* refused to recognize as a

victim of a marijuana conspiracy a girlfriend abused by a boyfriend who bought marijuana

from the drug-dealing defendant.  *Id.* at 557-58.  The basis for so holding was that the requisite

causation could not be established.  The court said that linking the conviction to the girlfriend's

> abuse is too attenuated, either temporally or factually, to confer "victim" status on
> [the girlfriend] as that term is used in the statute.  [She] is no doubt an alleged
> victim of *her boyfriend's* violent ways.  But [she] cannot demonstrate the nexus
> between the Defendant's act of selling drugs and her former boyfriend's
> subsequent act of abusing her.

*Id.* at 566 (emphasis in original).  Domestic violence that may or may not have been related to

general drug use is simply not tied to a drug distribution conspiracy in the same way that the

murder of Mr. Henríquez is tied to the Defendant's conspiracy:  *Mr. Henríquez was killed in*

*furtherance of the conspiracy at issue*.

　　　Defendant's contention to the contrary notwithstanding (Opp. at 1, 4), the *Sharp* court did

not engage in an elements-only analysis; rather, the court recognized that victim status could be

based on a harm resulting from an act that assisted the commission of the offense.  The *Sharp*

court determined that the domestic violence there "*neither assisted the Defendant in the*

*commission of his federal offense, nor* was it an essential element necessary for the

accomplishment of his criminal acts."  *Sharp*, 463 F. Supp. 2d at 564 (emphasis added).

Applying the *Sharp* analysis here, Movants are victims both because the murder of Mr.

Henríquez assisted Defendant's conspiracy and because it proves, and was in furtherance of, the

object of the conspiracy, which is an element of the offense.

　　　*United States v. Atlantic States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453 (D.N.J. 2009), at

first blush seems completely irrelevant to determining whether Movants should be recognized as

victims of Defendant's conspiracy because *Atlantic States* addresses those who are victims when

a government investigation is obstructed.  In fact, the analysis supports the conclusion that

Movants are victims by instructing that the objective of a conspiracy must be considered in

determining the conspiracy's victims.

　　　In *Atlantic States*, six workers had been injured in separate incidents at a single company.

*Id.* at 457.  The government charged the company and several of its employees with obstructing

the subsequent OSHA investigations into those incidents.  The indictment included multiple

counts of obstruction and false statements and a count charging a conspiracy to obstruct the investigations and to make false statements to, and defraud, OSHA.  *Id.* at 456.  The court decided that the six injured workers (or their representatives) were not victims.  In so ruling, the court noted that "[e]ach of the substantive convictions . . . was an obstruction or false statement during the OSHA investigation *after* the worker in question had been injured," and, therefore, could not be the direct and proximate cause of the workers' injuries.  *Id.* at 541-42.

In assessing whether the injured workers might nevertheless be victims of the conspiracy, the court focused on the conspiracy's objectives.  The court noted that the offenses for which the government contended the workers were victims "are limited to obstruction and false statement offenses, and *corresponding conspiracy objectives*, all based upon deception of OSHA rather than violating OSHA workplace standards."  *Id.* at 516 (emphasis added).  The court observed that "[t]he conduct that allegedly harmed one or more of the six named workers may have been in violation of OSHA workplace standards . . . and that appears to be the actual basis of the government's argument . . . . Such conduct, however, was not conduct proscribed by the obstruction and false statement substantive offenses *and conspiracy objectives* . . . ."  *Id.* at 545 (emphasis added).  In contrast, the harm to the Movants is directly tied to the objectives of the Defendant's conspiracy.  The objective of Defendant's conspiracy included the proscribed conduct of producing cocaine.  To achieve that proscribed objective, Defendant needed coca to be grown, and Mr. Henríquez was killed because he got in the way of the objective of the conspiracy by urging coca eradication.

