IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America, )
) File No. 04-CR-114-1
Plaintiff, )
) Date: April 21, 2015
v. ) Time: 10:00 a.m.
)
Hernán Giraldo-Serna, )
)
Defendant. )

---

TRANSCRIPT OF MOTION HEARING
HELD BEFORE
THE HONORABLE REGGIE B. WALTON
UNITED STATES JUDGE

---

APPEARANCES:

For the Plaintiff: Paul Laymon
Assistant United States Attorney
555 Fourth Street NW
Washington, DC 20530

For the Defendant: Robert Feitel
Feitel Law Firm
1614 20th St NW
Washington, DC 20009

For the Movants: Leo P. Cunningham
Melissa Mannino
Roxanna Altholz
Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304

Court Reporter: Janice E. Dickman, RMR, CRR
Official Court Reporter
U.S. Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3267

THE COURTROOM DEPUTY: Criminal action 04-114-7, United States of America versus Hernan Giraldo-Serna, whose presence is waived for this hearing.

Counsel, can you please come forward and identify yourselves for the record.

MR. LAYMON: Your Honor, for the United States, Paul Laymon.

MR. FEITEL: Good morning, Judge Walton. Robert Feitel for Mr. Giraldo-Serna. And for purposes of this hearing, Mr. Laymon was kind enough to share counsel table with me because, ordinarily we would be on different sides.

MR. CUNNINGHAM: Leo Cunningham for the movants, Your Honor. Good morning. And with me are my colleagues Roxanna Altholz and Melissa Mannino. And if I may, I would like to introduce my client, who -- one of my clients, who came up from Colombia for this hearing. Her name is Nadiezhda Henriquez Chacin, and she's seated in the front row. She has the scarf on.

THE COURT: Okay. Let me just ask government counsel and Mr. Feitel, are there still any issues that I have to address regarding the sealing question? Because if there are, until that issue is resolved, the courtroom has to be cleared. So I don't know if there are any issues still on the table in that regard or not.

MR. LAYMON: Your Honor, I think in regards to

this hearing, in my opinion there are no sealing issues, so that this hearing could -- could and should be open and not under seal.

THE COURT: Mr. Feitel, do you agree with that?

MR. FEITEL: Good morning, Your Honor. I'm -- maybe the last time I ever agree with Mr. Laymon, but I do agree with him with that, with the caveat that if something should come up that is dramatically related to an issue that needs to be under seal, I'll ask permission to approach the clerk and explain it and we can deal with it on an ad hoc manner. But as a general matter, I have no objection to the unsealing of this proceeding.

THE COURT: Very well. Does that also include unsealing of matters that would have -- matters that would have occurred prior to this hearing?

MR. LAYMON: Your Honor, are you saying that --

THE COURT: I don't know if your concession regarding non-sealing applies from this date forward, or are you saying that it also applies to -- because as I understand, there's an attempt to try and unseal things that would have taken place prior to today.

MR. LAYMON: Correct, Your Honor. There is that, there is that effort ongoing. No. What I'm saying here today is that this hearing concerning the CVRA issue does not need to be under seal. And I think if we have

subsequent discussions about the CVRA issue, unless something unusual occurs, then I don't think anything of that needs to be under seal.

To the extent that -- to the extent that we, certainly, have had past hearings, the government is not saying today that all of those should be, at this point, automatically unsealed by the court. We're not asking the court to do that. I do think that we are going to have to address that issue with the court, Your Honor. And it may be that ultimately most everything can be unsealed. But I don't think that's before us at this point.

THE COURT: I guess one question I have is until we had reached this point where there's a concession regarding these proceedings, at least going forward and as of today being unsealed, until that concession was made, the matter remained under seal. But yet, as I understand, the media was made aware of these proceedings. I don't know who did that. But whoever did that acted in contradiction of this court's order. Because before any information was related to the media about the -- this hearing, there should have been a motion filed for immediate unsealing and that should have been ruled on before there was dissemination about this hearing being conducted. So somebody violated a court order.

MR. LAYMON: Your Honor, as I recall from the

previous hearing, I think one of the parties here today acknowledged how the media was notified, so I think that's -- as I recall.

THE COURT: Refresh my recollection of what that was.

MR. LAYMON: My recollection is, Your Honor, that Mr. Cunningham spoke to the court about that issue at our prior hearing. And I will certainly let him speak to that. I don't wish to speak for him.

THE COURT: Yes, I'll hear. I don't recall exactly what was said at that time.

MR. CUNNINGHAM: Your Honor, it's my recollection that with respect to the scheduling of this hearing, that occurred in open court at the last hearing, when Your Honor calendared this. And the last hearing was open to the media and members of the media were here. And while I acknowledge that I had told the media about the last hearing, I didn't do it this time. Although, to be candid with the court, I would not have appreciated that the sealing rules would have prohibited it. But at any rate, I'm quite sure that this hearing was scheduled in open court, even though the docket remained sealed.

THE COURT: Okay. Well, in light of the representations made by Mr. Feitel and government counsel regarding no objections to these proceedings proceeding as a public hearing, we'll proceed in that manner. And if a

question comes up about matters that were previously under seal, then we may have to clear the courtroom until that issue is resolved.

Okay. Then that brings us to the merits of the question of whether the decedent who is at issue in this case, whether he qualifies as a victim under the federal victims rights statute and, therefore, his heirs can proceed in his stead. And I'll hear from counsel on that.

MR. CUNNINGHAM: Thank you, Your Honor. The charged offense here is a cocaine conspiracy. It's a conspiracy to produce cocaine and then distribute it, including importing it into the United States. And the conspiracy allegedly occurred between 1994 and 2005. I'm here because I represent the family of Mr. Henriquez.

Mr. Henriquez was killed in 2001. That was in the middle of the conspiracy. And he was killed in a part of Colombia that was controlled by this defendant. I don't think there's any dispute about that.

The issue here is whether or not there's a sufficient -- I'll use the word nexus, for lack of a better one, a sufficient nexus or connection between the conspiracy and the killing.

The law instructs, in the *Stewart* case, which I think all the parties agree is the standard the court is to use, requires us to look at the conduct that constitutes the

offense.

THE COURT: And in making that assessment, what standard of proof applies?

MR. CUNNINGHAM: The standard is preponderance of the evidence, at least some cases have said so. I would just footnote that there are certain arguments the defense and the government have attempted to make where there is no way we could sustain a burden as movants on that because we don't have access to information. And so there may come a point where I would disagree with that standard, but I think, generally, we need to convince Your Honor by a preponderance of the evidence.

So the first question is what is the course of conduct or what is the conduct that constitutes the commission of the offense, before we look to see whether or not that caused the killing here. And a conspiracy is a funny creature under the law. You have a conspiracy if you have an agreement. And, of course, an agreement in and of itself doesn't hurt anyone. So there's a view of the law, I suppose, that would be ridiculous, where there could never be a victim of a conspiracy. But the law rejects absurdities like that.

So what the *Stewart* case and the *McNulty* case tell us is you look at how the conspiracy was conducted. In the *Stewart* case, for example, the conspiracy was alleged to be

a conspiracy to deprive a bank of the honest services of one of its employees. So the obvious victim is the bank, who's deprived of its obvious -- of the honest services.

But what the court said is no, we're going to look at how that conspiracy was actually executed. And in looking at the execution of the conspiracy, it's obvious, you look at the facts. And it turns out the honest services violation was really a skimming scheme and borrowers from the bank were having their costs affected. And so the court rightly said, well, look, the victim here is not just the bank that's named in the indictment, it's also the borrowers, even though they're not named in the indictment.

