|  |  |
|---|---|
| UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF COLUMBIA | FILED<br>JAN 2 9 2009<br>NANCY MAYER WHITTINGTON, CLERK<br>U.S. DISTRICT COURT |

UNITED STATES OF AMERICA      :
                              :
v.                            :
                              :
HERNÁN GIRALDO-SERNA,         :   Criminal No. 04-114-1 (RBW)
    a/k/a "El Viejo,"           :
    a/k/a "El Patron,"          :
    a/k/a "Don Hernán,"         :
                              :
Defendant.                    :

## STATEMENT OF FACTS

The United States of America submits the following statement of facts in support of defendant's plea of guilty:

1.    Beginning in 2000, the United States Drug Enforcement Administration conducted an investigation of the Self-Defense Forces of the Campesinos of Magdalena and Guajira (ACMG), which was led by the defendant, Hernán Giraldo-Serna, a/k/a "El Viejo," "El Patron," and "Don Hernán," and operated along the northern Caribbean coast of Colombia. By March 2002, the ACMG merged with a group within the United Self-Defense Forces of Colombia (AUC) led by Rodrigo Tovar-Pupo (a/k/a "Jorge 40"). This group became known as Bloque Tayrona or the Tayrona Resistance Front and was led by both the defendant Hernán Giraldo-Serna and Tovar-Pupo. The AUC was a federation of right-wing paramilitary groups (such as the ACMG/Bloque Tayrona) that was initially formed to undertake responsibility for protecting Colombian citizens from left-wing guerrilla paramilitary organizations dedicated to the overthrow of the Colombian government.

2.    The areas controlled by the ACMG, and later the AUC Bloque Tayrona, were the same areas used by individuals involved in the growing, processing, manufacturing and transportation of cocaine. These individuals would manufacture cocaine in, or transport cocaine



through, areas controlled by the AUC. This cocaine would eventually be transported to beaches on the north coast of Colombia. In large part, the AUC's Bloque Tayrona funded its anti-guerrilla operations through "taxes" imposed by the defendant on cocaine manufacturers and traffickers operating in its region. These were called "war taxes."

3. Once the cocaine was transported from ACMG/Bloque Tayrona-controlled cocaine manufacturing laboratories to the northern coast of Colombia, it would be placed into so-called "go-fast" boats or *"lanchas rapidas."* The go-fast boats were designed to hold 2,000 pounds (approximately 1,000 kilograms) or more of cocaine at one time. Moreover, each of the go-fast boats was typically outfitted with two to four high performance outboard engines, enabling it to travel long distances at relatively high speeds, even when fully loaded with cocaine. The go-fast boats would leave loading points along the northern coast of Colombia for destinations in the Carribean, Central America and Mexico. The cocaine was then received by other drug trafficking organizations in those regions and, later, shipped to the United States and elsewhere.

4. By 1998, the defendant, Hernán Giraldo-Serna, had been the leader of the ACMG for several years, and conducted the organization's operations from several compounds in the Sierra Nevada mountains outside of the costal town of Santa Marta. Between approximately 1998 and 2005, the defendant was in command of between 500 and 2,000 paramilitaries and had a personal security detail of approximately 200 men. In addition to the support of his own armed security detail, the defendant frequently carried firearms, including pistols and rifles, during organization-related activities.

5. The defendant, assisted by his brother, co-defendant Jesus Giraldo-Serna, organized and led members of the organization involved in drug trafficking operations who were tasked with

2

the collection of war taxes throughout the ACMG/Bloque Tayrona area of control. The organization members who oversaw and taxed numerous shipments of cocaine and cocaine manufactured in ACMG/Bloque Tayrona-sanctioned cocaine manufacture laboratories under the direction of the defendant included co-defendants Alvaro Padilla-Redondo, Martin Peneranda-Osario, Freddy Castillo-Carillo, Edwing Mauricio Gomez-Luna, and Huber Anibal Gomez Luna. Between 1998 and 2005, these individuals collected war taxes from drug traffickers, such as Jose Miranda-Ortiz and Carlos Humberto Meneses-Sepulveda, who utilized the coastal area to launch numerous drug shipments on go-fast boats that were ultimately destined for the United States. Taxes due on these cocaine loads, which averaged between 1,000 and 1,500 kilograms of cocaine each, ranged in amount from an average of 50,000,000 Colombian pesos (approximately $25,000) per boat-load in 1998, increasing at the direction of the leaders of the ACMG/Bloque Tayrona each year by an average of 25,000,000 Colombian pesos. At the time the loads were launched, the appropriate tax would be paid by the trafficker to the defendant's subordinates in cash – either in Colombian pesos, U.S. dollars or a combination of both. All of these taxes were, in turn, initially paid to defendant Hernan Giraldo-Serna, either personally or through a representative, including co-defendants Jairo Antonio Musso-Torres and Nodier Giraldo-Giraldo. After the merger of the Northern Bloc with the ACMG, the taxes were paid directly to co-defendant Giraldo-Giraldo (designated as the "finance commander" in approximately 2002) or to one of his representatives.

