# EXHIBIT A

The New York Times | http://nyti.ms/2cC9DjW

# The Secret History of Colombia's Paramilitaries and the U.S. War on Drugs

After decades of atrocities, the warlords were finally being held to account. Then the Americans stepped in.

## Leer en español

By DEBORAH SONTAG   SEPT. 10, 2016

CALABAZO, Colombia — Skinny but imposing with aviator glasses, a bushy mustache and a toothy smile, Julio Henríquez Santamaría was leading a community meeting in this sylvan hamlet when he was abducted by paramilitary thugs, thrown into the back of a Toyota pickup and disappeared forever on Feb. 4, 2001.

Ahead of his time, Mr. Henríquez had been organizing farmers to substitute legal crops like cacao for coca, which the current Colombian government, on the verge of ending a civil war fueled by the narcotics trade, is promoting as an antidrug strategy.

But Hernán Giraldo Serna, or his men, didn't like it, or him.

From his early days as a small-time marijuana farmer, Mr. Giraldo had grown into El Patrón, a narcotics kingpin and paramilitary commander whose anti-insurgent mission had devolved into a murderous criminal enterprise controlling much of Colombia's mountain-draped northern coast.

Mr. Henríquez was hardly his only victim; Mr. Giraldo, whose secondary alias was the Drill because of his rapacious appetite for underage girls, had all kinds. But

Mr. Henríquez became the emblematic one, with a family tenacious enough to pursue Mr. Giraldo even after he, along with 13 other paramilitary leaders, was whisked out of Colombia and into the United States on May 13, 2008, to face drug charges.

It happened in a dead-of-night extradition that stunned Colombia, where the men stood accused of atrocities in a transitional justice process that was abruptly interrupted. In the whoosh of a jet, and at the behest of the Colombian president, Álvaro Uribe, the United States-led war on drugs seized priority over Colombia's efforts to confront crimes against humanity that had scarred a generation.

Victims' advocates howled that it was like exporting "14 Pinochets." Mr. Henríquez's family, meanwhile, quietly vowed to hold at least one of them accountable for the Colombian blood that stained the cocaine shipped to American shores.

"We hope that the effort we have made over all these years means that things won't end with impunity," said his daughter Bela Henríquez Chacín, 32, who was 16 when her father was murdered and hopes to speak at Mr. Giraldo's sentencing in Washington next month. The Henríquezes will be the first foreign victims ever given a voice in an international drug smuggling case in the United States, experts believe.

Whether this recognition is more than symbolic remains to be seen. Mr. Giraldo's fellow extraditees have received relatively lenient treatment for major drug traffickers who were also designated terrorists responsible for massacres, forced disappearances and the displacement of entire villages, an investigation by The New York Times found.

Once the paramilitary Colombians — several dozen, all told — have completed their American prison terms, they will have served on average seven and a half years, The Times found. The leaders extradited en masse will have served an average of 10 years, at most, for drug conspiracies that involved tons of cocaine.

By comparison, federal inmates convicted of crack cocaine trafficking — mostly street-level dealers who sold less than an ounce — serve on average just over 12 years in prison.

What's more, for some, there is a special dividend at the end of their incarceration. Though wanted by the Colombian authorities, two have won permission to stay in the United States, and their families have joined them. Three more are seeking the same haven, and still others are expected to follow suit.

"In the days of Pablo Escobar, they used to say they preferred a tomb in Colombia to a prison in the United States," said Alirio Uribe Muñoz, a member of the Colombian Congress. "But maybe now extradition is a good deal."

For 52 years, with abundant American support, the Colombian government has been locked in a ferocious armed conflict with leftist insurgents. Though it initially empowered paramilitary forces as military proxies, the government withdrew official sanction decades later, long after landowners and cartels had co-opted them. Before their demobilization in the mid-2000s, the militiamen came to rival the guerrillas as drug traffickers and outdo them as human rights abusers.

Now, eight years after the paramilitaries were extradited, Colombia has reached a peace deal with their mortal enemies, the Revolutionary Armed Forces of Colombia (the FARC). Facing an Oct. 2 vote on the accord, the country is in the midst of a polarizing debate about crime and punishment for the FARC, informed by what went wrong during the paramilitary peace process. Nobody is advocating that justice be abdicated to the United States this time.

But the paramilitary chapter of the country's history is not closed, and remains "totally full of blanks," said María Teresa Ronderos, the author of "Recycled Wars," a Spanish-language history of Colombian paramilitarism. "Nobody knows what happened to those guys."

For years, the Justice Department shrouded the militiamen's cases in secrecy, not only sealing sensitive documents but also hiding basic information and sometimes even erasing defendants like Mr. Giraldo from the public docket.

Using interviews, recently unsealed legal briefs, transcripts of hearings, internal government documents, and information obtained from Colombia and the United States, The Times examined the cases of 40 extradited paramilitary members and associates.

