UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | : | Cr. No. 04 CR. 114 (RBW) |
| | : | **REDACTED** |
| V. | : | |
| HERNAN GIRLADO-SERNA | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**INTRODUCTION**

Defendant Hernan Giraldo-Serna is a sixty-eight (68) year old Colombian citizen, who is before this Court for sentencing, after having pled guilty to one count of Conspiracy To Manufacture and Distribute More Than Five Kilograms Of Cocaine, Knowing Or Intending That It Would Be Unlawfully Imported Into the United States, in violation of 21 United States Code Sections 963 and 959. The Presentence Report in this case calculated Hernan's adjusted sentencing guideline range as Level 41, which corresponds to 324-405 months. The defendant has been continuously incarcerated since he voluntarily demobilized and surrendered in Colombia on February 3, 2006, with full knowledge that he would be extradited to the United States. By the time of his sentencing he will have served more than eleven (11) physical years in custody, under onerous conditions of confinement in a jail thousands of miles from his home and family.

As described more fully in this memorandum, this defendant's criminal conduct was not motivated by greed or avarice, or by willful contempt for the law and its consequences. Rather, the defendant was compelled to become involved in the self-defense group known as the AUC because of patriotism and a sense of duty, honor, and obligation to protect the peasant farming

community where he was raised from the unrelenting violence of the terrorist group known as the FARC. The attendant drug trafficking was solely for the purpose of maintaining the defense force. The defendant understands that his motive is not a defense to the charges brought against him, but at the same time it is a matter that this court can consider when imposing sentence. See United States v. Thavaraja, 740 F.3d 253 (2d Cir. 2014)( sentence reduction of more than fifty percent affirmed for member of Sri Lankan resistance in civil war whose motive was to obtain peace for his community).

Hernan Giraldo-Serna was extradited to the United States in 2008 and has been fully cooperating with law enforcement agents and prosecutors since the moment he arrived in this country. He entered a guilty plea and is eligible for a three-point reduction for his prompt admission of guilt. Moreover, the Government has indicated that it will be filing a motion pursuant to 5K1.1 of the Federal Sentencing Guidelines to permit a reduction of the defendant's sentence to the ten-year mandatory minimum as the result of his "substantial assistance." A summary of that cooperation will be filed by the defense with this Court and the prosecution *ex parte* and under seal.

Despite his extradition to the United States, Hernan has continued his cooperation with Colombian authorities. He provided extraordinary assistance in that country's reconciliation process, known as Justice and Peace, giving more than three hundred interviews to Colombian magistrates and prosecutors via videoconference. He has also paid significant sums in reparations under Justice and Peace. Even after his return to Colombia, the defendant's criminal problems will not be over. There are numerous criminal charges pending against him in Colombia and it is a certainty that he will be arrested upon his return (as was his nephew and former co-defendant Nodier Giraldo) and could face up to eight or more additional years in jail.

Hernan wants nothing more than to resolve this criminal case and return to his native country of Colombia, despite the risks that await him as the result of his cooperation with both the United States and Colombian authorities. He has no intention – and in reality would have no opportunity - to ever again become involved in international drug trafficking. He has tried to demonstrate the sincerity of this claim through his plea of guilty before this Court and his continuous cooperation with law enforcement agents and the prosecutors.

The defendant has written a letter directly to this Court explaining (not excusing) his conduct and remorse. As further testament to Hernan's character and credibility, attached are also twenty (20) letters of support from his family, friends, and other persons from his community and religious life. Also annexed to this memorandum is a Declaration by the defendant's principal Colombian defense attorney providing background information and context for the defendant's activities against the backdrop of the civil war with the FARC. Finally, the presence of the Henriquez family in this case should not alter the calculus of the Court's sentencing decision. The tragedy of Henriquez's murder is a matter before the Colombian courts and upon his return the defendant will be required to serve an additional jail sentence for crimes in Colombia, including the murder.

Based upon the totality of circumstances presented in this case, including the factors set forth in 18 United States Code Section 3553(a), **the defense requests a sentence of twelve years**. This is a significant amount of time in jail given the defendant's advanced age, other personal characteristics, and would also be consistent with the sentences imposed by this Court and other judges in the jurisdiction on other AUC members – most particularly the sentence imposed upon the unrepentant Rodrigo Tovar Pupo (Jorge 40). As such, the requested sentence

would further the Supreme Court's admonition that a sentence imposed be "sufficient, but no greater than necessary" to punish. Kimbrough v. United States, 552 U.S. 85, 101 (2007).