In *In re McNulty*, 597 F.3d 344 (6th Cir. 2010) the court affirmed that a whistleblower who was harmed by being "blackballed" from the packaged-ice industry was not a victim of the conspiracy to suppress and eliminate competition by allocating customers, the conspiracy on which he blew the whistle.  *Id.* at 352.  Far from supporting Defendant's theory, *McNulty* recognized that victims of a conspiracy include persons who can show a direct and proximate harm from the defendant's actions in furtherance of the conspiracy.  The court stated that "purported victims of the conspiracy to violate the Sherman Act must show that they were

13

directly and proximately harmed by the defendants' entry into a conspiracy *or by the defendants' actions in unreasonable restraint of interstate commerce.*"  *Id.* (emphasis added).

    *McNulty* went on to explain that behaviors "that are not part of the elements of the crime" can nevertheless be "directly related to the crime itself" such that they result in "direct and proximate harms to innocent bystanders" making them victims.  *Id.* (giving examples of damage to a vehicle during escape from a robbery or pointing a gun at a bystander during a robbery).  *McNulty* does not support an elements-only approach, and under its analysis, Movants here are victims because they were harmed by conduct that was directly related to the conspiracy and in furtherance of it.

    Finally, Defendant misreads *United States v. Sellers*, 512 F. App'x 319 (4th Cir. 2013) in asserting that it held that "the murder by a drug trafficker of someone who tried to rob his residence and steal cocaine was not relevant conduct for purposes of sentencing."  Opp. at 9. What the Court actually held was that the testimony of the witnesses at the sentencing hearing was not that the murder victim had stolen drugs from the defendant or even that the defendant was motivated by a belief the victim was in the drug trade.  To the contrary, the two witnesses testified that the defendant "was infuriated not because of any connection the attempted break-in may have had to drugs, but rather because the attempted break-in occurred at [defendant's] mother's residence."  512 F. App'x at 331.  The court said "there was no evidence [the victim] was ever a part of the drug conspiracy in this case, or that [the defendant] ever sold drugs to, or purchased them from, [the victim]."  *Id.* at 331-32.  The court concluded that "nothing connects the . . . murder to the particular drug conspiracy in this case."  *Id.* at 332.  That case stands in sharp contrast to this where the witnesses established that Mr. Henríquez was killed because he was trying to eradicate coca and get the farmers to grow cocoa.  Gov't.'s Response Ex. 8 at 1-2, 4, 5; Holzer Opp. Decl. Ex. B at 1, 4; Gov't.'s Response Ex. 7 at 14.

    **D.**    **The Definition of Crime Victim in the CVRA Is Not Narrower than the Definition in the Restitution Statutes**

The Opposition argues that the CVRA was "specifically designed to be more limited"

than other restitution statutes, citing and relying upon *Turner*.  Opp. at 4.  *Turner* is mistaken

on that point and at odds with the weight of authority.  *See, e.g.*, *McNulty*, 597 F.3d at 350 n.6

("it appears logical that those directly and proximately harmed by criminal conduct in the

course of the conspiracy beyond the overt act required to prove the conspiracy would be

victims under CVRA, just as they would be under the VWPA and the MVRA"); *Atlantic

States*, 612 F. Supp. 2d at 462 ("the CVRA definition will be interpreted to include that

expansive clause because of the Congressional and case law history of that clause under the

VWPA").

        Moreover, in *Turner* the court clearly articulated that the CVRA is *not* limited to

victims of charged offenses, stating that "[w]hile the offense charged against a defendant can

serve as a basis for identifying a 'crime victim' as defined in the CVRA, the class of victims

with statutory rights may well be broader."  367 F. Supp. 2d at 326.  Indeed, the *Turner* court

specifically directed the Government to identify victims of the defendant's crimes, "including

any person whom it characterizes as the victim of uncharged conduct, or to show good cause

why it should not be required to do so."  *Id.* at 328.  *Turner* is, therefore, no support for

Defendant's argument that this Court should blind itself to the facts of how the conspiracy was

actually committed and focus only on the elements of the offense in determining who is a

victim.