That's the right approach to assessing a conspiracy. Your Honor has to look at what actually happened in the course of the conspiracy.

So now let's talk about what this conspiracy was really about. It's about producing cocaine in Colombia to send it to the United States. So to produce cocaine in Colombia, you've got to do two big steps. You've got to get the farmers to grow the coca and then you have to do the processing to turn it into the drug and, you know, mule it out of the country and get it into the United States.

What the father and husband of my clients did here that got him killed was he opposed the growing of the coca. And he was out actively instructing farmers that they should

be eradicating coca and growing alternate crops, particularly cacao, that's used to make chocolate and another fruit, lola. He was -- he had formed an organization called Mother Earth, *Madre Tierra*, and he was going around trying to sign up farmers to stop growing coca and, instead, grow alternate crops, like cacao.

In other words, what Mr. Henriquez was doing here was he was standing in the way of the object of the conspiracy. Just like you would look at what the farmers were doing to grow the coca, you would look at what these conspirators did to assure that the coca got grown. And one of the things they did, was they killed a man who was standing in the way.

So if you look at what really went on in this conspiracy as you should, based on the *Stewart* case and the *McNulty* case, this killing was part and parcel of the conspiracy. Much has been said in the papers in this case about whether or not the killing has to have been an element of the crime. There's nothing that says that. There's no law that says that. The law says that in connection with conspiracy, you look at how it was actually executed. The *Stewart* case and the *McNulty* case, the statute itself says you look at the commission of a federal offense.

So Your Honor is not supposed to strip this case of all of its facts. Your Honor is, in essence, obligated

to dive into the facts and figure out what really went on in connection with the conspiracy.

And I would add that as Your Honor does that assessment, you are not limited to the indictment and you are not limited to whatever was admitted in connection with the plea process. And I say that because, again, the law says that. When the Federal Rules were revised in 2008 in order to reflect the Criminal Victims Rights Act, the drafters of the rules recognized that there may be occasion for there to be evidentiary hearings or fact finding. And other courts have said what the standard for review is when there's fact finding in connection with the victim's motion and it's deferential. And there are cases, for which I forget the cite and which we did not cite in our papers, *Citco*, for example, where a court did hold extensive evidentiary hearings.

I'm not asking for an evidentiary hearing. My point is that Your Honor, like with any matter that's in dispute before the court, gets to consider all of the evidence, not just some denatured set of pleadings where, with all due respect to my adversaries, I think they have pointedly attempted to plead around the victims in this case. And they can't do that. It's Your Honor's job to identify what was the conduct --

THE COURT: What's your basis for saying that when

the government sought the indictment, that they had in mind trying to circumvent potential rights of the purported victims?

MR. CUNNINGHAM: So, I don't have good proof of it. I'll tell you what I do know. I know there's a superseding indictment that I've seen. I've never seen the original indictment, it's been under seal. I've never seen it. I'm dying to know what it said. I also know that our clients, represented by Miss Altholz and others, wrote a letter to the Department of Justice in 2008, shortly after the extradition here. And I think that letter actually caused a bit of a concern at the Department of Justice that they were going to be overwhelmed with Colombian victims.

And one of the reasons I think that is that I've seen that argument made by the government in their initial papers and again in their most recent papers. And so, if I may speak to it, I would point out that the CVRA -- first of all, Your Honor is not going to be overrun with Colombian victims. It is not the case that every victim of something bad that has happened in the strife in Colombia qualifies for victim status. We're not saying that. And if we were saying that in the New York case, in the *Rendón* case, we lost. But this case is different from that.

But Your Honor is not going to be overrun with Colombians, and the Justice Department hasn't been either.

We're here representing one family, only one family, and this case is almost over.

But, I will say that if there were the specter of being overrun with Colombian victims, the law says what you do is you don't deny them their victim status, instead, you fashion reasonable procedures for dealing with it. So the CVRA, in subpart (d), actually provides for how you handle a situation where there's a lot of victims. But it is my belief -- I don't know that I could prove it, even to a preponderance level, or that I should have to, that that specter has loomed over these proceedings and it has caused both the government -- has caused the government, and maybe the defendant, who has his own motivations, to encourage an incredibly straight-jacketed and narrow approach to how you determine what a victim here is.

So again, you look at the conduct of the conspiracy in a normal, natural way. And that conduct here included getting rid of a guy who was going to thwart the coca production. And then you figure out whether or not that caused the harm. And it did cause the harm.

We know that because of the evidence that we've adduced, which included -- so there was a criminal proceeding against this defendant in Colombia and in connection with the investigation and the proceeding, various witnesses were -- gave statements and then the court

made findings. We have quoted those in our last set of papers and earlier, so I'm not going to requote it. But what it amounts to is this: Two of the guys who were soldiers for this defendant explained what happened. And they explained that there were, in essence, two motivations for the killing here.

The first motivation was the one I've been emphasizing, which is he stood in the way of the coca production. He was trying to recruit farmers to his organization, *Madre Tierra*, to quit growing coca to be turned into cocaine. That was the first motivation.

The second motivation that's also identified is that Mr. Henriquez had, many, many years before, been a guerrilla. He'd been on the other side of the civil war. So, the question then is, well, does the fact that there are two motivations for the killing, does that mean that the killing was not caused by the conspiracy? And we've briefed this extensively in our most recent briefings. But the take away is that there can be two factual causes, two but-for causes for a harm.

And I would submit that as a factual matter, it's a little bit far-fetched to think that this killing happened as a result of Mr. Henriquez having been a guerrilla fighter. And I say that because the killing happened in 2001. Mr. Henriquez had been living in the region

controlled by the defendant, and he controlled a geographical area of Colombia, Mr. Henriquez had lived there for five years before he got killed. Five years. No threats in that time, he's not assaulted and, obviously, he's not killed.

What does happen though just before he's killed? He's killed in February of 2001. In January of 2001 he forms this organization, the *Madre Tierra*, and he starts preaching the gospel of coca eradication. And if we need any more evidence as to what really caused this killing, Mr. Henriquez was dragged out of a meeting with farmers where he was delivering just that message.

So as a factual matter, if you're going to choose what the most direct cause of the killing was, it was because he was preaching a message of coca eradication. But again, as a legal matter, as we've explained, there can be multiple causes. And Your Honor would know that the court needs to assess not only whether there's direct cause, which there is as explained, but whether or not there is proximate cause. And there are cases out there where people have sought victim status where there are obvious intervening events that destroy the causal chain and undermine a finding of proximate cause. There are no intervening events here. This killing was part of the conduct that was in furtherance of this conspiracy and trying to obtain its objective.

And there are cases where courts have found that, for example, the murder of an ATF agent was foreseeable in connection with a drug conspiracy because where large amounts of drugs are involved, as they are here, and where weapons are involved, as they are here, that a homicide can be foreseeable. So I don't think that the proximate cause limitation is realistic here.

So, for those reasons, we submit that we satisfy the definition of victim under the CVRA. There are not going to be practical problems with recognizing our victim status and what, at this point, seems to be allowing us participation in the sentencing. Although, we, again, another footnote, we have -- the plea agreement and the plea process in this case has been under seal. We were actually stunned to learn that the plea had been entered back in January of 2009 because we had communications with the government lawyer -- not Mr. Laymon, but one of his predecessors on the case -- who told us that we would be notified before there was a plea. And the government was telling us that after there had been a plea in the case.

So, that's a little disconcerting, at best. And we still would like to see the unsealed plea agreement, or such parts of it as we may, and the plea colloquy because we do think that we were deprived of our rights to confer with the government in -- before that plea agreement was entered.