6.  In exchange for these taxes, the ACMG/Bloque Tayrona ensured that the traffickers were not molested by left-wing paramilitary groups or other criminal elements, and would keep a lookout for law enforcement presence in the area. As part of this security, the defendant, or other organization members at the defendant's direction, would coordinate and make arrangements with

the "urban" commanders in his area, including Walter Torres and co-defendant Eduardo Enrique Vengoechea-Mola, to ensure that ACMG or AUC troops would be present in the area to provide additional perimeter security during the actual loading of the cocaine into the go-fast boats; to perform surveillance on Colombian law enforcement authorities and rival drug trafficking groups; and to monitor and relay communications within various units of the ACMG /Bloque Tayrona.

7. In summary, in the course of the defendant's activities leading the organization, including those activities with other members of the ACMG/Bloque Tayrona, the defendant came to learn the following: that large quantities of cocaine, amounting to more than 1500 kilograms, either transited through or were manufactured in the ACMG/Bloque Tayrona's area of control and were subject to taxation; that in exchange for receipt of the taxes, the laboratories where the cocaine was manufactured were allowed to operate, and cocaine that was transiting through the area was allowed to pass, and that both activities were provided protection from insurgent groups, other criminals, and to a certain extent drug-control efforts of the Colombian government; that cocaine from these laboratories, as well as the cocaine that transited through the area eventually ended up at the coast, where it was loaded into go-fast boats, beginning the process leading to its ultimate destination in the United States.

8. This Statement of Facts is not intended to constitute a complete statement of all facts known by defendant Hernán Giraldo-Serna, but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. The defendant has provided to the United States additional information about the activities of himself, his coconspirators and others, which is not contained herein. The limited purpose of this Statement is to demonstrate that there exists a sufficient legal basis for defendant's plea of guilty to the charged offense. The Government submits that had there been a trial in this matter, the Government would have proven each of the facts as

4

outlined, beyond and to the exclusion of every reasonable doubt, and further that the facts satisfy each of the essential elements of the charge to which the defendant is entering his plea.

                                Respectfully Submitted,

                                Paul M. O'Brien, Chief
                                Narcotic and Dangerous Drug Section
                                Criminal Division
                                U.S. Department of Justice

Date: __1/29/09__                               _____
                                                          Matthew Stiglitz
                                                          Trial Attorney
                                                          Narcotic and Dangerous Drug Section

## DEFENDANT'S ACCEPTANCE

      I have read the Statement of Facts, as translated into Spanish and with the assistance of my attorney, setting forth the facts as to my involvement in a conspiracy to manufacture and distribute five kilograms or more of cocaine, intending and knowing that such cocaine would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959, 960 and 963. I have discussed this statement of facts fully with my attorney, Elita C. Amato. I fully understand this statement of facts and I acknowledge its truthfulness, agree to it and accept it without reservation, with the provision that this statement of facts does not include all the details of the criminal activity I have participated in during the time period alleged in the Superseding Indictment. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this statement of facts fully.

Date: _1/29/09_                                 _____
                                                          Hernán Giraldo-Serna
                                                          Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read the above Statement of Facts as to my client's involvement in a conspiracy to import five kilograms or more of cocaine into the United States and to manufacture and distribute five kilograms or more of cocaine, intending and knowing and such cocaine would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959, 960 and 963. I have reviewed the entire statement of facts with my client and have discussed it with him fully. I am ~~fluent~~ proficient in the Spanish language and I confirm that the Statement of Facts was accurately translated ~~for my~~ client. I concur in my client's agreement with and acceptance of this statement of facts.

Date: 1-29-09

Elita C. Amato
Counsel for Hernán Giraldo-Serna