Most were handsomely rewarded for pleading guilty and cooperating with the American authorities; they were treated as first-time offenders despite extensive criminal histories in Colombia; and they received credit for time served there, even though the official rationale for their extradition was that they were committing crimes in Colombian jails.

Take Salvatore Mancuso, who the government said "may well be one of the most prolific cocaine traffickers ever prosecuted in a United States District Court" and whom Colombian courts found responsible for the death or disappearance of more than 1,000 people.

Under the terms of his plea agreement, he faced 30 years to life in prison. Because of his extensive cooperation, however, prosecutors — one of whom characterized Mr. Mancuso in an interview as "always a gentleman to me" — asked for just under 22 years. A federal judge sentenced him to 15 years and 10 months. In the end, he will spend little more than 12 years behind bars in the United States.

"It's crazy," said Roxanna Altholz, the associate director of the International Human Rights Law Clinic at the University of California, Berkeley, who represents the Henríquezes. "These individuals are the worst of the worst. They are drug lords and war criminals. Why should they be getting any benefits?"

Early on, federal prosecutors addressed Ms. Altholz's qualms by saying, "We're going to put them away; it doesn't matter what for." But as she and other human rights advocates saw it, it did matter: Crimes against humanity outrank drug crimes, and the United States could have indicted the men for crimes of torture, too — or simply given the Colombian transitional justice system a chance.

The American authorities think the extraditions served a critical purpose at a historic juncture, "demonstrating to the Colombian people that there are no such things as untouchables," as one put it. Eventually, said a Department of Justice spokesman, Peter Carr, the Americans provided the Colombians with "unique and unprecedented" access to imprisoned foreign defendants so that the transitional justice process, called Justice and Peace, could continue.

Mr. Giraldo will be the last of the extradited paramilitaries sentenced.

Though the United States Marshals Service said it was improbable that The Times would be able to meet with him — demanding that permission be obtained from the prisoner, his lawyer, his warden, an assistant United States attorney general and a federal judge — a reporter and a photographer did succeed in visiting Mr. Giraldo at a Virginia jail last month.

In a baggy blue coverall, El Patrón, 68 now, appeared a markedly deflated version of his formerly fearsome self. His hair has grayed, his weight has dropped, his step has slowed. He passes his days weaving purses from potato-chip bags and selling them to other inmates for "siete pollos," seven portions of chicken from the commissary.

"Look," he said proudly, tugging at the shoulder strap of a silver-foil bag. "They are double-stitched."

## An Urgent Appeal to the U.S.

Shortly before midnight on May 12, 2008, Mr. Giraldo was jostled awake in a jail in Barranquilla, instructed to pack a small suitcase and then hustled onto a flight to Bogotá, the capital. No explanation was offered.

Once in Bogotá, he was handcuffed to waist chains, shackled at the ankles and loaded onto an American government plane with a veritable who's who of paramilitary heavyweights. They flew in stony silence, furious that Colombia's iron-fisted president, with whom they had a "shared ideology," as Mr. Giraldo put it, had broken his promise not to extradite them.

After years of declining to turn over the men, President Uribe had suddenly made an urgent appeal to the Americans: Those wanted paramilitary leaders? Take them. Immediately.

He wanted them picked up after the Colombian Supreme Court closed for the day and flown out before the court resumed the next morning, said a United States official who agreed to speak only on the condition of anonymity. Mr. Uribe said he feared that the court might block the extraditions if they did not act hurriedly.

The Americans snapped into action, though it was a logistical challenge. They needed to "move the men from four corners of Colombia to one location, then the aircraft needed to go wheels up with all prisoners onboard prior to the court opening for business the next day," the official said.

At one point, the official said, the Drug Enforcement Administration had six aircraft "in play" to ferry the men through Bogotá and Guantánamo, Cuba, to courthouses in Florida, New York, Texas and Washington, D.C.

Why did the American government go to such lengths to accommodate a Colombian president who, as it turned out, may have had political motivations of his own?

"The driving policy during the Bush administration was cooperation on anti-narcotics efforts," said José Miguel Vivanco, the director of Human Rights Watch's Americas division. "Not human rights, not atrocities, not to make victims of crimes against humanity committed by these bastards have a day in court in Colombia.

"So what do you do if overnight you get as a gift from the president of Colombia 14 guys wanted for narcotics? You just welcome them."

This is a crime story tangled up in geopolitics. Colombia is the United States' closest ally and largest aid recipient in the region, and the partnership has focused on combating narcotics, guerrillas and terrorism.

Both the guerrillas and the paramilitary groups funded their activities with drug money, collecting "war taxes" and providing security for traffickers in their areas. But the drug enforcement authorities focused primarily on the narco-guerillas at first; the paramilitaries, while opponents in the war on drugs, were technically on the same side as the Colombian and American governments in the civil war.