**LEGAL OVERVIEW**

**This Court Has Discretion To Impose A Below Guidelines Sentence**

In undersigned counsel's experience, most sentencing memoranda recite as a matter of course the now well established legal principles that govern the manner in which the federal sentencing guidelines are to be imposed. It remains critical, however, to point out that the legal paradigm governing the imposition of federal guideline sentences has been dramatically altered and that federal judges are no longer relegated to status as "automatons," armed with calculator and pencil and the federal sentencing guidelines manual. The change in sentencing law began with the Supreme Court conclusion almost a decade ago in United States v. Booker, 542 U.S. 220 (2005), that the federal sentencing guidelines were not mandatory, but merely advisory upon the district courts. The change occasioned by *Booker* has grown exponentially; thus while a sentencing court will generally begin its analysis with consideration of the relevant guideline range, it "should" entertain arguments from the parties as to whether a non-guidelines sentence is appropriate. Rita v. United States, 551 U.S. 338, 351 (2007). In making this decision, the trial court will generally consider the sentencing factors set forth in 18 U.S.C. Section 3553(a). Kimbrough v. United States, 552 U.S. 85, 109 (2007). Without doubt the district courts have the discretion to impose a non-guideline sentence based upon their assessment of each individual case. See Gall v. United States, 552 U.S. 38, 47-48 (2007)(abuse of discretion standard applies to review of sentence outside guideline range and there is no mathematical test for reasonableness of sentence).

That analysis thus begins with the calculation of the adjusted sentence guideline calculation.

**Presentence Report Adjusted Guideline Calculation**

In this case, the Presentence Report computed the defendant's guideline calculation as follows:

| | |
|---|---:|
| Base Offense Level (150 kgs of more of cocaine) | 38 |
| Leadership Adjustment | 4 |
| Possession of A Firearm | 2 |
| Downward Adjustment Acceptance of Responsibility | -2 |
| Early Entry of Plea | -1 |
| Adjusted Total Offense Level | 41 |
| | (324 – 405 months) |

The Government did not file any objection to the Presentence Report and the defense concurs in the above calculation. See PSR at pages 10-11.

**Sentencing Guideline Factors**

Once the adjusted guideline offense level has been calculated, the Court then turns to a consideration of the following statutory sentencing factors: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentencing to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment; (3) specific and general deterrence; (4) the need to provide the defendant with training, medical care, or treatment; available sentencing alternatives; (5) consistency in sentencing among similarly-situated defendants; and (6) the need to provide restitution. See 18 U.S.C. § 3553(a).

**THE APPROPRIATE SENTENCE TO BE IMPOSED**

**Defendant's Personal History And Nature And Circumstances of the Offense**

*His Early Years In Colombia*

Hernan Giraldo-Serna is a sixty-eight (68) year-old Colombian citizen, who was born in San Bartolome, Caldas, a rural area in the center of Colombia. Hernan is the son of a peasant family and from an early age was personally subjected to the violence perpetrated by the FARC against thousands of peasants in his community. Beginning when he was only five years old, Hernan's family was subjected to several forced displacements as the result of violence in his region and his family moved first to Quindío, a department in the western central region of the country, then later to the Sierra Nevada de Santa Marta, a remote region in the world's highest mountain range.

At age eleven, Hernan had to stop his formal education and began working on coffee plantations to support his parents and six siblings. As the result of his own physical labor, by age 18, he had hand cleared and was farming approximately 432 acres of plantain and corn. From 1975 to 1985, Hernan organized the community and expanded his cultivation with the aid of other peasant farmers. As an example of how modest were the circumstances in his community, after ten years of work Hernan was finally able to fulfilled his parents' "lifelong dream" of obtaining both a horse and a cow.

During this era, the Sierra Nevada was a remote and isolated location, populated by small farming communities, without direct access to Colombia's capital and without any significant governmental involvement in education, roads, public health or safety. During the thirty-five years that he lived in the region, Hernan supported and aided thousands of families in the region by helping to organize the construction of roads, schools, and hospitals.

Beginning in 1982, however, the FARC began to infiltrate the Sierra Nevada as part of a campaign of extortion, kidnapping and theft against the law-abiding citizens in the region. The peasant farmers, including Hernan (who was by then a significant land owner in the region that was respected by the population) rejected the FARC demands. Just a few days later, Hernan was the victim of a murder attempt in Santa Marta. A grenade was thrown at him while he was standing in the village square and the explosion tore apart Hernan's digestive tract, ultimately having to replace sixty-five centimeters of his intestine. This attack caused irreparable damage to his digestive system, right ear, lumbar spine, and gallbladder. This was just the first of three other murder attempts against Hernan by the FARC.

The FARC continued its efforts to subdue the local population through violence and intimidation and Hernan and the other members of the region petitioned for help to from the Colombian military forces. Unfortunately, the FARC had already begun a massive crusade throughout Colombia against peasant farmers, kidnapping and killing its opponents and forcing children into military service. See e.g., *https://en.wikipedia.org/wiki/FARC*.  The Colombian government did not have effective control of its entire territory and lacked the capability to protect its own citizens. Hernan remembers countless occasions in which he asked for help from the Colombian National Police and the National Army, but despite his pleas, help did not come. In total, at least four other members of Hernan's immediate family were murdered by the FARC, including his parents Jesus Giraldo and Virgelina Serna, as well as his brother Libardo Giraldo.