## III.    MR. HENRÍQUEZ WAS ABDUCTED AND MURDERED AS THE DIRECT RESULT OF THE DEFENDANT'S DRUG CONSPIRACY

        The Defendant abducted and murdered Mr. Henríquez because he was thwarting the

object of the charged drug conspiracy.  The Defendant's pursuit of the object of the conspiracy

– by eliminating Mr. Henríquez's public opposition to coca production and his efforts to train

farmers to grow substitute crops – is the direct cause of Mr. Henríquez's killing.  The nexus

between the drug conspiracy and Mr. Henríquez's abduction and murder is substantiated by eye

witness testimony[15] and the Colombian Court's conviction of the Defendant.[16]  Moreover, before the Government was motivated to re-cast the criminal conduct to exclude Colombian victims, the Government acknowledged that the Defendant threatened violence against local farmers to further his drug conspiracy.[17]

The circumstances of Mr. Henríquez's abduction and murder also are compelling evidence that the killing was in furtherance – and so the direct result – of the cocaine production and importation conspiracy.  During the time period covered by the indictment, Mr. Henríquez was abducted from a *Madre Tierra* meeting with local farmers only weeks after founding the organization to train farmers on crops substitution.  *See* Govt.'s Response Ex. 7 at 11-12, Ex. 8 at 1-2.  After kidnapping and killing Mr. Henríquez, the Defendant took control of Mr. Henríquez's farm and grew coca on his land.[18]  The Movants suffered direct and proximate harm as a result of the Defendant's criminal conduct for which he is before this Court.

---

[15] Declaration of Carmelo Sierra Urbina at 6 (Sept. 25, 2003) (Holzer Opp. Decl. Ex. 8); Declaration of Alberto Segundo Manjarres-Charris at 2 (Aug. 22, 2003) (Holzer Opp. Decl. Ex. 14).

[16] With respect to motive, the Colombian court recognized two:

> The testimony by the relatives of Henríquez Santamaría is consistent with the above, as they reach the same conclusion as the demobilized individuals, in that the former had to be disappeared at all costs since he was impeding the objectives of the AUC to continue planting coca, which Henríquez wished to see eradicated in order to cultivate cacao.  This was not permitted by Hernán Giraldo who, in revenge and with malice decided, together with his right-hand man, Leónidas Acosta Ángel, aka Troilo, to make Henríquez Santamaría disappear. . . . Even so, the fact that Henríquez Santamaría was a former member of M-19 who had been reintegrated into civil society constituted another motive for his execution, as the evidence shows that it was considered a bad thing for a former guerrilla to be gaining influence and even more so in an area under paramilitary influence.

Govt.'s Response Ex. 7 at 14 (conviction).  Defendant's desire to be rid of Mr. Henríquez's coca-eradication efforts was plainly the direct cause of the killing inasmuch as Mr. Henríquez had lived in the area as a former guerilla for five years without incident, but he was killed immediately after commencing his eradication efforts.

[17] Govt.'s Detention Memo at 2.

[18] *See* Report No. 0117 UDH-DIH at 5 (July 7, 2003) (Holzer Opp. Decl. Ex. 5).

The Opposition argued that the victim's death was unrelated to the Defendant's cocaine conspiracy,[19] and the Government has asserted that it was part of "Defendant's civil war with FARC rebels."[20]  This argument is unsupported by the evidence and belied by the facts.  There is no evidence that Mr. Henríquez was a member of the FARC.  Mr. Henríquez demobilized from the M-19 in 1984,[21] long before the Defendant joined the AUC, and had been living and farming in the area without threats or violence since 1996 – five years before his murder.[22]

The Defendant and the Government have argued that the Defendant may have had "multiple reasons" for killing Mr. Henríquez as if that would mean the Movants are not victims under the CVRA.[23]  It would not.  Even if true and there were concurrent or multiple motives for abducting and murdering Mr. Henríquez, the Movants would still satisfy the statutory definition of "crime victim."  The CVRA's definition requires only that Mr. Henríquez have been "directly and proximately harmed" as a result of the conspiracy to constitute a victim.  18 U.S.C. § 3771(e).