THE COURT: Thank you.

Mr. Laymon. Either one can go first. Either one. Doesn't make any difference.

MR. FEITEL: Good morning, Your Honor, I should say that, as a preliminary matter, we are here because the movants have attempted to intervene. And so for purposes of this discussion, I'm willing to accept, on behalf of my client, the truth of the representations of what they're saying in their pleadings, sort of like you would during a 12(b)6 civil motion. Because I believe that even if you accept them, arguendo, as true, they fail to reach the status of a victim under the statute.

If Your Honor finds that the pleadings are sufficient, though, I do think we need to have some sort of evidentiary hearing about this. And I'll try to explain why that is.

There was a criminal proceeding of sorts in Colombia. And I know that Your Honor has had lots of hearings about process and about the *Auto Self-Defensas* (sic) in Colombia, but their judicial system operated in that era, and I believe until today, in a different manner than ours does. There are, in the criminal courts, the submission of declarations by people who claim to be witnesses and there is a paper record created that judges make decisions on. There is not, usually, an opportunity

for cross-examination. And we have asked Mr. Hernán Serna's lawyers in Colombia about the record in the criminal proceedings. I have not learned as much as I'd hoped I would have. But I don't believe that the statements were subject to cross-examination.

And I think there's some reason to be skeptical of some of the things that were said. And, certainly, I would not accept them on their face, if there is sufficient evidence to move forward.

In addition, as I believe I pointed out in my prior pleadings, the criminal case has in some way -- or, the matter of Mr Henriquez' murder has been subsumed into the Justice and Peace process. I think Your Honor has heard about this during some of the other proceedings involving the AUC leaders.

But, basically there's a process of reconciliation in Colombia. And in return for participating in it, the mobilized members of the *Auto Self-Defensas* face an aggregate sentence of no more than eight years, if they admit to responsibility for the acts they committed during the era while they were actively involved in a civil war in Colombia.

This matter, I can tell you, has been subsumed into that. And according to my meeting in Colombia recently with a member of Mr. Hernán Serna's legal team and

conversations that we've had, the family of Mr. Henriquez is participating. There is some discussion of it in the movant's pleadings about how exactly they're participating, whether it's as victims or whether they want their property back. But my understanding is they have been identified as what the Colombian law refers to as indirect victims. That is, they were not directly victims, their father was and they have some status. My client is participating in Justice and Peace.

I'm not suggesting that alternatives remedies obviate their status or change the status under the law here. But I think it's noteworthy that there is a more complex factual record that has been presented here. And so if Your Honor finds that the facts alleged are sufficient, I'm going to ask that there be a next step and there be some sort of process to determine, to the best that we can, given that this is a murder from the year 2001, the bona fides of the claim.

Turning to that, the issue of the status, I notice that Mr. Cunningham did not at all during his discussion with Your Honor mention the actual standard built into the Crime Victims Rights Act, and that is, the person must be -- there has to be proof that the victim was directly and proximately harmed as a result of the commission of a federal offense.

The standard is not -- and Mr. Cunningham mentioned -- or, the movants mentioned foreseeability, in terms of what's foreseeable, for example, in a drug case. The standard is not foreseeability. The standard is not relevant conduct. Those are the more common tests for inclusion in a case that we have in a criminal court. But the test is a lot more specific and, I think, a lot higher standard here; it is directly and proximately caused by.

So the courts have tried to look for some method of figuring out what is a direct and proximate cause? There are cases that I cite in my pleading, the *Sharpe* case from the Fourth Circuit across the river, some cases from the Tenth Circuit and the like, that have essentially done a functionality test. They have looked at the elements of the offense.

In *Sharpe*, the putative claimant alleged that she had been abused by the defendant who was charged in a drug trafficking offense. The conduct is not as grievous as it is here, but it's the same nature. Someone alleged that they were assaulted as a result of someone's drug problems. The court looked at the elements of the offense. That's what they did in this *In re: Workers' Compensation* case. I mean, the courts have said, Let's see, at least at a first blush, what does the statute require?

In this case my client is charged with and he has

pled guilty to international drug trafficking. The elements are that he was involved in the conspiracy to manufacture or produce cocaine, knowing or intending that it would come to the United States.

To be fair, I think people also want to know, well, what is the -- I should say that the *Sharpe* case and others seem to focus -- *Sharpe* focuses on the elements and they say nothing more. *Sharpe* says it's not an element to the offense, this person was not involved in the conspiracy, and that's that. But even if Your Honor wants to go look at what the conduct is, there are other places to go. One is the plea agreement in this case and the facts that are attendant to it.

Before I turn to that, I just want to mention one thing to Your Honor about the indictment. I know in the course of your --

THE COURT: Do you look to the entire indictment or just the offense that he pled guilty to?

MR. FEITEL: I don't think there is another charge --

THE COURT: Isn't there a distribution? Isn't there a separate charge?

MR. FEITEL: How the indictment --

THE COURT: It was a four-count indictment, as I recall.

MR. FEITEL: Your Honor is exactly right. There is a distribution count and there's an aiding and abetting count. But those do not, I think, involve any more specific conduct.

THE COURT: I would agree. It's probably the same conduct that form the predicate for both offenses.

MR. FEITEL: What I was going to say is Your Honor has seen a lot of criminal cases come and go in your years on the Superior Court and here. There are indictments that allege conspiracies that have specific overt acts and specific manner and means. For example, there are cases that allege that it was a manner and means of the conspiracy to kill competitors. It was an overt act of the conspiracy that on such and such date somebody was stabbed or killed because they transgressed into another drug trafficking organization's territory. None of that is alleged in this case.

THE COURT: Yes, but you would agree, wouldn't you, that you can only manufacture cocaine if coca is produced for the manufacturing? And obviously, you could only import that into the country, into the United States if someone was growing it for that purpose.

MR. FEITEL: Absolutely. There must be cultivation. But the theory of this prosecution and the theory of the guilty plea is not that our clients were

involved in actively cultivating cocaine, it's not even that they were actively involved in manufacturing it. I think Your Honor has heard this more than you probably care to during the course of the other hearings, the *Auto Self-Defensas* imposed a tax against the people that grew it, against the people that manufactured it, and against the people that transshipped it. So the logic flow --

THE COURT: Aided and abetted that, right?

MR. FEITEL: Yes, sir. They added and abetted it, and they did it for purposes of funding the civil war. But there is no allegation that anything specific involving these violent means were included in this case. And, I should say that Your Honor asked -- I mean, the movant said that, well, you know, the government is not, sort of, being fulsome in their facts and in the things that they say. Your Honor said what basis do you have about that? And Mr. Cunningham said, well, he's worried about a floodgate argument, that's why he thinks the government has not been more complete in the facts alleged. Because there's no facts at all that my client pled guilty to that involve violent means or violent purposes.

He admitted that he carried a weapon and they admitted that they taxed cocaine. But there's no allegations in the indictment or in the plea or in the factual representations of the company that go to violent

means or violent methods or specific overt acts.

In the pleadings --

THE COURT: So you're saying even if I could find, based upon the record, that the decedent was killed because of his efforts to try and get other farmers not to produce the coca plant, that that would not be a sufficient nexus to warrant the decedent being considered a victim under the statute?

MR. FEITEL: That is exactly what I'm saying. It's a terrible tragedy; no one could say otherwise. No one could possibly, who has any semblance of humanity, can say this isn't a terrible thing that happened. But I don't think that the recourse under the law is for this family to participate as victims in this case because it's too attenuating. Because the theory of the government's case is that our clients imposed taxes against the producers, the transporters, and the growers -- or, those that transported it.