After 2000, however, when paramilitary troops reportedly committed at least 75 massacres, Washington shifted its perspective. On Sept. 10, 2001, a day before his attention turned elsewhere, Secretary of State Colin L. Powell designated the United Self-Defense Forces of Colombia, known as the AUC, a foreign terrorist organization, just like the FARC.

Drug indictments of key paramilitary leaders followed, and Mr. Uribe, elected in 2002 with a vow to crack down on leftist rebels, used the threat of extradition to motivate the paramilitary leaders to lay down their arms.

Unlike his predecessor, Mr. Uribe, whose law-and-order toughness made him a popular two-term president, wholly embraced extradition as a drug crime-fighting tool. "The biggest commodities traded between Colombia and the U.S. were coffee, cocaine and co-defendants," said Robert Feitel, Mr. Giraldo's lawyer.

But for years, Mr. Uribe carved out an exception for the paramilitary men, saying he wanted to give Justice and Peace a chance.

The initial Justice and Peace Law was relatively toothless; a Times editorial called it the "Impunity for Mass Murderers, Terrorists and Major Cocaine Traffickers Law." But in 2006, the Colombian Constitutional Court strengthened it, granting victims a central role, increasing the maximum punishment to eight years in prison, and demanding full and truthful confessions.

Much to Mr. Uribe's consternation, the leaders then began confessing not only their war crimes but also their ties to his allies and relatives. The Colombian Supreme Court — responsible for investigating lawmakers — undertook an aggressive "para-politics" inquiry that ensnared many in the president's coalition.

Mr. Uribe fought back, accusing the justices of leftist bias and conspiracies against him. His intelligence agency illegally wiretapped the Supreme Court and individual judges; he denied involvement.

Then in April 2008, Mario Uribe, the president's cousin and a former Senate president, was arrested and accused of conspiring with paramilitary death squads. A few weeks later, Colombia woke up to police photos of the paramilitary leaders being boarded onto American planes.

"The whole country was shocked," said Miguel Samper Strouss, a former vice minister of justice in charge of transitional justice policy. "It was like they had extradited our chances for knowing the truth and for getting justice and reparation for our victims."

By 2008, the Justice and Peace process, while slow and flawed, had become a real process. Some 200,000 victims had registered to participate; thousands of crimes had been confessed and thousands of hidden graves revealed.

Publicly, Mr. Uribe — whose representatives did not respond to The Times — justified his interruption of this process by claiming that the men had been continuing to run their illegal operations from jail.

The commanders themselves, however, firmly believed that Mr. Uribe shipped them out to silence them. And many of their victims' leading advocates agreed.

"They were, collectively, going to deliver testimony that directly implicated Uribe," said Senator Iván Cepeda, who founded the influential Movement for Victims of State Crimes. "Afterward, the authorities entered the cells where they had their computers, their USBs, and they took it all. All the work they had been doing, all the proof they were going to present to Justice, disappeared.

"Those extraditions marked a before and an after," Mr. Cepeda continued. "If the intention really was to achieve silence and impunity, it was obtained to a high degree. Only now, after so many years, are we starting to see results."

## A Blood-Drenched History

At the Northern Neck Regional Jail in Warsaw, Va., the other Colombians used to rise when Mr. Giraldo entered an English language classroom. They would sharpen his pencils and fetch his papers, said Ted Hull, the superintendent.

Were it not for that, Mr. Giraldo's jailers would have had no hint that he was ever a force to be reckoned with. That the senior prisoner who limps from sciatica and speaks with his hands because he never conquered English once ran a paramilitary bloc found responsible for 1,800 serious human rights violations with over 4,000 victims — mind-boggling, they said. Mr. Giraldo is now the type of docile inmate who reflexively crosses his wrists behind his back even when they are not cuffed.

Yet here in the territory that Mr. Giraldo controlled, from the bustling market in the port city of Santa Marta up through the Sierra Nevada foothills and back down to the Caribbean coast, he remains the larger-than-life godfather in the brimmed hat and jaunty scarf whose commanding presence is still palpable.

"This man, from the time he demobilized, left behind armed groups guarding his territory," said Priscila Zúñiga, the security adviser to Santa Marta's mayor. "We have not stopped, from 2006 to 2016, having an illegal armed presence in the area."

Now it's called the Giraldo Clan.

Ms. Zúñiga spoke in the modular office that she has stationed beside the pastel-colored marketplace, along with a new police post inside, to signal that the government is wresting control from Mr. Giraldo's men, who still try to extort an "inoculation" fee for "protection" in his name.

The heavy police presence jumps out at visitors, but in general the region hides its blood-drenched history, and lurking menace, well. It is nearly impossible to imagine hacked-up bodies buried in secret graves beneath this picture-postcard landscape, where snow-capped peaks rise above palm-fringed beaches dotted with weathered fishing boats as boughs of arborescent ferns dip into rivers with women scrubbing laundry.