The Colombian Government's failure to protect its citizens created the necessity for the peasants to organize and protect themselves and this was why the Auto-Defense Forces of Colombia was first created. By 1988, Hernan and other peasants organized a group of young men to volunteer for Colombian national military service. The hope was that these men would

come back with training and military skills that would help them to protect against the FARC. From 1988 to 1996, this local self-defense group, named *the Self Defense Forces Of The Peasant Farmers of Magdelana and Guajira* (*ACMG*) ultimately consisted of more than two hundred trained men. Until this point in time, Hernan and other landowners of the region were subsidizing and supporting their cause solely by agriculture profits. This process, however, was going to change dramatically as the result of the use of deadly force against Hernan and his community by other self-defense groups.

### *The AUC, Self-Defense, and Drug Trafficking In The Region*

In 1998, Carlos Castaño Gil, kingpin and founder of the *Self-Defense Forces of Córdoba and Urabá* dispatched an emissary to discuss with Hernan the possibility of forming an alliance between both fronts. Gil also made it clear that the AUC groups would need to tax drug traffickers for using the Sierra Nevada region as a point of transit for their drug shipments to the coast. It is beyond dispute that Hernan rejected this request. As a result, other AUC elements led by Salvatore Mancuso and Rodrigo Tovar Pupo, waged an internecine war against Hernan's *AMCG*. Uniformed and armed members of Pupo's group marched into the *ACMG* region, blocked roads, commandeered schools, and attacked anyone who opposed their presence. As a result, more than one hundred and fifty peasant farmers were murdered. Hernan was unable – and unwilling - to risk the lives of the remaining 150,000 people in his community and thus, the *ACMG* was forced to be part of the new group, named the *Tayrona Resistance Front*.

Hernan was never satisfied with this alliance, but he concluded that it was better to submit than to allow other peasants of the region be murdered. As a result of the new hierarchy, Hernan was **ordered to impose taxes** on the cultivation of cocaine in the region and on drug traffickers transporting loads through their area of control. Hernan's group was ordered to turn

over sixty percent (60%) of the amount collected from drug trafficking activities in the area. The remaining forty percent (40%) was used to support and feed the armed peasants in the region. The relationship between Hernan's group and the larger AUC was precarious. Jorge 40's intentions were to profit from his trafficking activities at the expense of the peasants and the region. During this era, hundreds of local families were murdered and displaced and the region suffered catastrophic financial displacement.

Moreover, although Hernan knew that taxes were being imposed, he was not directly involved in the details of the collection efforts. That responsibility was delegated to other local AUC commanders named Walter Torres and Jairo Pacho Musso, along with the assistance of Hernan's nephew, named Nodier Giraldo. Musso and Torres were in charge of collecting taxes in the lowest part of the mountain while Hernan focused on agriculture and social activities in the region. In exchange for these "war taxes," the AUC would ensure that the traffickers were not molested by the FARC or other criminal elements. The Presentence Report concluded that the amount of cocaine attributed to the defendant is "in excess of 1,500 kilograms," but no more precise amount is identified. See PSR at Paras 24-27.

Hernan was initially opposed to taxing drug trafficking activities and continued to be opposed to cocoa cultivation. Hernan eventually became one of the main supporters of Colombian government initiatives focused towards drug eradication in the area. This initiative was supported by the United Nations and the United States under *Plan Colombia*. Between 2002 and 2005, without "Jorge 40" and Mancuso's knowledge and/or consent, Hernan secretly started

a campaign to eradicate drug cultivation among peasants. [1]

From 1998 until late 2005, the war between the AUC and the FARC continued in Colombia. In many respects, the AUC served as a proxy for the Colombian army and coordinated its land campaigns with the military, while receiving air support from the air force. In early 2006 the Colombian government was finally able to offer consistent aid to the region and Hernan Giraldo-Serna decided to demobilize after years of civil war. On February 3, 2006, he and his nephew Nodier voluntarily reported to a prison camp, where they remained incarcerated until their extradition to the United States on May 13, 2008. After being extradited to the United States, and while being incarcerated at the D.C. jail in Washington, D.C., the defendant had a confrontation with "Jorge 40," who blamed Hernan for leaving him no option but to demobilize. Hernan's answer was direct: "I prefer to be locked up here far away from home, rather than witnessing all the peasants' massacres perpetuated by your group in the zone. I had two choices and I do not regret being here."