For the harm to be "direct" it must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked."  *McNulty*, 597 F.3d at 352 (whistleblower who was harmed by being "blackballed" from packaged-ice industry was not a victim of a price-fixing conspiracy on which he blew the whistle).  The analysis for determining direct causation

---

[19] The Defense argues that there is no nexus between the conspiracy and the Henríquez murder:  "In the same way, even assuming *arguendo* the accuracy of the allegations made by the interveners concerning the Enriquez (sic) murder the murder was not the proximate and direct result of the crime charged in this case - or the conduct underlying that offense - and interveners are therefore not 'crime victims' within the meaning of the CVRA."  Opp. at 9.  The Government argues that "the movants' allegations, as a matter of fact, do not establish that the defendant's participation in the charged drug conspiracy was the direct cause of the killing of Mr. Henríquez, as it was, at most, ancillary to the charged conspiracy, and, at least, wholly unrelated to the commission of the offense charged in the United States."  Govt.'s Response at 15.

[20] Govt.'s Response at 18 ("as a leader of an AUC paramilitary bloc, the defendant was conducting a civil war with FARC rebels.").

[21] *See* Govt.'s Response Ex. 6 at 5.

[22] *See id.* at 14.

[23] Govt.'s Response at 20.

when there is no issue of multiple causes has often been phrased as the "but-for" test.  Courts

applying the CVRA, however, have recognized that the CVRA does *not limit* direct causation

analysis to the "but-for" test but rather that the definition "'*encompasses* the traditional "but

for" and proximate cause analyses.'"  *Id*. at 350 (emphasis added) (quoting *Rendon-Galvis*, 564

F.3d at 175).  Consequently, courts have considered alternatives to "but-for" causation in

applying the CVRA.  For example, in *Sharp*, the court considered whether a conspiracy was a

"substantial factor" in causing the victim's harm before reaching the unsurprising conclusion

that a girlfriend abused by her boyfriend who bought marijuana from the drug-dealing

defendant would not be recognized as a victim of the defendant's drug dealing.  463 F. Supp.

2d at 567.  *See also United States v. Crandon*, 173 F.3d 122, 126 (3d Cir. 1999) (concluding

that although the victim had a preexisting mental illness, it was reasonable for the District

Court to conclude that the defendant's conduct was a substantial factor in causing the victim's

hospitalization and the defendant could be required to pay the victim's medical expenses).

Courts should interpret legislation to impose an appropriate causation test when

necessary to "vindicate the law's purpose."  *Paroline v. United States*, 134 S.Ct. 1710, 1724

(2014).  The definition of "crime victim" under the CVRA is intentionally broad.  Congress

indicated that it intended the statute to apply in an expansive manner to "correct, not continue,

the legacy of the poor treatment of crime victims in the criminal process."  108 CONG. REC.

S4260, S4269, S4270 (daily ed. Apr. 22, 2004) (statement of Sens. Feinstein and Kyl) (Holzer

Opp. Decl. Ex. 27).  The CVRA definition of crime victim is therefore inclusive.

In a variety of contexts courts and commentators have recognized that direct causation

may be found where a given result was produced by concurrent causes (*e.g.*, two persons

independently shoot a victim and the victim dies from the combined effect of the wounds

caused by the gunshots) or where a cause was a substantial factor, but not the sole factor, in

bringing about the result (*e.g.*, a person mortally wounds but does not immediately kill the

victim and another person inflicts a second mortal wound that instantaneously kills the

victim).[24]  According to the Third Tort Restatement, there are "multiple sufficient causes" for a harm, if each would have been regarded as a factual cause of the harm standing alone, then each is still regarded as a factual cause of the harm if they occurred simultaneously.[25] Consequently, even if Mr. Henríquez was killed for his anti-coca efforts and for being a former member of M-19, the motive based on his eradication efforts is still a direct (or but-for) cause of his death.[26]

It defies logic, common sense, and the intent of the CVRA for the Movants to be denied their status as crime victims just because the Defendant may have had multiple motives for killing Mr. Henríquez.[27]  It would run counter to the Congressional intent to enact a law to provide "meaningful progress" in the treatment of victims to deny a remedy to a victim because multiple factors concurrently caused the harm.[28]  Such a result is manifestly unjust in this case

---

[24] 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.4(b) (2d ed. 2003) (updated Sept. 2014) ("if the result would not have occurred but for [the Defendant's] conduct, his conduct is a substantial factor in bringing about the result; but his conduct will sometimes be a substantial factor even though not a but-for cause.").