What the defendants say about that -- and I was pretty specific about this -- on page 8 of their most recent pleading, they say that the facts establish the object of the conspiracy. And this is a quote from the pleading, "And it includes overcoming obstacles that prevented any of that," that is referring to the narco trafficking. That is the part that is not included in this case.

There is not automatically infused or crafted or

grafted on to every conspiracy involving drug importation the automatic suggestion that and you stop anyone who might be in your way. That's what the defendants are asking you to do in this case, they're asking you to add a gloss to this case, where none ever existed before, that the manner and means of this conspiracy somehow, of necessity, must have included stopping anybody who, for whatever reason, was involved in their way. And I --

THE COURT: As I understand, the taxes were being collected not only against individuals involved in the drug trade, but against others who were involved in other nondrug-related activity, is that right?

MR. FEITEL: Yes, sir. Your Honor has heard before, I believe it involved the taxing of other commercial enterprises, including the growing of milk (sic) and the sale of cigarettes in this case.

There was a point I wanted to make earlier, is that the movants are suggesting that somehow the government and the defense -- Mr. Laymon and I were not involved at the time of the plea, but that the other side is in cahoots with each other. And the argument they adduced before Your Honor today was that, well, they're in cahoots because they're worried about the floodgates. I want to talk about that later. But that's not the argument that they adduced in their pleading. I was really struck by this because there

are some limits to propriety, I think.

On page 5 of their pleading, at footnote number 9, the movant suggests that the reason that the government and the defendant limited the facts in this case is, and I quote, because, they say, "The government is in league with the defendant with respect to the disposition of the defendant's assets." I mean, the theory that they adduced in writing, in a pleading before the court, is that we're all in cahoots to prevent -- because we want to collect the proceeds of a forfeiture action against my client.

I think that's sort of inappropriate -- wildly inappropriate. I think it's without any basis. And I think it reflects a level of desperation about this case because those assets are all in Colombia. There's no profit sharing plan between the Department of Justice and Colombia nationals in the United States that include properties in Colombia. In fact, all those properties that my client has are being submitted for distribution to the victims in the Justice and Peace process.

So, I don't think that, on its face, this case includes a conduct that's directly and proximately related to this murder. And I think that the gloss that the defendant is asking you to put on is outside of the boundaries of the direct and proximate language. The issue about whether or not this is going to open up a floodgate I

think is one that is fairly addressed by the statute itself. It talks about having representatives of classes. But I think it points to a more significant problem, which is that I think if you would ask most people, just as a generic matter, whether or not a murder of someone who was opposing cultivation of cocaine was related to a drug international importation case, I they at first blush most people would say, well, no, it was not.

I think that intuitively there's a huge difference between what this defendant was doing, which was taxing cocaine to move it to the United States, and what they say that Mr. Henriquez was doing. There's no evidence of record that, according to the movants, the whole -- this movement, *Tierra Madre*, Mother Earth, started in January, and that it was such a fearsome thing that less than a month later they were forced to disappear Mr. Henriquez because they were worried about him. I think that also kind of defies logic.

The production of cocaine has been fought by the government of the United States and the government of cocaine (sic) for time immortal --

THE COURT: The government -- you said cocaine.

MR. FEITEL: I'm sorry. The government of Colombia and the government of the United States. I mean, we've had eradication programs. It's a matter of record, Your Honor worked at the Office of National Drug Director --

ONDCP. I mean, eradication efforts have been tried since time began and they have failed.

I think it really does strain credulity to think that one person who is, to be fair, an ex, you know, rebel, was going to create such a whirlwind activity that cocaine production would stop and that our client -- my client viewed it as such a direct threat that he had to immediately stop that.

Even if that was the case, it's still outside of the parameters of the indictment that's charged in this case. And I think that it is without -- it is of some moment that when the indictment was returned, there was no motion by any of the victims to participate in this case. It was not crafted with an idea that violence was a manner and means or an overt act of this conspiracy, and that it is far outside of the contours of this case.

And the last case I want to mention about is the one Your Honor had asked about in the supplemental pleading, which is Galvis, Rendón. That was a case in which a AUC leader, whose name is Diego Murillo, M-U-R-I-L-L-O, Bejarano -- and I'll spell it for the reporter later -- came to the United States and pled guilty to a drug trafficking offense. This defendant's nickname was Don Berna. He pled guilty in a drug trafficking case in New York. He was not in cooperation with the government.

He was not permitted to be in cooperation with the government because the prosecutors in the Southern District determined that he was such a nefarious, dangerous person, who had committed such horrible atrocities, that they would not speak with him, nor give him a sentence reduction for anything that he did. And in fact, the reason for that is because although Don Berna was ostensibly a member of the *Auto Self-Defensas*, he had another job.

He was the leader of what's called the *Oficina*, which is the Spanish word for office, of Envigado. Envigado is a suburb of Medellín, I believe. It could be Caldas. I think it's Medellín. And basically what Don Berna did in Colombia was he collected drug debts for other drug traffickers by force, by violence, and by kidnapping, and by violations. He was a completely amoral person. Even in that case -- and no one could have said otherwise about him. The factual record about who Don Berna is is indisputable.

But even in that case the government, which was not permitting him to cooperate, which is almost unheard of in this country, I mean, especially in these kinds of cases, even the government in the Southern District decided and fought and prevailed before both the District Court -- I think it was Judge Richard Sullivan, and in the Court of Appeals on a challenge to the family standing, Galvis, Rendón, to participate as victims in that case because it

was simply too tenuous.

THE COURT: But doesn't the manufacturing allegation in the complaint create a problem for you, relating back to what I previously indicated, because, obviously, you could only manufacture the product if you have the coca being grown by somebody. If Mr. Henriquez had been successful in his efforts in convincing the farmers in that region of the country to not produce the coca plant, then manufacturing, conceivably, could not have occurred, right?

MR. FEITEL: It is with some note that the language -- I note the language of Your Honor's question, "if" and "is it possible." It is true that if he convinced someone, it might have been possible. But I think that even phrasing -- it's necessary to phrase the question with indeterminate language because it's impossible to know. And I think that's the failure of this case, along with the fact that the case, on its merits, does not include efforts to silence those who would oppose a drug trafficking or who would oppose drug cultivation. That's simply not an inherent part of this case, either by the precise language of the indictment, the plea, or the facts, or by implication in the case.

I mean, if you were to have a case in which someone were to say, well, is it foreseeable, is it possibly

foreseeable, as we use that language in criminal cases, that they would have killed someone who opposed drug trafficking? I think there's a pretty strong argument that even if it was foreseeable, it wouldn't have been in furtherance of a drug trafficking conspiracy. It's outside the parameters.

Not every drug case includes, of necessity, the notion that you'll kill your competitors. And there's sort of an analogy -- Your Honor may remember this, there's a body of law concerning the statute of limitations in conspiracy cases. And I'll be glad to provide a supplemental brief.

The government had argued for awhile that the statute of limitations never ended in a drug conspiracy case because, of necessity, built into every drug conspiracy is a conspiracy to conceal its existence and to conceal its efforts, that that would have extended the statute indefinitely. And the Supreme Court and every other court that's considered it has said no, it is not by implication built into every conspiracy statute a goal to keep itself secret. And I think in the same way it is not built into every drug conspiracy statute automatically, or in this case, on its facts, the goal of killing all the competition.