From the start, Mr. Giraldo's personal history, pieced together from interviews, court records, government documents and his public confessions, intersected with Colombia's intense civil conflict. He was born in 1948, the year that kicked off the decade of politically motivated bloodletting known as La Violencia.

He did not seem destined for leadership. He had a second-grade education when he left home to become an itinerant farmhand. His lawyer, who likes to turn a phrase, says that even now, Mr. Giraldo remains "a quintessential campesino at heart" — "the kind of guy who wants to get up at the crack of dawn, and draw lines in the hardened earth under a blazing sun."

By the 1970s, Mr. Giraldo was rising early to get in on "la bonanza marimbera" — the marijuana boom that preceded the cocaine boom. He organized a mule

transport service to gather the marijuana from isolated farms and deliver it to the coast.

He was first drawn into violence after his younger brother was killed during a robbery at the Santa Marta market. To avenge the death, Mr. Giraldo contracted a private security group led by a thug called Dracula; six men were murdered at the start of a long "social cleansing" campaign to eliminate "undesirables" — thieves, prostitutes, homosexuals, unfaithful women, witches and leftists.

After Dracula himself was killed, Mr. Giraldo took over his business, inheriting its subsidiary interest in the nascent cocaine industry controlled by the Medellín cartel. He transformed the so-called security group into a ragtag militia when the FARC sought a foothold in his territory and tried three times to assassinate him.

His troops trained under an Israeli mercenary, and to practice what they had learned, they slaughtered union workers at banana farms that were supposedly guerrilla strongholds.

Mr. Giraldo was arrested as a mastermind of the massacres. That was when he came onto the Americans' radar, identified in a diplomatic cable as a "top-rank assassin of the Medellín cartel" whose detention "demonstrates that Colombian officials are not turning a blind eye to murders committed by the rightists."

Eventually he was convicted and sentenced to 20 years. But by that point, eluding justice, he had exiled himself in the remote Sierra Nevada. From there he ruled his dominion for almost two more decades, protected by a personal security detail of 200 men but also by the elite families that backed him and the rural people dependent on him, the local authorities say.

"He didn't use a camp per se, like the guerrillas," Ms. Zúñiga said. "His camp was the community because he was part of the community. So the houses were his houses, the farms were his farms.

"Despite being, for us, a criminal, he was always seen with much respect — and not just respect out of fear, but respect for the order he gave to the area, because there was a great absence of the state there."

When Mr. Henríquez's older daughter, Nadiezhda, first met Mr. Giraldo, she encountered an almost benign side of him as a local authority. A young teacher then, she appreciated it when Mr. Giraldo resolved a dispute between her tiny school and the local fishermen storing their gear in the classrooms.

She also got a glimpse at his more sinister side, however. She lost her three female students when their mother sent them away to protect them from El Patrón. "He was starting to rape girls," she said.

Like a feudal overlord, Mr. Giraldo exercised "a kind of droit du seigneur" over girls in the region, said a Colombian law enforcement official, who requested anonymity because he was not authorized to talk to the news media.

"People brought him their daughters or facilitated his sexual relations with them because it was a way to safeguard their lives — if you have ties to the chief, you feel protected," he said.

After Mr. Giraldo laid down his arms, a prosecutor asked him at a public hearing why he was called the Drill. He blushed, but seemed proud of the nickname, observers said. The prosecutor then asked pointedly if it had anything to do with rumors that he liked virgin girls.

"That could be," he said.

Colombian prosecutors began to take a closer look at his relations with girls and women, starting with the mothers of the 24 children he acknowledges. Eventually, they labeled Mr. Giraldo "the biggest sexual predator of paramilitarism."

In the Justice and Peace process, he accepted responsibility for 35 acts of gender-based violence — some committed by his subordinates — including the rape of 11 girls under age 14.

The prosecutors' summary of the cases reads like a litany of uninformed consent wrapped inside a pathological dynamic.

Victim No. 6: "It is documented that in the month of October of 2004," the girl, referred to as Yajanis, visited an aunt who worked at Mr. Giraldo's ranch. A few

months later, "he proposed that she be his girlfriend, a proposition that she accepted, and on Dec. 25, 2004, they had their first sexual relations, when Yajanis was barely 13." He was 56.

Based on an analysis of birth certificates, Humanas Colombia, a feminist organization, estimated that at least 13 underage girls bore children who were the "product of violent carnal intercourse committed" by Mr. Giraldo. Nine were under 14 when they gave birth.

And some victims were probably too young to get pregnant, like the 9-year-old daughter of one of his cooks. Adriana Benjumea Rúa, the director of Humanas, said Mr. Giraldo had bought the child dolls and instructed her, 'Never tell your mama, because I will kill her.'"

## 'Sufficient Motive to Kill'

From the moment police inspectors arrived here to investigate the disappearance of Julio Henríquez, they were stonewalled.

"The law of silence prevailed," a police report said.