**Seriousness of the Offense/Promote Respect for the Law/Just Punishment**

There is no doubt that the crime for which the defendant admitted his guilt is a serious matter. Hernan Giraldo-Serna knows that he violated the law in the United States and has done all that is within his power to acknowledge responsibility for his actions. He entered an early guilty plea in this case and has met with the prosecutors and agents assigned to this case whenever requested. They have determined that the information he provided about his own

---

[1] According to the defendant, in 2002, Santiago Giraldo (no relation), a local famer lost his crops after they were fumigated with glyphosate--a broad-spectrum crop desiccant that was intended to destroy cocoa plants. Hernan gave him cattle, corn, and plantain crops. Hernan used this example amongst the peasants to show the consequences and risks of having illicit cultivations in their farms. As a result, approximately fifty neighbor families were convinced by Hernan to substitute other crops for cocoa and by 2004, 4,750 families in the Sierra Nevada substituted illicit crops with agriculture products.

activities and that of others was complete and as a result, intend to file a motion for a sentence reduction as the result of his substantial assistance.

The task of fashioning a sentence to promote respect for the law, to reflect the seriousness of the offense and to provide for just punishment is in many respects an existential quest. But at least one district court judge has noted that "it is not always necessary to incarcerate a defendant to promote such respect and demonstrate the seriousness of the crime." United States v. Smith, 2009 WL 24917 (N.D. Ohio). What promotes respect for the law is a fair sentence and under the totality of the circumstances.

In considering the nature of the offense, however, this Court can - and should - look to the defendant's motivation. In United States v. Thavaraja, 740 F.3dc 253 (2d Cir. 2014), the Court of Appeals affirmed the district court's sentence reduction from a guideline range of twenty years, to 108 months. The defendant was a native of Sri Lanka, who had been involved in the illegal purchase of more than twenty million dollars of military grade weapons in violation of international conventions and the payment of bribes to public officials. The district court noted that the defendant's conduct was motivated by a genuine desire to help his people achieve freedom and democracy and that by the time of his sentencing had already been separated from his family and friends for almost six years. The sentencing judge explained the reason for his variance as follows:

> Despite his serious criminal conduct, all indications are that this defendant, like most of his co-defendants, is a person of substance and decency who was motivated solely to assist the Tamil minority in Sri Lanka who were engaged in an ongoing civil war that it now appears involved serious human rights violations on both sides of the conflict.
> ...
> The defendant has been in custody for almost six years, separated from his family for the entire period. In the Court's view, supported by judges with whom I have consulted, a substantial variance is appropriate and reasonable given the full range of circumstances presented.

Thavaraja, 740 F.3d 253, 258 (2d Cir. 2014).

A unanimous Court of Appeals affirmed, noting that "while these motivations do not justify or excuse acts of terrorism, it is not inappropriate for the District Court to take the defendant's motivations into account." Id. at 260. The facts of the instant case mirror in most important respects the scenario presented to the *Tavaraja* court and give the similarity in the motive of the respective defendants, a similar sentence reduction would be warranted.

With respect to the issue of just punishment, the circumstances present in this case fully support the conclusion that Hernan was subjected to significantly harsher conditions of confinement than a typical federal inmate. The defendant has been incarcerated in the United States for almost nine years, first at the D.C. Jail and then for the last eight years at the Northern Neck Regional Jail in Warsaw, Virginia. The conditions of confinement at the D.C. jail are so deplorable that a recent report commissioned by the Washington Lawyers' Committee for Civil Rights concluded that the "physical infrastructure appears to be crumbling and multiple inspections have revealed unsanitary conditions and non-compliance with basic standards established by national correctional authorities." The Report recommended that the jail should be closed. See http://www.washlaw.org/pdf/conditions_of_confinement_report.PDF at pages 12, 48.

The conditions of confinement at the Northern Neck Regional Jail are possibly worse. The jail was designed to house pre-trial detainees or inmates serving short sentences. The prisoners at Northern Neck are only allowed outside one hour every fifteen days, but that privilege is frequently cancelled when it is hot, cold, wet or the guards otherwise are occupied. The quantity and quality of the food served the inmates can fairly be described as sub-standard. More troubling, there is a decided lack of medical treatment available to Northern Neck inmates. Undersigned had a client at the jail who had an untreated hernia for more than a year and the

medical situation was only resolved after the intervention of another member of this court. During the time that undersigned has represented the defendant, he has been forced to call the jail numerous times to follow up on medical issues.

The defendant was incarcerated at Northern Neck because it has two-way video-conferencing facilities that permitted Hernan to participate in his Justice and Peace interviews. The defendant understands that incarceration is not a vacation and that jails are not hotels, but the conditions of his pretrial confinement were significantly more onerous than those faced by a typical defendant. Hernan was also jailed thousands of miles away from his home and family and has had no personal visitation the entire time he has been incarcerated in the United States.[2] Whenever a defendant is extradited from Colombia to the United States, the visas of family members are immediately cancelled. Thus, Hernan Giraldo-Serna has endured his time in jail, alone and without the support of his family and other loved ones. He has rarely been outside to see the sun and in undersigned's opinion, the eleven years of his incarceration have aged the defendant beyond measure.