[25] Multiple Sufficient Causes:  "If multiple acts occur, each of which under § 26 alone would have been a factual cause of the physical harm at the same time in the absence of the other act(s), each act is regarded as a factual cause of the harm."  1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm, § 27.  The Attorney General guidelines for victim assistance note "[t]here may be instances in which case law developed in other legal contexts should be considered when determining issues of direct and proximate harm."  U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL GUIDELINES FOR VICTIM AND WITNESS ASSISTANCE, at 9 (2012) (Altholz Supp. Decl. Ex. 10).

[26] *See* MODEL PENAL CODE § 2.03 cmt. 2 p. 259 (1985) ("The only-difficult-case is one that arises most infrequently, when the conduct of-two actors is completely independent, and each actor's conduct would have been sufficient by itself to produce death or some other forbidden consequence.  In such cases the language of Subsection (l)(a) should be assigned a meaning that accords with penal policy.  In- this context, the result in question should be viewed as including-the precise way in-which the forbidden-consequence occurs.  For example, in-the illustration of concurrent causation given above, the result should be characterized as "death from two mortal blows."  So described, the victim's demise has as but-for causes each assailant's blow.").

[27] "A defendant whose tortious act was fully capable of causing the plaintiff's harm should not escape liability merely because of the fortuity of another sufficient cause.  That justification is not entirely satisfactory.  Tortious acts occur, with some frequency, that fortuitously do not cause harm. Nevertheless, the actors committing these acts are not held liable in tort.  When two tortious multiple sufficient causes exist, to deny liability would make the plaintiff worse off due to multiple tortfeasors than would have been the case if only one of the tortfeasors had existed."  1 Restatement (Third) of Torts, § 27, comment (c).

[28] 108 CONG. REC. S10910, S10910 (daily ed. Oct. 9, 2004) (statement of Sen. Kyl) (Holzer Opp. Decl. Ex. 28) ("I would like to make it clear that it is not the intent of this bill to limit any laws in favor
(continued...)

because the most direct cause here was the Defendant's motivation to kill the victim because of his anti-coca efforts. The Defendant would have ordered his troops to kidnap and kill Mr. Henríquez even if he had not been a demobilized member of the M-19 because he stood in the way of the Defendant's drug trafficking. The same cannot be said about the victim's former status as a former guerrilla fighter because, if that were the direct cause of the killing, Mr. Henríquez would not have been allowed to live in the region for five years (1996-2001) without incident. The Defendant's drug conspiracy is the direct cause of Mr. Henríquez's murder because it alone would have resulted in its commission.

**CONCLUSION**

For the foregoing reasons, and based on the entire record in this case, the Movants should be granted their statutory rights as victims, and the right of the Movants, and of other members of the public, to access the proceedings against Defendant should be honored.

Dated:  March 2, 2015

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: _Melissa B Mannino_
MELISSA MANNINO
D.C. Bar No. 446154
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
1700 K Street, NW
Fifth Floor
Washington, DC 20006-3817
Telephone:  (202) 973-8800
Facsimile:  (202) 973-8899
mmannino@wsgr.com

*Counsel for Movants Zulma Natazha Chacín de
Henríquez, Nadiezhda Natazha Henríquez Chacín,
and Bela Henríquez Chacín*

---

of crime victims that may currently exist, whether these laws are statutory, regulatory, or found in case law."). In analyzing a criminal restitution statute, the Supreme Court reasoned that "it would be nonsensical to adopt a rule whereby individuals hurt by the combined wrongful acts of many (and thus in many instances hurt more badly than otherwise) would have no redress, whereas individuals hurt by the acts of one person alone would have a remedy.)." *Paroline*, 134 S.Ct. at 1724.