I mean, the test is directly and proximately. It's not whether or not it was foreseeable or whether it would have been helpful or whether it would have somehow

even been, arguably, in furtherance. It's whether it's directly and proximately caused by the commission of the offense. The commission of the offense was international drug trafficking. What the defendants are asking you to do is to add a gloss that it included some other conduct that was not charged, was not admitted to by my client, and I don't think is part, fairly, of this case.

And we have all the sympathy in the world for the victim's family, that's why my client is participating in Justice and Peace in Colombia. But that does not mean that under this particular statute they have standing or status to be involved in the formulation of a result or to otherwise participate in this criminal case.

THE COURT: Thank you.

MR. FEITEL: Thank you, Your Honor.

THE COURT: Mr. Laymon, any -- let me just ask: In light of what counsel said about not being privy of the original indictment, does the government have any opposition to that being unsealed? My recollection is that it probably doesn't add anything to the position that they're advancing. But he seems to feel that, conceivably, if he had access to that, maybe that could provide ammunition for his position.

MR. LAYMON: No, we don't have any objection to revealing the indictment, Your Honor, or the superseding indictment.

THE COURT: Very well.

MR. LAYMON: They're fairly straightforward.

THE COURT: Right. Okay.

MR. LAYMON: If I might, Your Honor. I don't want to repeat anything that Mr. Cunningham or Mr. Feitel said, so I'm going to endeavor not to do that. But I would like to deal directly with the court's last question to Mr. Feitel, which basically was: Doesn't the manufacturing allegation in the indictment create problems for the government's position or the defendant's position? Because I think that's maybe the key question.

So to address that question, Your Honor, it's necessary to take a step back and for all of us to understand how it is that we came to know of Mr. Henriquez' death and its potential connection to this case. As the court is aware from the pleadings, the defendant Hernán Giraldo-Serna was found guilty in Colombia through the Justice and Peace proceeding, under Colombia law, of bearing some responsibility for the death of Mr. Henriquez.

It's important to understand that he wasn't convicted of directly killing Mr. Henriquez or of doing it himself. He was convicted under the theory that he had command responsibility of the people that were directed to do it. And as part of that proceeding, Your Honor, there was testimony by people who purported to be witnesses with

knowledge of how Mr. Henriquez came to die -- or, came to be killed.

Mr. Cunningham has referred in his pleadings and somewhat in his argument to that testimony, and I'll do the same. But to respond to the court's question, I think it's important to understand what was going on in Colombia.

So briefly, we have -- as the court knows, Hernán Giraldo-Serna was the commander of a block of the AUC. The AUC was in an armed conflict with other armed groups, to include the Farc, but to include other groups. For example, the ELN and other guerrilla groups that were fighting amongst themselves for particular reasons, to include control of certain territory in Colombia.

It appears as if Mr. Henriquez was a member of a different guerrilla organization, or had been in his past, a member of another guerrilla organization. At least two people testified to their knowledge of how Mr. Henriquez came to be killed. And we can, each of us, stand up here and tell the court what we think they said, but bottom line is that it's not entirely clear from these witnesses' testimony why Mr. Henriquez was killed.

We know from their testimony that he was previously a member of a rival guerrilla group and that may have alarmed Serna and his men. We know from their testimony that a meeting was to be arranged between Mr.

Henriquez and Hernán Giraldo-Serna, or his responsible people, and apparently that meeting was ignored. We know from their testimony that there was apparently a directive to Mr. Henriquez to, effectively, register his presence in the area and wear an identification tag. Apparently he declined to do that.

So, in response to the court's question as to how he comes to be killed, is it because he's allegedly organizing coca farmers to grow some other plant? Is it because he was formerly a member of another guerrilla group? Is it because he started advocating for whatever he was advocating for in this contested territory? Is it because he refused to meet with the persons who control the territory and rejected their authority?

It's difficult to know clearly, as it is in recreating any heinous offense such as this, it's difficult to know exactly what's going on. And for us to presume that, well, it's got to be because he was advocating for farmers, I think is not entirely accurate.

Now, maybe in the end that's what was going on. But I don't think that's really clear from what we know. And as the court pointed out, Hernán Giraldo-Serna and all the other AUC and Farc and other guerrilla leaders, as the court pointed out, not only were they waging -- not only were they assessing -- let's just call it extortion,

extortion penalties on the coca farmers and the labs and the transporters of cocaine, but they were also taxing other illegal activity. They were also taxing other legal activity.

So the idea from someone like Hernán Giraldo-Serna's position -- he was all about raising money to fund his armed conflict. That's what the AUC was all about. Let's see how much money we can raise to fund the armed conflict that we're involved in. So they weren't just dealing with the coca farmers or the coca labs or the transporters.

THE COURT: So you're saying that if Mr. Henriquez had been successful in convincing the farmers to grow a different type of crop, that those would have been taxed also?

MR. LAYMON: Sure. I mean, theoretically. I can't stand here before the court and say that Hernán Giraldo-Serna was taxing people who were growing wheat or sunflowers or flowers or palm oil, which is another popular Colombian product. But I think the answer to that would be yes because if they saw an opportunity to make money, then that's what they did.

THE COURT: What other nondrug-related activities do you know were being taxed?

MR. LAYMON: Well, from all of the AUC cases that

we've had here in the last -- or, that I've personally been involved in in the last several years, Judge, I mean, among the kinds of taxes that we know were being -- "taxed," I almost hate to use that word. It's almost extortion. But among the financial penalties that they were levying, for example, against oil, the sale of gasoline or the movement of oil in pipelines, that was a lucrative source of money for some of these groups that had that kind activity in their area.

Now, whether Hernán Giraldo-Serna had pipelines crossing his particular area, I don't know. But that's an example, a common example of what they were doing. They were commonly taxing liquor, commonly taxing cigarette sales. All the kinds of taxes that we would levy, if you think about it, in the United States, they were levying there. Banking transactions were taxed, attorney transactions were taxed, as well as, you know, the taxes that were on illegitimate activity, such as drug trafficking being one. But human -- well, I don't want to say that there was human trafficking in his area, but that was potentially taxable, and other illegal activity could also be taxed, Your Honor.

THE COURT: Let me just ask this question in response to what Mr. Cunningham suggested. I know you weren't involved in the actual drafting of the indictment,

since you didn't have the case at that time. I don't know if you were involved in drafting the superseding indictment, or not.

MR. LAYMON: I was not.

THE COURT: Do you have any knowledge that the government intentionally sought to circumvent the extent or the scope of the alleged conspiracy for the purpose of denying victim status to individuals in Colombia?

MR. LAYMON: I have no knowledge of that, Your Honor. If I did have knowledge of that, I would certainly reveal it. I find that extremely difficult to believe, that that would have been the case.

Now, certainly, we can go back and take a look at that, but I know that -- I don't even know that the government -- I don't know when the government became aware of Mr. Henriquez and his situation. We know there was an initial indictment and superseding indictment. It bears looking into as to when we learned that. I know that there was some communication between Mr. Cunningham and my colleague Paul Joseph, but like myself, Paul Joseph would have come into the case later, after the indictments were returned. So, certainly that's something we should look at. I just cannot imagine that, there being anything to that.

So, I think what I'm suggesting to the court, and obviously the court understands what I'm saying, is that,

you know, the legal and illegal activity that Hernán Giraldo-Serna was involved in as the block commander of that area was vast. And to the -- and I'm not here -- and I'm not conceding, Your Honor, that he ordered that Mr. Henriquez be killed, that he had knowledge of it, or that he had a role to play in it. I don't know that to be the case. What we do know is that as part of the Justice and Peace proceedings, he accepted responsibility for the death of Mr. Henriquez, which, evidentially, occurred in the territory that he controlled at the time.