Mr. Henríquez's wife and older daughter had faced the same fears when they rushed to this village after getting the phone call that he had been abducted. "Leave it alone," they were told, which infuriated Nadiezhda Henríquez Chacín, 42, now a human rights lawyer and a fierce one.

"They will kill me one day, but it won't be because I was afraid," she said in an interview in Bogotá.

An ardent environmentalist, her father himself had been fearless, determined to work alongside farmers and fishermen to reclaim the rugged region from the drug trade, she said. On his large property, he was creating a nature preserve, planting indigenous trees and uprooting marijuana and coca planted without his consent.

He was not antidrug in a moralistic way, but alarmed by the deforestation caused by coca cultivation, his daughter said.

Mr. Giraldo maintained at a hearing in Colombia that he had no direct involvement in Mr. Henríquez's disappearance, but that he had instructed his men, "Everything that smells of subversion has to be removed from the area."

And Mr. Henríquez had belonged to the M-19 guerrilla movement, though he had been granted amnesty 17 years before his abduction. But his new activism — he had just formed a nongovernmental organization called Mother Earth — was a real-time threat, an ex-paramilitary soldier, Carmelo Sierra, told prosecutors.

"It's obvious Mr. Hernán did not agree with what this man was proposing to the peasants, because he grows coca — and because encroaching on his turf was sufficient motive to kill somebody," Mr. Sierra testified. "The Mafia does not forgive."

Mr. Sierra said Mr. Giraldo had sent a son, El Grillo (the Cricket), to deliver a warning: Leave town or deal with the consequences. But Mr. Henríquez did not budge. So seven of Mr. Giraldo's men were plucked from a morning lineup, instructed to change into civilian clothing, loaded onto a flatbed and sent down the mountain "to disappear the gentleman from the NGO."

"I sincerely do not know what happened to him," Mr. Sierra testified. "I don't know if they slit his throat, or chopped him into pieces. I don't know how he died nor where they buried him."

Eight months later, antidrug agents investigating Mr. Giraldo's business were murdered along with tourists and a hotel worker at a beachside restaurant. This unleashed a big counternarcotics operation and then a bloody paramilitary power struggle, at the end of which Mr. Giraldo's "resistance front" suffered a hostile takeover by another warlord, Rodrigo Tovar-Pupo.

In 2004, Mr. Giraldo and Mr. Tovar-Pupo were indicted in Washington in a conspiracy to manufacture and distribute cocaine bound for the United States. In a superseding indictment the next year, prosecutors said the two men controlled or were involved in the shipment of thousands of kilograms of cocaine that left northern Colombia on "go-fast boats," rigged with extra motors and fuel.

In 2006, Mr. Giraldo and over a thousand of his fighters laid down their arms — 597 of them along with 73,400 rounds of ammunition — in the paramilitary peace process.

The next year, Mr. Giraldo's lawyer provided coordinates that ultimately led the authorities to Mr. Henríquez's decomposed body in a clandestine grave. Nadiezhda Henríquez attended the exhumation with her mother. It was a chilling coda to years of hoping against hope.

"I never thought we would find him as we found him: in a mountain tomb, so very green, beneath a tree, near streams that turn into rivers, with moss and stone of the Sierra Nevada," Ms. Henríquez said in a statement filed with the court on Thursday. "With his two hands tied behind his back and two coups de grâce shots to the head, in clothing that was not his, missing a shoe, missing a foot, missing part of his mouth. Only bones."

Mr. Henríquez's family distrusted the Justice and Peace process, and pushed for Mr. Giraldo to be tried in an ordinary criminal court for the forced disappearance. In 2009, after his extradition, he was convicted in absentia, and sentenced to 38½ years in prison and reparations of 1,000 grams of gold, about $43,000.

By that point, though, he was beyond the reach of Colombian justice. So the Henríquezes took their fight to America.

## Only the Lawyers Are Winners

A few months after Mr. Giraldo arrived in the United States, he was transferred to Northern Neck, whose inmate population was a combustible mix of Mexican drug traffickers, Central American gang leaders, "jihadi terrorists," and Colombian combatants from both sides who got along fine, Mr. Hull, the superintendent, said.

"To be honest with you — I don't want to sound like I'm pandering or excusing terrorism — but both the FARC and the AUC, they were model inmates," he said. "I got the vibe: 'I'm busted, and I'm out.' Every one of them was cooperating" with prosecutors.

None of the paramilitary defendants went to trial.

Almost all had private lawyers. Mr. Giraldo said that his family was poor, and that "a friend" was underwriting his American legal costs. Fees could be substantial: A document in Mr. Tovar-Pupo's case reveals that he paid his lawyer $390,000.

"The only people who ever win in the great extradition game are the lawyers," said Mr. Feitel, Mr. Giraldo's lawyer.