The defendant's status as a foreign national will also cause him to be subjected to more onerous punishment after the imposition of sentence. First, under Bureau of Prison guidelines, the defendant cannot be sent to a prison "camp" to serve any remaining portion of his sentence. Second, he is likewise not eligible to work in prison industries. Third, he will not be sent to a halfway house six months prior to his release date in order to help his re-integration into society. In United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994), the Court of Appeals specifically

---

[2] The defendant asks this Court to specifically state on the Judgment and Commitment Order that he is receive credit for time served beginning on February 3, 2006, the date that he surrendered to the authorities in Colombia, knowing that he would be extradited to the United States. This is the date that the Bureau of Prisons used for determining good time credit in the case of co-defendant Martin Peneranda-Osorio and this Court accepted the same date for the purposes of good time computation in the case of Hernan's nephew, Nodier Giraldo-Giraldo.

approved a "downward departure" because of a defendant's status as a deportable alien because they were ineligible to spend the last six months of their sentences in community-based confinement. <u>Accord</u> <u>United States v. Graham</u>, 83 F.3d 1466, 1481 (D.C. Cir. 1996)(internal quotations omitted). In the recent case of Rodrigo Tovar Pupo, this Court expressly reduced the defendant's sentence by six months under the reasoning of the *Smith* case. An equal sentence reduction should be applied to this case as well.

Finally, at the conclusion of his sentence the defendant will not immediately be deported back to Colombia, but rather will be sent to an immigration detention facility for an unspecified amount of time. These immigration facilities are located in remote regions in the Southern United States and their populations consist of transient ex-inmates awaiting deportation to their native countries. They are often overcrowded and dangerous, filled with anxious and oftentimes angry ex-inmates, many of whom do not wish to be deported.

The defense asks that this Court consider the totality of these circumstances in considering the appropriate sentence to impose in this case.

### Specific and General Deterrence/Prevent Future Crimes/Just Punishment

The factor of specific deterrence also supports the sentence requested by the defense in this case. Defendant Hernan Giraldo Serna admitted his involvement in drug trafficking in this case when he pled guilty. Moreover, he also agreed that he was a "leader" in the conspiracy and to an upward adjustment based upon carrying a firearm during the course of the conspiracy.

The defendant has written this Court a letter, describing in his own words that he pled guilty because he "was guilty." The defendant has vowed to never again become involved in criminal activities, but wants to return home and try to make up for all the years he has been apart from his family and loved ones. In the defendant's own words, upon his return to

Colombia, he will raise cattle or farm or wash dishes or floors or drive a taxicab, but he will never again be involved in such criminal matters. There is every reason to believe this representation. The civil war in Colombia has ended and the government has entered into a peace treaty with the FARC. See www.nytimes.com/2016/11/30/world/americas/colombia-farc-accord-juan-manuel-santos.html. The AUC no longer exists and this defendant would have no motive, reason or opportunity to be involved in the collection of "war taxes." Accordingly, this Court should conclude that the need for specific deterrence in this case is diminished. A copy of the defendant's letter and an English translation thereof is attached hereto as Exhibit 1.

Moreover, the defendant can count upon the support and love of his extensive family and network of friends upon his return to Colombia. Attached for the Court's consideration are more than twenty letters (along with English translations) from the defendant's family and friends and other members of his community. It is not merely the quantity of letters, but their content, that attests to the defendant's character.[3] His family members miss him dearly and the letters from community members uniformly praise him for his leadership in organizing against the FARC. A letter dated April 12, 2016 from Rosalba Leon Sierra summarizes the sentiment expressed by all:

> . . this rural zone was quite distant from the urban zone, and abandoned by the state, it was targeted by subversive groups outside the law that arrived and depriving farmers from their belongings without any justification. In response, Mr. Giraldo Serna took leadership and organized a group with peasants from different villages near Santa Marta, exercising control over them to defend the peasants' properties and protect their rights.
>
> On the other hand, I have full knowledge that Mr. Giraldo Serna collaborated with eradication of illicit crops and justice, participating in a peace process for the good of the region and country.

---

[3] One of the letters is signed by eighty-three (83) community members.

With respect to this issue of specific deterrence, this Court should also conclude that because the defendant is sixty-eight years old, his likelihood of recidivism is greatly decreased. This principle has been recognized in numerous cases where a below guideline sentence was imposed as the result of a defendant's age. See United States v. Martinez, 2007 WL 593629 (D. Kan)(according to data compiled by the Federal Sentencing Guideline Commission recidivism decreases with age). Accord United States v. Jayyousi, 657 F.3d 1085, 1171 (11 Cir. 2007). See also United States v. Carmona–Rodriguez, 2005 WL 840464 (S.D.N.Y.)(defendants over the age of forty exhibit markedly lower rates of recidivism"). [4]

Finally, there is every reason to believe that the defendant will be incarcerated upon his return to Colombia, for an additional eight years or more. A brief explanation follows. In order to help resolve the divide caused by the civil war in Colombia, the Government established a reconciliation program for former AUC members called Justice and Peace. The process authorizes a maximum sentence of eight years for participating AUC members, who are required to admit culpability for any and all activities taken by them or anyone under their command. In order to encourage participation by extradited AUC members, the process initially provided that the eight years may be served in jail in a foreign country, including the United States.