So I don't mean to suggest that he ordered it or that he even knew of it. But what I am suggesting is that to the extent that he was -- that he was involved in the death of Mr. Henriquez -- and there could be any number of reasons, in addition to but well beyond this alleged social activism with these farmers, any number of reasons why Mr. Henriquez would have been killed.

So, I agree with what Mr. Cunningham says and I agree with what Mr. Feitel says in that what the court has to answer, what the court has to figure out is was he killed as a direct and proximate result, or direct and proximate cause of Hernán Giraldo-Serna committing this federal offense. And I agree that that's a relatively straightforward question, Your Honor, but I do think that the factual terrain, the universe of facts that we have is

actually very broad and susceptible to many, many conclusions.

And so I think for that reason it would be, I think, very difficult for the court to find that by a preponderance of the evidence they've met the burden, simply because there are so many reasons why Mr. Henriquez could have been killed.

But beyond that, Your Honor, on the -- I think one of the questions the court has to deal with is what's the next step? Can you just rule on the issue now or must there be some kind of further evidentiary hearing? Because up to this point, you've had the pleadings of the parties which refer to the Justice and Peace proceedings and the witnesses that have testified, but you've not had an opportunity to see, for example, an English translation of their testimony, to make some kind of assessment of what they really say. And the parties, obviously, haven't made an effort at this point to really present that to the court.

So, I don't know where the court wants to go with this. In my own opinion, I think I would share Mr. Feitel's belief that even if we accept the allegations of the defense, they still can't meet their burden. But assuming that the court feels differently, then I think we've got to really look at the facts. And I don't see how we could do anything else.

THE COURT: Okay. Let me give the court reporter a ten-minute break.

(Recess.)

THE COURT: Before I hear from Mr. Cunningham, I do think we need to resolve the sealing issue because I think, conceivably, that information that's been under seal prior to this proceeding will be pertinent in my resolution of this particular issue. So, is there an objection to -- because there is a request that that information be unsealed, is there an objection, either by defense counsel or government counsel, to the unsealing of that information? And if so, are there specific things that you're objecting to? As I understand, as far as Mr. Pupo is concerned, his whole record in this case has been unsealed.

MR. LAYMON: As to this defendant, Hernán Giraldo-Serna, Your Honor, what -- specifically what information are you saying --

THE COURT: Well, as I understand, they want everything.

MR. LAYMON: So there would be the indictment, the plea agreement, the statement of facts. Presumably there would be various motions to continue, perhaps motions to seal. I couldn't -- what I could say to the court right now, and I'll let Mr. Feitel answer this as well, without going back and looking at every motion that was filed,

Judge, it's hard for me to know because some of those were filed by my predecessors and I'm certainly not -- I don't recall every one of them that was filed. I would have to go back and look and see if they contained any -- I doubt that they contain any sensitive information that we wouldn't want revealed, but I should at least take a look.

THE COURT: Okay. That's reasonable.

Mr. Feitel, anything on that?

MR. FEITEL: Good morning again. Yes, good morning again, Your Honor.

Well, there are pending -- there is pending a motion before this court by the reporters committee. And I think one of the attorneys or a representative is in the courtroom. And I spoke to Mr. Laymon yesterday about this. I agree with him. I think we should take an appropriate, principled approach. I would like to know what's in the docket because I came in this case later than Mr. Laymon did.

For purposes of the disclosure to the intervenors in this case, I have a proposal: I would have no objection to having the plea agreement, the statement of facts -- I think they already have a copy of the superseding indictment, but I have no objection -- excuse me. With respect to the plea agreement and the statement of facts, I have no objection to the documents being produced to them,

but I would ask it be produced pursuant to a nondisclosure order; that they use it for purposes of this litigation, and this litigation only, that it not be shared with anyone who's not directly involved in the preparation of these pleadings, and that if there's a need later to unseal it completely, then we can talk about it. But I --

THE COURT: That doesn't address, though, the reporters' request.

MR. FEITEL: That's an issue that I think I'm going to need to talk to my client about. I saw him this week, but -- because I'm not -- as a matter of professional responsibility, I would like to speak with him about his position. It may be that he'll say to me, look, I don't care. My client has spoken hundreds of times, you know, in these Justice and Peace -- they call them *version libres*, which means -- I'll have to translate again later, or free discussions. And so he may not care.

So, that's a question I would like to talk to my client about. But for purposes of the here and now, I have no objection to it being released pursuant to a nondisclosure order.

So, counsel can review it. If there's something that they feel that they must share on the record that's otherwise privileged, they can ask for leave of the court or they can call me, maybe I won't object. But I do think,

given the dynamic of what's happened in this case and the notifications to the reporters and other things, out of an overabundance of professional caution, we should not simply unseal everything and make it public. That may ultimately happen, but I don't think it's, of necessity, needed to be done today.

THE COURT: I think it's fair to give you and Mr. Laymon the opportunity to review what's out there and, therefore, make an informed decision as to whether you think there's information that should not be made public. Obviously, it's a heavy burden that you bear in not making it available. But I think you should have the opportunity to at least make that assessment.

MR. FEITEL: To be fair, Your Honor, the motions to continue and the like, I can't imagine that I would. The thing that concerns me the most is, actually, the plea agreement and the statement of facts, those are the things that concern me the most. They reflect issues that are generally hidden from public view for legitimate and compel -- and, I think, compelling reasons.

I'm prepared to let the movants have it because I think there ought to be -- people ought to be able to be advocates and having the facts makes it easier to be an advocate. But I don't think it should be in the public domain automatically because the movants want to intervene

in this case. I don't think that's a sufficient reason, absent anything else. And I just ask that they be subject to an order that limits its disclosure because I don't want it to be inadvertently or by intention become a public document.

THE COURT: How long do you think it would take you and Mr. Laymon to review what's out there and assessment to what extent you would object? Because I understand there's no objection to the original indictment being released, provided a nondisclosure order is issued.

MR. FEITEL: No, that I actually don't object to. The original indictment I think they can have. I don't -- and the superseding I think they already have.

THE COURT: The nondisclosure agreement, you say, would cover the plea agreement?

MR. FEITEL: And the statement of facts. I would like it to be an order -- well, how ever Your Honor wants to phrase it is fine. And Mr. Laymon and I discussed this. We do not have, either of us, the knowledge to determine whether we have a complete file or not. We need to review the under-seal file in the clerk's office, see what's in it and then decide. It may be a very simple matter between the two of us, we'll agree to let it be unsealed.

THE COURT: How much time do you think you need to do that?

MR. FEITEL: I'm going to be out of the country most of next week and I have some things to do this week. If I could have until two weeks from today? Two weeks from yesterday, Monday.

THE COURT: Mr. Laymon, you agree with that?

MR. LAYMON: Yes, Judge.

THE COURT: Okay. But as far as the information you agree that can be released, either with or without a limitation on how it can be used, I guess that can be produced.

Any response to what we've discussed regarding this so far, Mr. Cunningham?

MR. CUNNINGHAM: My only concern is that I'm reluctant to take information under a gag order, out of concerned that I'll be accused of violating it, whether I have or haven't. And I don't like taking on that obligation and burden when judicial documents are presumptively open to the public. I'm actually --

THE COURT: Presumptively.

MR. CUNNINGHAM: Presumptively. But there's a balancing test.

THE COURT: But at least at one point. Whether that's true now, but at least at one point there was a good reason to have the proceedings under seal.