In the men's defense, their American lawyers highlighted the political backdrop of their crimes, presenting them as freedom fighters whose movement became corrupted by drugs. One defense lawyer, referring to American support for the Colombian military, went so far as to tell a judge that a notorious paramilitary leader named Carlos Jiménez Naranjo "was initially, and we can put it right on the record, financed by our own government."

The authorities, in some instances, did seem to view the men as "substantively different" from purely profit-driven drug lords, as Judge Reggie B. Walton of the United States District Court in Washington put it when he sentenced Mr. Tovar-Pupo to 16½ years.

"He was engaged in trying to fight an enemy that I think, probably, had that enemy won, it would not have enhanced the quality of life for people in Colombia," the judge said. "So, I mean, he was engaged in some activity that had some positive perspectives."

Robert Spelke, a retired federal narcotics prosecutor and the one who called Mr. Mancuso a gentleman, said, "Some of these guys were real thugs, but not that many."

He continued: "It's hard sometimes to believe they did what they did. Clearly, they did some nasty things. But, you know, it was a civil war down there. I always wanted to believe that if I was put in the same situation, I would have done things differently. But I don't know."

Ms. Altholz, who represents the Henríquezes, said she saw an irony: "Because these individuals took some kind of role in fighting 'the evils of Communism'

embodied in the FARC," their identity as warlords had become a mitigating rather than aggravating factor in their cases.

A Colombian law enforcement official said he had hoped for far stiffer penalties as a trade-off for losing the men to the American justice system.

"We all made many sacrifices to pursue them," he said. "They threatened me. They displaced some of my colleagues. They killed several of my friends. We believed that they were going to get punishment more in line with the damage they did — at the least sentences greater than 20 years."

In those cases examined by The Times, the sentences that could be determined — some remain sealed — ranged from probation to just over 30 years. Because "time served" was easier to ascertain, and because many sentences were reduced to "time served," The Times used that as a metric.

In exchange for their cooperation, most of the men got sentence reductions — sometimes before, sometimes after and sometimes both before and after sentencing.

There was one notable exception, as far as The Times could determine.

Federal prosecutors in New York declined to allow Diego Murillo Bejarano — alias Don Berna — to exchange information for benefits. He got 31 years. The one other paramilitary leader who received a sentence over 30 years expects it to be cut by 35 percent to 50 percent because of his cooperation, his lawyers said.

In one instance, a senior federal judge in Ocala, Fla., balked at the idea of a second sentence reduction for a paramilitary chief. There reaches a point, said Judge William Terrell Hodges, when any further reduction "tends to denigrate the seriousness of the subject defendant's criminal behavior and threatens to invite public disrespect for the administration of criminal justice."

When Hebert Veloza Garcia, known as H.H., was sentenced this spring in Manhattan federal court, a prosecutor pronounced him an "extraordinary defendant" — "in terms of his very serious criminal conduct, but also in terms of his extraordinary cooperation."

In his case, as in most, it is not possible to ascertain precisely how his cooperation helped the American government because specific information is redacted. But Mr. Veloza, according to Ruben Oliva, his lawyer, gave "a full-throated confession" that laid the groundwork for his own indictment, and "his assistance served to deal severe blows to major drug trafficking organizations as well as the violent and corrupt organizations that exist to both serve and prey upon them."

The American government found Mr. Veloza responsible for trafficking more than 450 kilograms of cocaine. Sentenced to 11½ years, he will be released this fall after seven and a half years behind bars in the United States. Then, despite "all of the horrendous things you've done in the course of your life," Judge William H. Pauley III told him, he will "get the chance to hit the restart button."

He hopes to stay in the United States, Mr. Oliva said — though he has a Justice and Peace sentence awaiting him in Colombia for 85 crimes including torture and homicide.

So far, two paramilitary associates have won haven in the United States on their release from prison: Juan Carlos Sierra, known as El Tuso, who spent five years in American prisons, and Carlos Mario Aguilar, alias Rogelio, who spent about seven.

Both men have pending arrest warrants in Colombia, Mr. Sierra's in connection with a murder, according to the Colombian attorney general's office.

Their families have received political asylum, as has the family of a third paramilitary associate, Mauricio López Cardona, known as Yiyo, who has also applied to stay. So, too, has Guillermo Pérez Alzate, a paramilitary leader extradited with Mr. Giraldo and released in June, having served less than half his original sentence.

As convicted drug traffickers, these men do not qualify for asylum. Instead, they request a rare form of protection against expulsion under the Convention Against Torture, arguing that they would probably be tortured by their government, now led by President Juan Manuel Santos, a centrist.

"I'm not suggesting President Santos would be personally lying in wait," Mr. Oliva said. "But these guys wouldn't make it out of the airport. Literally, they'd whack them in the airport."

Mr. Samper, the former justice official, whose father was president of Colombia in the 1990s, called this argument "unbelievable."

"We have the world's finest individual protection program, as recognized by the Inter-American Human Rights Commission," he said.