Since his arrival in the United States, the defendant continued to participate in Justice and Peace and has given hundreds of detailed admissions against his penal interest to Colombian magistrates and prosecutors. In the last year and a half, however, the Colombian courts have indicated that the sentences under Justice and Peace will not be concurrent to time spent in jail in the United States. Worse, the defendant's Colombian lawyers have advised that his inculpatory

---

[4] As a result of his advancing age, the defendant is taking medication for high blood pressure, gout, ulcers, gastro reflux and is relatively constant pain as the result of the injuries he sustained in the grenade attack on his life. See PSR at paras. 58-62.

statements may also be used against him in the Colombian criminal justice system. Indeed, the defendant's nephew, Nodier Giraldo Giraldo, who served ten years in the United States, was arrested by the Colombian authorities at the Bogota airport, upon his return in May of this 2015. See http://www.semana.com/nacion/articulo/nodier-giraldo-tas-pagar-pena-en-ee-uu-llega-carcel-en-colombia/429151-3. Nodier Giraldo Giraldo remained incarcerated for almost two years after his return home, despite his complete participation in the Justice and Peace process.

With respect to Hernan Giraldo-Serna, in addition to the Justice and Peace process, there are several criminal cases pending against him, including the Henriquez murder case. If the defendant should fail to continue his cooperation with Justice and Peace or if the Colombian authorities should conclude that he has not been honest, his participation can be terminated and he would be required to serve sentences for all those matters. The need for any significant additional jail time for this defendant in the United States is thus greatly reduced because it appears almost certain that he will be sentenced to at least an additional eight years of incarceration in Colombia. [5]

**Consistency In Sentencing Among Similarly-Situated Defendants**

This factor also supports the sentence requested by the defense in this case. While it is often complicated to make a meaningful comparison between "similarly situated" defendants, in this case the sentences recently imposed against two AUC commanders, who occupied senior level positions in the AUC are instructive. They are: (1) Salvatore Mancuso; and (2) Rodrigo Tovar Pupo.

---

[5] With respect to the sentencing factor of general deterrence, the United States Government is currently requesting the extradition of more than two hundred Colombian nationals every year. The message that every drug trafficker the United States can identify will be arrested and brought to the United States is made clear on a regular basis in Colombian print and television news, which regularly provides detailed information about extraditions to the United States. No further general deterrence would be accomplished by additional punishment for this defendant.

*Salvatore Mancuso*

Salvatore Mancuso was the highest-ranking member of the AUC extradited to the United States and one of the principle architects of its decision to finance its paramilitary activities by drug trafficking. Mancuso also had a reputation for violence, against the FARC, and also against innocent Colombian civilian in the zones that he controlled. The Statement of Facts entered into by Mancuso included an admission that he was responsible for the importation of 138,000 kilograms of cocaine. *United States v. Mancuso*, Cr. 02-388 (DE 149 at para.4). In sharp contrast, the prosecution in this case has indicated that the defendant is responsible for something in excess of 1,500 kilograms of cocaine, or .01 percent of Mancuso's total

In addition to his drug trafficking, Mancuso was involved with what can only be described as a series of human rights atrocities in his role as AUC commander. According to the prosecutors in his case:

> Mancuso provided information about and/or accepted command responsibility for "forced disappearances committed by members of the blocs that comprised the organization he commanded." . . . Although no exhumations were performed based on information from Mancuso, 223 bodies had been located and recovered based on information supplied by other AUC members, of which 154 had been reliably identified. Id. Mancuso also accepted responsibility for what were termed "high profile acts," meaning certain aggravated offenses, including massacres that occurred in 1997 and 2000, the murder and disappearance of students from the University de Cordoba, the murder and attempted murder of trade unionists, and the murders of two special prosecutors of the city of Cucuta.

See DE 233, *Government's Redacted Sentencing Memorandum And Motion Pursuant to USSG 5K1.1* at p. 15.

The Government recommended a sentence for Salvatore Mancuso of "no less than 263 months of incarceration." Judge Huvelle imposed 190 months, or 15 years and 10 months. Given Mancuso's exponentially larger involvement in drug trafficking and his admitted human rights

violations, any fair comparison to Hernan Giraldo Serna supports the requested twelve year sentence.

***Rodrigo Tovar Pupo (aka Jorge 40)***

The sentence recently imposed by this Court in the case of United States v. Rodrigo Tovar Pupo, provides additional support for a twelve-year sentence for defendant Giraldo Serana. Tovar Pupo was another high-ranking member of the AUC and controlled several different zones in the northern part of the country. He was in charge of the AUC forces that compelled Hernan Giraldo Serna's defense group to become involved in the imposition of taxes on drug traffickers. Tovar-Pupo was extradited to the United States and entered a plea of guilty to international drug trafficking conspiracy. In the Statement of Facts, the defendant admitted that he imposed a "war tax" on drug traffickers moving cocaine through his area of control and that in return, his troops provided protection so the traffickers could load the drugs on to "fast boats" with large shipments of cocaine "ultimately destined for the United States."