MR. CUNNINGHAM: And I don't know what the good

reason is. But, obviously, I'm in no position to dispute it. I'm surprised to hear that it's the factual basis for the guilty plea. That surprises me. I had my own surmise as to why it might have been sealed, but my surmise is worth very little.

So I would much rather take the plea materials -- well, I'm hopeful that counsel will reach an agreement that it can be disclosed at this point. And I would rather have it under those terms.

THE COURT: Then we can wait for two weeks. I'll set a status hearing and we can come back and the government can tell me and the defense can tell me what their position is. And if there's disagreement, then I'll have to make a ruling.

Okay. Let's get back to the merits then. And what about the position that's been advanced by both government counsel and defense counsel that the record would indicate that there were, conceivably, multiple reasons as to why Mr. Henriquez was killed and that you cannot make a sufficient showing, based upon the preponderance standard, that the reason for it was related to what was charged in this case?

MR. CUNNINGHAM: Yes, Your Honor. There are three documents in this case that I would urge Your Honor and Your Honor's staff to consider carefully. The first is what I

will call Exhibit 7. It was originally submitted by us in part and then the government provided a full translation of Exhibit 7 in their addendum in their first submission. And Addendum 7 is the record from the proceeding in Colombia where the court reached a decision relating to this matter. And I'm going to read from it in one second, but I want to be clear about what that proceeding was and what it was not.

That was a criminal case, not part of the Justice and Peace process. It was a criminal case and it resulted in the conviction of the defendant in this case. He was sentenced to 38 and a half years in prison for the killing I've made at issue here; he was ordered to pay a fine and he was ordered to make restitution. And in reaching that conclusion, the court in Colombia said the following -- and now I'm reading from Exhibit 7 at page 14. I'm going to skip the first part of the second paragraph, where it says that "Mr. Henriquez" -- now I'm reading -- "had to be disappeared at all costs, since he was impeding the objectives of the AUC to continue planting coca, which Mr. Henriquez wished to see eradicated in order to cultivate cacao. This was not permitted by Hernán Giraldo who, in revenge and with malice, decided, together with his right-hand man, Leonidas Acosta Angel, AKA Troilo, to make Henriquez Santamaria disappear."

I'm going to skip a little bit. Then the court

said, "Even so, the fact that Henriquez Santamaria was a former member of M-19 who had been reintegrated into civil society constituted another motive for his execution. As the evidence shows, that it was considered a bad thing for a former guerrilla to be gaining influence and, even more so, in an area under paramilitary influence."

So we don't have a lot of unanswered questions. We have answers. The court in Colombia said there were two reasons for the killing; the one I've emphasized, Mr. Henriquez' anti-coca eradication efforts, and the fact he was a former guerrilla.

I've argued as a factual matter the second reason -- I've said as a legal matter they can both be direct causes. So the fact there are two motives, that doesn't prevent us from being victims.

As a factual matter, Mr. Henriquez had been a guerrilla since 1984. He'd been living in this region since 1996. Five years earlier. He didn't get abducted, tortured and killed because he was a guerrilla, he'd been there for five years. What precipitated his killing was his anti-coca messaging.

THE COURT: Let me just ask this question: What nexus or relationship do you have to show between the coca plant that purportedly Mr. Henriquez was seeking to try and suppress, and the drugs that actually were being brought

into the United States? Because the crime is manufacturing and importation of drugs into the United States.

As I understand, the cocaine that was being produced in this region was not just coming to the United States, it was also going to other locations. In fact, as I understand it, it was actually going first to Mexico and then being disbursed into the United States from that location.

So, what relationship or nexus do you have to show between the cocaine at issue that Mr. Henriquez was seeking to try and suppress through his efforts, and cocaine that was actually coming into this country?

MR. CUNNINGHAM: So that was the footnote I flagged earlier for Your Honor with respect to my burden of proof. So I know that this coca was being grown in the same time as this conspiracy and in the same place as this conspiracy. But I think it's an impossible burden to put on me, the movants here, to try to establish that the coca on the farms of the farmers to whom Mr. Henriquez was talking, that that cocaine, coca into cocaine, was destined for the United States.

THE COURT: Maybe the statute makes it -- maybe the statute makes it very difficult because of the wording of it.

MR. CUNNINGHAM: Because -- you know, Your Honor,

I -- I think it's very -- I'm -- I'm hemming and hawing --

THE COURT: Query, I'm just asking in query, do you have to show that the specific cocaine in question was intended to be transported into the United States and that the defendant had a role in Mr. Henriquez' death because he was seeking to try and avoid that taking place?

MR. CUNNINGHAM: I don't think I do have to show that. I think I've gotten us close enough when I'm in the same time and in the same place and with the same people who are charged in this conspiracy. And that's what I have here. That we have established.

THE COURT: Okay.

MR. CUNNINGHAM: One of the things that has gone on in arguing this is, you know, what I'm hearing described obliquely as the conduct to which the defendant pled, seems to bear very little resemblance to the indictment that I have seen. The indictment I've seen is a vanilla conspiracy to manufacture and distribute cocaine, with knowledge that it's going to be imported into the United States. It doesn't mention the word taxes. I didn't read anything about taxes or extortion, yet I'm hearing --

THE COURT: That's -- I do know, and I don't think it's anything to hide, that is the predicate for what they said, at least the individuals who have appeared before me, the role that they were playing; that they weren't actually,

themselves, involved in growing the coca, they weren't actually involved in the manufacturing of the cocaine, and they weren't, necessarily, actually involved in putting the cocaine on the fast boats that bought it to, I guess, Mexico and then into the United States. That their role was that they were collecting taxes for the activity so that they could fund their guerrilla -- or, antiguerrilla behavior, activity they were involved in. That's all I've ever heard.

I've never heard that they were actually involved in growing it, manufacturing it, even transporting it. But they were collecting taxes from those who were doing it in order to fund the efforts they were involved in in their fight against Farc and some of the other guerrilla groups.

MR. CUNNINGHAM: That's fascinating and surprising to me, because I -- we, again, have very limited visibility into what the government does. But we do have some FOIA released DEA investigative materials -- not DEA-6s, but more of their country reports and things, and they paint a very different picture, a very, very different picture of what this man's role was in the production and distribution of cocaine; not that he was a tax man or even just extorting other drug dealers.

THE COURT: Maybe they thought that's all they could prove, I don't know. But all I know is that's all that's ever been presented to me in support of their

position of what his activity was that justified the indictment and ultimately his plea.

MR. CUNNINGHAM: That raises an interesting -- another -- yet another interesting question here because the statute, the CVRA says that you have to be -- to be a victim, the harm has to have been caused as a direct and proximate result of the commission of a federal offense. And the federal offense or a federal offense that I thought we all had in mind here was the vanilla cocaine conspiracy that was indicted. Now I'm hearing that it's some carved-out version.

THE COURT: I assume that's why they charged the aiding and abetting.

MR. CUNNINGHAM: Interesting. That's interesting. I would say that we've, nonetheless, satisfied the definition of crime victim, if we can say we were harmed as a result of the offense alleged in the indictment, which is its vanilla version and which includes an allegation that they were manufacturing, which, necessarily, includes that they were encouraging the growing of the coca.

THE COURT: Well, I don't think I can disregard the facts that they present to me in support of the indictment and speculate that it's something other than that.

MR. CUNNINGHAM: But, but -- no, Your Honor should not disregard any facts, but Your Honor should consider

additional facts. The additional facts include, for example, what the Colombian court found, which was that this defendant was disappeared because he was impeding the objectives of the AUC to continue planting coca. That's a fact Your Honor should consider, as well.