## An Apologetic Warlord

As a warlord and a drug lord, **Salvatore Mancuso** was a bigger player than Mr. Giraldo. He was also, unlike Mr. Giraldo, verbosely apologetic. Once he entered the Colombian transitional justice process, he talked and talked. He even sobbed as he asked forgiveness of his victims.

Then he was extradited, and after almost a year went by, he felt compelled to take action "to prevent the stagnation and virtual death" of Justice and Peace. Or so he said in a florid letter to an unlikely pen pal — Piedad Córdoba, then a Liberal Party senator and a victim of a paramilitary kidnapping.

"Respected Senator," he wrote. "The situation that arose from our extradition has generated a state of helplessness, both for the victims and for us."

In a kind of private truth and reconciliation effort, Ms. Córdoba, along with victims' advocates including Mr. Cepeda, traveled to the United States for jailhouse meetings with Mr. Mancuso — prison officials declined to let him be interviewed by The Times — and other warlords.

Mr. Cepeda said he asked one of them point blank if he knew who had killed his father, a leftist senator murdered in 1994. The paramilitary leader, Don Berna, not only threw out some names but agreed to reveal them to Colombian prosecutors, he said. It took six months to arrange a meeting.

"Finally, the stars aligned and we went with a Colombian prosecutor, and somebody from the Department of Justice, and succeeded in obtaining his

testimony," Mr. Cepeda said. "But that was me. A campesino from Córdoba or Antioquia, where there are thousands of victims, would never have been able to go through this exercise."

Colombia's attorney general and justices joined advocates in complaining to the Obama administration, which had inherited the cases, that their pursuit of justice was being thwarted. As a result, in 2010, the Justice Department created an "access plan," promising to make about a dozen key paramilitaries available for in-person or video interviews — if the men were willing.

Mr. Carr, spokesman for the Justice Department, said that more than 2,000 video depositions and interviews with paramilitary leaders had taken place, and that some had been televised to centers in Colombia from which victims could ask questions.

Still, even in the cases of those leaders like Mr. Mancuso who participated most actively, these sessions were insufficient, according to a Colombian prosecutor who testified last year in his case.

"In total, we progressed maybe 8 percent of what we have to progress," said the prosecutor, Giovanni Álvarez Santoyo. He noted that Mr. Mancuso had been charged in 4,800 "matters," from "murder to forced disappearances, through forced removals, recruiting of minors, sexual violence, sexual slavery, and related crimes such as kidnapping, terrorism, theft and destruction of protected property."

It is impossible to know how things would have been different if the leaders had not been extradited — whether more truth would have been divulged, whether greater or quicker justice would have been done, and whether the paramilitary groups would have been more successfully, or less successfully, dismantled.

Iván Velásquez, who led the Supreme Court's paramilitary corruption investigation, said at a forum in Bogotá a few years ago that the truth-telling by paramilitary leaders was not impressive before or after the extraditions.

"Many of them reduced a good part of their 'collaboration,' as we call their obligation to tell the truth, to relating in a decontextualized manner the murders

committed — justifying them by portraying their victims as guerrillas dressed in civilian clothing — and revealing the locations of graves," he said.

Guaranteeing "nonrepetition" of their atrocities would have required far more — "revelations about the sponsors, financiers, promoters, beneficiaries or owners of those criminal structures, which in many cases remain intact," he said.

Over the past decade, 128 ex-paramilitary members have been sentenced in the Justice and Peace process, out of more than 1,000 detained, according to the Colombian government. But even as the country prepares to set up another transitional justice system for the FARC, Justice and Peace keeps inching forward.

As do the para-political inquiries: In February, Mr. Uribe's younger brother, Santiago, was arrested for supposed ties to a death squad, the Twelve Apostles.

The former president himself was investigated last year for alleged paramilitary ties, but not charged. Now a senator, he considers investigations of him and his family to be politically motivated. Mr. Uribe is the most virulent critic of his successor's peace deal with the guerrillas; he accuses Mr. Santos of what he himself was accused of in relation to the militias: offering impunity to war criminals.

President Santos has said he hopes that one dividend of the peace accord will be a reduction in the drug trafficking that financed the internal armed conflict. Coca cultivation has been soaring in Colombia, with a significant increase over the last couple of years in acreage dedicated to drug crops.

Extradition as a panacea has fallen out of favor. Colombia extraditions to the United States were half as frequent in 2015 — 109 — as the year the paramilitary leaders were sent away. And the new accord, if approved by voters, would guarantee the guerrilla leaders protection against extradition for their drug smuggling — with the blessing of the Americans.

"If you want to see that as the U.S.'s contribution to the peace process, you're welcome to do so," Kevin Whitaker, the American ambassador to Colombia, told Radio Caracol.

## Achieving Standing as Victims

This year, two young women cautiously approached the authorities in Santa Marta. They had decided to reveal that they had been victims of Mr. Giraldo's sexual violence even after he surrendered and pledged to stop committing crimes.