More than two years later, Tovar-Pupo sought to withdraw his plea. During a protracted evidentiary hearing before this Court, Tovar-Pupo testified that he had no knowledge where the drugs were going, that he had "lied" during the plea colloquy before the Court, and that he was innocent of the charges against him. The Court denied the motion to withdraw and the case proceeded to sentencing on November 6, 2015.

The Government requested a sentence of thirty years, noting the "enormous amount of cocaine for which the defendant is accountable, the length of time he was linked to drug trafficking, and the armed force employed by the defendant as a leader and organizer to pursue and gain his criminal objectives [and] his lack of remorse and acceptance of responsibility." See DE 486, *United States v. Tovar Pupo*, 04 Cr. 114. The defendant was not considered to be "in

cooperation" with the United States and no motion for a downward departure based upon substantial assistance was filed with the Court. Tovar-Pupo did not participate in Colombia's Justice and Peace process by giving honest testimony or by providing for reparations for the victims of the civil war and was excluded from the program in 2015. <u>See</u>

<u>http://colombiareports.com/extradited-warlord-sees-judicial-benefits-in-colombia-revoked/</u>

Despite the Government's request, this Court ultimately sentenced Tovar Pupo to 198 months, or sixteen and one half years, almost fifty percent less than the Government requested. Given defendant Hernan Girlado-Serna's role in the conspiracy charged in this case and the cooperation detailed in the following section, a twelve-year sentence would be fully consistent with the periods of incarceration imposed upon similarly situated defendants, including his co-defendants in this case. [6]

None of the remaining federal sentencing factors appear to be relevant in this case. [7]

---

[6] The sentences imposed by this Court upon the co-defendants in this case also support the requested sentence. Co-defendant Jairo Antonio Musso-Torres was an acknowledged drug trafficker who controlled the movement of drugs on the north coast and ran a gang of assassins. He received **90 months**. Co-defendant Jesus Antonio Giraldo-Serna (the defendant's brother) was another leader in the AUC and did not cooperate in either Justice and Peace or with the United States' authorities. He received a **144 month** sentence. Huber Anibal Gomez-Luna and his brother Edwing Gomez-Luna were drug traffickers who coordinated large drug shipment in fast boats and received a respective **87 and 67 month**s for their criminal conduct. Co-defendant Martin Penerando-Osario was an AUC tax collector who actively aided drug traffickers by providing information about the location of United States, British and Columbian naval forces. He received **120 months**. Eduardo Enrique Vengochea-Mola was another AUC leader, who was responsible for hundreds of homicides in additional to his drug trafficking activities. He received **120 months**. Co-defendant Nodider Giraldo-Giraldo was sentenced by this court to **120 months** in jail. Finally, Juan Carlos Sierra-Ramirez, an AUC leader and financial manager and co-defendant for Salvatore Mancuso was sentenced to slightly more than **sixty months** by Judge Huvelle.

[7] The remaining sentencing factors are: (1) the need to provide the defendant with training, medical care, or treatment; available sentencing alternatives; (2) the need to provide restitution. This defendant is not requesting and does not appear to be in need of any training or other treatment. The defense also requests that this Court not impose an order of restitution because there is no definable group of victims. <u>See</u> 18 U.S.C. Section 3663(a). Similarly, the defense request that no fine be imposed. All of his assets are located in Colombia and have been "frozen" pursuant to a forfeiture process called "Extinction of Dominion."

### SUBSTANTIAL ASSISTANCE

The Government has indicated to the defense that pursuant to Section 5K1.1 of the Federal Sentencing Guidelines, it intends to file a motion to reduce the defendant's sentence as the result of his "substantial assistance." The assistance falls into two discrete categories: (1) cooperation with Colombian authorities in Justice and Peace; and (2) cooperation with United States laws enforcement authorities.

**Justice and Peace**

During the more than eight years that Hernan Giraldo Serna has been incarcerated at the Northern Neck Regional Jail he has participated in approximately three hundred video interviews with prosecutors and magistrates from Colombia. That is a rate of one interview almost every week. During these oftentimes lengthy sessions, the defendant has testified under oath about every aspect of the AUC's activities, including violations of human rights, corruption among Colombian military, police, and political leaders. The penalty for lack of truthfulness is expulsion from the process. To date, Hernan Giraldo-Serna has been completely candid and cooperative with the Colombian authorities and remains actively involved in the process.[8]

This extraordinary cooperation is surely a reflection of the defendant's sincere commitment to rehabilitation and participation in the reconciliation process in Colombia, but his actions also provide an important benefit to the United States. In 2008, when Colombia summarily extradited fourteen AUC leaders to the United States, there was intense concern on the part of Colombia's citizens that the reconciliation process would come to an abrupt end. Colombian President Alvaro Uribe publicly stated that he had requested access to the AUC