And lest I forget, the other two documents that I would very much like to bring to Your Honor's attention are the two statements, two particular statements of witnesses in the Colombian proceedings. One is a witness named --

THE COURT: I mean, you're sort of suggesting I would have to have another entire trial or judicial proceeding in order -- because I don't think I'd just be inclined to accept what the Colombian courts found. I think I would have to have something more than that because, I mean, I'm getting representations about their process being very different than what our process is.

MR. CUNNINGHAM: Their process is different, Your Honor. They use the inquisitorial system, not the adversarial system, and there is not the kind of cross-examination we see in this country. But, and this is probably a subject for a further briefing, if necessary, there are principles of judicial comity that would have Your Honor accepting or deferring to findings made by the Colombian court.

But leaving that aside, whether or not you want

to, in essence, rely on the conclusion that's reflected in Exhibit 6, you have at least some of the evidence that was the basis for that court's decision. And again, these are in the form of statements, but Your Honor can consider them. And that --

THE COURT: I mean, I have to go back and look at the legislative history and what see what congress envisioned in reference to this type of situation, if they even thought about this being a potential. But, I mean, it seems to me that the government, I would assume, made an assessment. I mean, you suggest that they sort of sought to hide the ball by only indicting a certain aspect of the conspiracy that otherwise was broader than what they allege in the indictment. I don't have any proof that that's in fact the case. And I'm not convinced by what you said that that is in fact the case.

But it seems to me I have to rely upon what the government believed they could prove as a federal offense, if this case ultimately went to trial. And as I say, despite, you know, the vagueness of the indictment itself, the facts that they presented to me in support of the indictment and the guilty plea in this case isn't nearly as broad as what you suggest.

MR. CUNNINGHAM: Right. So we know from the enactment of the Federal Rules, the drafters of the Federal

Rules contemplated a fact-finding process, if need be, in order to ascertain victim status. We know that. And I can tell you and I could provide cites where other courts have engaged in evidentiary hearings to do so. But I actually think this is simpler --

THE COURT: And in those cases did the court look behind what the allegations were as the government proffered they were in support of the indictment and sought to expand the scope of what the government alleged in the indictment to assess victim status?

MR. CUNNINGHAM: Your Honor, pardon me for -- I don't know the answer to that question.

THE COURT: I don't know either. I'm just asking.

MR. CUNNINGHAM: Yeah, I know. It's an excellent question. But I can't answer it as I stand here now. I guess -- I see --

THE COURT: What we're going to do is we're going to come back in two weeks and at that time the government is going to let us know, and defense counsel, whether there's any objection to all of the information amassed prior to this proceeding, whether that information can be released and whether they're willing to release it without a disclosure of prescription. And I assume, conceivably, you may want to have access to that before I reach a final decision on this question, which I'm willing to do. I'm

willing to wait until that takes place, but I want to get this done as soon as I can.

So maybe the appropriate thing to do is to wait until we come back two weeks from now, see what the government and the defense are agreeable to, as far as unsealing is concerned, and then at that point maybe you can provide some additional support to me as to what the scope of any evidentiary hearing would be, if I decided that an evidentiary hearing was in fact necessary.

Because I would think, in order for me to get where you want me to go, that I would have to have an evidentiary hearing and buy in on evidence that would expand the scope of what the government decided the conspiracy was. Because based on what they've alleged, I think you have a difficult row to hoe in showing victim status. But if you're right, that conceivably it's appropriate for me to have an evidentiary hearing and entertain other evidence that would broaden the scope of what the conspiracy was, despite what the government alleged, maybe that changes the calculation, I don't know.

MR. CUNNINGHAM: I agree in not knowing.

THE COURT: Let me set a date when we can come back. I assume you'll want to submit something to me. I don't know if you would be aided by whether this information is made available to you in that regard. I would assume, as

it relates to the evidentiary hearing, that wouldn't be necessary because I've told you, based upon my understanding of the facts and what's been related to me, what the scope of the conspiracy is as alleged by the government. So I don't think this additional information would assist you in alleging in some filing what the scope of any evidentiary hearing would be.

MR. CUNNINGHAM: So if I'm -- I may not be tracking right. Would Your Honor contemplate then that at the next proceeding perhaps then we get -- we would get a version of the plea proceedings, either subject to a nondisclosure or not, and then could we react to that after seeing --

THE COURT: If you think that would be necessary. I don't -- I don't think, based upon what I know that information is -- and maybe I don't know all of it -- I don't think that that information is going to change the assessment of what the scope of an evidentiary hearing should be. All it's going to do is, I think, relate, in essence, as far as the facts are concerned, what I've told you their predicate is for what the conspiracy is as alleged by the government.

MR. CUNNINGHAM: Okay.

THE COURT: But if you think you want to wait to get that before you file something, that's fine.

MR. CUNNINGHAM: I think I would, Your Honor.

THE COURT: Okay. Then we'll just set a date for us to come back. The government will and defense counsel will report back to me at that time as to whether they're willing to unseal the information without any restrictions and we can proceed from there.

Unfortunately, the 5th, I'm not going to be here that day. Two weeks from now would be the 5th and I'm not going to be here that day.

Actually, I do have to get here for a judge's meeting at 4:30, but I have some other commitments that day.

MR. CUNNINGHAM: If you're struggling for the 5th, Your Honor, I can tell you it's a disaster for me. But I would, of course, be where Your Honor wanted --

THE COURT: What's your situation?

MR. CUNNINGHAM: Although I have to be in D.C., I'm committed in a series of day-long meetings.

THE COURT: What about the 8th?

MR. CUNNINGHAM: The 8th I'm meeting with the SEC here in D.C.

THE COURT: All day?

MR. CUNNINGHAM: Late morning -- middle of the day.

THE COURT: What time do you meet with them?

MR. CUNNINGHAM: I think my meeting is from ten to

noon.

THE COURT: Because ours shouldn't take long, for the government and the defense counsel to let us know what their position is on the unsealing. And I'm free at 9 o'clock.

MR. LAYMON: Judge, on Friday, the 8th, I have a contested hearing with Judge Bates at 10. But if we were done by 10, on Friday the 8th, I could certainly do 9 o'clock.

THE COURT: If that's not good, then we would have to go into the next week.

MR. CUNNINGHAM: My meeting at the SEC is at 11:15.

THE COURT: I can do it at 9. It shouldn't take more than five, ten minutes for the government and Mr. Feitel to relate whether they're willing to turn it over. And if they're not, what limitations they would want to impose in reference to that.

MR. FEITEL: Your Honor, to be fair, if we know beforehand and we're agreeable, we'll --

THE COURT: Then we don't have to have a hearing.

MR. FEITEL: We'll let the court know. We're not trying to drag this out at all. Yeah, I mean, if we could meet, 9 o'clock on the morning of Friday, that's fine with -- for my schedule, as well, or whatever other time Your Honor says I need to be here.

THE COURT: Does that put you in too much of a

crunch, Mr. Cunningham, to do it at 9?

MR. CUNNINGHAM: No. I can do it.

THE COURT: Okay. Let's set it at 9 and then we'll go from there. Hopefully we can get it done as quickly as possible.

Anything else today?

MR. CUNNINGHAM: No, Your Honor. Thank you.

THE COURT: Thank you.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 25th day of April, 2015.

/s/________________________

Janice E. Dickman, CRR, RMR
Official Court Reporter
Room 6523
333 Constitution Avenue NW
Washington, D.C. 20001