When they were under 14, they said, they were taken to Mr. Giraldo for conjugal visits, both in a special detention zone for paramilitary members and later in a jail.

So potentially damaging are their allegations that the young women are now in protective custody. "This year, it fell to me, initially, to protect the two girls who made the denunciations, and we got them out of the area because Giraldo's sons were going to kill them," said Ms. Zúñiga, the Santa Marta security chief.

Mr. Giraldo called the allegations "lies."

"Lots of victims are popping up in Colombia because they give them money," he said, referring to reparations, which relatively few victims have obtained.

If proved, the allegations would be grounds to deny Mr. Giraldo the eight-year alternative sentence he would get under Justice and Peace. He would face spending the rest of his life in a Colombian prison — if the United States sent him back.

This is an eventuality that the Henríquezes do not think they can bank on.

It took almost eight years for the United States to recognize them as victims of standing in Mr. Giraldo's American case. Their lawyers took a novel approach in arguing that the Crime Victims' Rights Act of 2004 applied to them. They argued that even though Mr. Henríquez was a foreign victim of a foreign crime, his murder was a consequence of the drug conspiracy to which Mr. Giraldo pleaded guilty.

The Justice Department did not agree, and for years did not confer with the Henriquezes about major case decisions or keep them apprised of proceedings.

And the Henríquezes were in the complete dark because the Justice Department had gotten the judge to seal key events and records in the case — as well as to seal its motion requesting the sealing. It was not until the Reporters Committee for Freedom of the Press filed suit last year that the docket for the case was made public.

Although Judge Walton initially denied the Henríquezes status as victims, he changed his mind after the United States Court of Appeals for the District of Columbia urged him to reconsider. "I think the movants have established their burden of showing that but for the defendant's involvement in the conspiracy the decedent would not have been killed," he said at a hearing in March.

Mr. Feitel, who considers the Henríquezes "pesky, phony victims barking at my client's heels," was disappointed.

From a broader perspective, Paul G. Cassell, a former federal judge and an expert on victims' rights, said international drug smuggling cases were generally treated like victimless crimes. "This is truly precedent-setting," he said.

It could have implications for violent drug lords like Joaquín Guzmán — El Chapo — whose extradition has been approved by Mexico.

After the March hearing, Ms. Altholz called Mr. Henríquez's daughters from outside the federal courthouse. "Ganamos!" she said. "We won!"

The Henríquez sisters do not like to talk to each other about developments in the case because it dredges up their grief. "We're like those little rubber dolls where you push a button and they fall apart," Bela Henríquez said. "But I was happy."

Nadiezhda Henríquez was more guarded.

"These rights are merely procedural," she said. "This has meaning, but it's pretty limited in terms of what is internationally recognized as victims' rights: truth, justice and reparation."

In its prosecutions of the Colombian warlords, she said, the American government engaged in "negotiations over justice, and that is not justice." It focused on the harm done to the United States, and not on "what they did to us."

The Henríquezes are asking for the maximum penalty for Mr. Giraldo — just short of life in prison. At the least, Ms. Henríquez said, "we want sufficient time so that this can be dismantled, so that in my land there can be peace."

Whether the paramilitary forces were ever truly dismantled, and what role the extraditions played, have been matters of debate in Colombia. But the illegal armed groups — called bacrims, short for criminal bands in Spanish — that surged after the militias disbanded are formally considered their successors in the peace accord.

In the Santa Marta region, the most recent flare-up of neo-paramilitary violence occurred in late 2013. Hundreds of civilians were forced to flee their mountain villages during a bloody confrontation between the Giraldo Clan and a rival group that lasted four months and left hundreds dead. Since then, his relatives have mainly fought one another.

"If Giraldo were here in jail rather than in Virginia, we wouldn't see the territorial disputes," Ms. Zúñiga said. Still, she added, "I don't think Santa Marta is ready for him to return."

Bela Henríquez, though her American visa is pending, said she looked forward to confronting in a Washington courtroom the man convicted in absentia for her father's disappearance.

"I don't know what Hernán Giraldo will be thinking, but at least he will have to see that the crimes he committed in Colombia have not been forgotten," she said. "He will have to recognize that his 'business' cost lives, and not just the lives of one leader or one community. It will affect the families who had to bear the brunt of the violence, yes. But it will also influence the history of our whole country for generations to come."

### Correction: September 18, 2016

An article last Sunday about the extradition of Colombian paramilitary men to the United States referred incorrectly to the "dividend" earned by some on their release from American prisons. They won relief against removal to Colombia, which has translated into residency; they did not receive green cards.
Follow Deborah Sontag on Twitter.

A version of this article appears in print on September 11, 2016, on page A1 of the New York edition with the headline: U.S. Extradition Benefits Warlords From Colombia.

© 2016 The New York Times Company