---

[8] The defendant has also provided reparations for the victims of the civil war. Among the letters provided to the Court is an April 26, 2016 letter from the Community Participation Foundation of Santa Marta, which provides specifics about the funds donated by the defendant's AUC group to fund local school, churches, parks, roads, and other public projects.

leaders in the United States and William Brownfield, then United States Ambassador to

Colombia also stated that the United States Department of Justice was committed to assisting in

the process. <u>See</u> *Breaking the Grip; Obstacles To Justice For Paramilitary Mafia In Colombia*,

books.google.com/books?id=0yP9buLdQ4wC&pg=PA83&lpg=PA83&dq=us+ambassador+bro

wnfield+on+colombia+extraditions&source=bl&ots=_wOuHSbdF.

Hernan Giraldo-Serna's cooperation stands in stark contrast to that of many other AUC

leaders, who used their power to confiscate property and other assets and then failed to

participate in Justice and Peace.

**Substantial Assistance Provided To United States' Authorities**

The other aspect of the defendant's cooperation is the substantial assistance he provided

to United States law enforcement authorities. The defendant met many times with the federal

prosecutors and agents assigned to this case and although undersigned was not present for every

meeting, he believes that the Government was satisfied with the truthfulness and completeness of

the defendant's responses. As set forth in greater detail, Hernan described his own criminal

activities as well as those of other members of his AUC group, other Colombian drug traffickers,

as well as corruption involving Colombian police, military and political elites.

The following paragraphs summarize that cooperation, but one of the most significant

aspects of this cooperation was ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████





[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Undersigned has not been counsel to defendant Hernan Giraldo-Serna since the beginning of his criminal case. Counsel has undertaken to present all of the instances of the

defendant's cooperation to this Court, but cannot be certain that the list of matters above is complete.

**The Henriquez Murder**

As the result of the Court of Appeals decision in this case, the family of Julio Henriquez was granted status as victims under the Crimes Victim's Rights Act. They have submitted statements to this Court and their lawyers have also filed a sentencing memorandum, in which they ask this Court to impose a "maximum" sentence. The pain and loss suffered by the Henriquez family is palpable and their grief must be unrelenting. Notwithstanding their participation in this case, however, the Court should impose a sentence proportionate to the time given to the other AUC defendants.

First, given the representations made by the Government in its sentencing memoranda concerning violence authorized by Mancuso and Tovar-Pupo, these matters must have been considered by the respective courts in fashioning a sentence for those two defendants, as well as the other AUC defendants who were extradited to the United States. The mandate for consistency among similarly situated defendants should not be abrogated solely because specific victims have appeared in this case.

Second, the submissions by the interveners are not the only version of what happened in Colombia more than sixteen years ago concerning the Henriquez murder. Attached to this memorandum as Exhibit 3 is the sworn declaration of Nodier Giraldo-Giraldo, the defendant's nephew and former co-defendant. In his declaration, Nodier Giraldo-Giraldo testifies that Hernan did not give the order to murder Henriquez and that he only learned about the event after it took place. The declaration also explains that Hernan accepted responsibility for the murder under Justice and Peace because that is how the process was established. In addition, the defense also

submits to this Court as Exhibit 4 the declaration of Hernan Giraldo-Serna's principal Colombian defense attorney, Antonio Obreder, who also states that the defendant did not order this murder. It is also noteworthy that many of the letters submitted by members of Hernan's community in Santa Marta also contended that he was not responsible for the Henriquez murder.

The purpose of these submissions is not to re-litigate the issue of criminal responsibility; Hernan Giraldo-Serna accepted responsibility for the murder in the Colombian Justice and Peace process. But there is obviously more than one side to the story. If there is to be punishment for this matter, then let it be in Colombia, the country where the crime took place and where there is an existing system to resolve this matter.

## CONCLUSION

Every criminal case and every defendant in federal court presents unique facts and circumstances for a Court's consideration in fashioning an appropriate sentence. In the end, the defense submits that Hernan Giraldo-Serna has fully accepted responsibility for his crimes and has done everything within his power to help the United States, without reservation and without regard for consequences of personal safety. He asks only that the Court consider these facts and all the personal factors set forth in this memorandum in its consideration of appropriate punishment.

Respectfully submitted

*Robert Feitel*

_____
Robert Feitel, Esquire
Law Office of Robert Feitel
3509 Connecticut Avenue, N.W.
Washington, D.C.  20009
D.C. Bar No. 366673
202-450-6133 (office)
202-255-6637 (cellular)
RF@RFeitelLaw.com

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a copy of the foregoing was sent, via email to Department of Justice Trial Attorney Paul Laymon at the Narcotic and Dangerous Drug Section this 28th day of February, 2017.

*Robert Feitel*

_____
Robert Feitel